## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| THE CHEROKEE NATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| MCKESSON CORPORATION; | ) | Case No. 6:18-cv-00056-RAW |
| CARDINAL HEALTH, INC.; | ) | |
| CARDINAL HEALTH 110, LLC; | ) | (Removal from: Sequoyah County |
| AMERISOURCEBERGEN DRUG CORP.; CVS | ) | District Court) |
| HEALTH CORPORATION; CVS | ) | |
| PHARMACY, INC.; OKLAHOMA CVS | ) | |
| PHARMACY, LLC; WALGREENS BOOTS | ) | |
| ALLIANCE, INC.; WALGREEN CO.; WAL- | ) | |
| MART STORES, INC. | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS MCKESSON CORPORATION, CARDINAL HEALTH, INC., CARDINAL HEALTH 110, LLC AND AMERISOURCEBERGEN DRUG CORP.'S MOTION TO DISMISS THE CHEROKEE NATION'S ORIGINAL PETITION AND MEMORANDUM IN SUPPORT**

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS............................................................................................... i

INTRODUCTION ..................................................................................................... 1

LEGAL STANDARD............................................................................................... 5

ARGUMENT ........................................................................................................... 5

I.    THE NATION'S CLAIMS FAIL FOR THREE THRESHOLD REASONS. ................. 5

    A.    The Nation Fails To Allege Proximate Causation. ................................... 5

    B.    The Derivative Injury Rule Bars the Nation's Claims for Damages. ..................... 8

    C.    The Free Public Services Doctrine Bars the Nation's Claims. ............................ 10

II.    THE NATION'S NUISANCE AND NEGLIGENCE *PER SE* CLAIMS FAIL
    BECAUSE THE NATION HAS NOT IDENTIFIED ANY STATUTORY OR
    REGULATORY DUTIES OWED BY DISTRIBUTORS. ............................................. 13

III.    THE NATION'S PUBLIC NUISANCE CLAIM SHOULD BE DISMISSED
    FOR ADDITIONAL REASONS. ................................................................................. 18

    A.    The Nation's Claim for Abatement of a Public Nuisance Would Violate
        the Rule Against Double Recoveries. ..................................................... 18

    B.    The Nation Does Not Allege a Special Injury. ...................................... 19

    C.    The Nation Does Not Allege Control Over the Instrumentality of the
        Nuisance. ................................................................................................. 20

    D.    The Nation Does Not Adequately Allege a Connection to Real Property or
        Interference with a Public Right. ............................................................ 21

IV.    THE NATION CANNOT MEET ITS BURDEN FOR PLEADING A CLAIM OF
    NEGLIGENCE *PER SE*. ............................................................................................. 24

V.    THE NATION'S NEGLIGENCE CLAIMS SHOULD BE DISMISSED FOR
    ADDITIONAL REASONS. ........................................................................................... 26

    A.    The Nation Has Failed To Identify A Common-Law Duty Owed by
        Distributors to the Nation. ...................................................................... 26

    B.    The Petition Fails To Allege Gross Negligence…………………………….28

    C.    The Nation's Claim Is Barred By Oklahoma's Innocent Seller Statute. ............ 29

1.      The product seller sold the product involved in such action; ................... 29

2.      The product seller did not exercise reasonable care: ................................ 29

3.      Such failure to exercise reasonable care was a proximate cause of
        the harm complained of by the claimant.................................................... 29

VI.     THE NATION'S UNJUST ENRICHMENT CLAIM SHOULD BE DISMISSED. ....... 30

VII.    THE NATION'S CIVIL CONSPIRACY CLAIM SHOULD BE DISMISSED.............. 33

VIII.   THE NATION DOES NOT HAVE STANDING TO ASSERT ITS *PARENS
        PATRIAE* CLAIMS........................................................................................... 35

IX.     THE NATION CANNOT ASSERT CLAIMS ON BEHALF OF NON-
        OKLAHOMA RESIDENTS................................................................................ 38

CONCLUSION.................................................................................................................. 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acoma Pueblo v. Am. Tobacco Co.*,
   No. 99-cv-01049 (D.N.M. July 30, 2001)..................................................................9

*Ala. & Coushatta Tribes of Tex. v. Trs. of Big Sandy Indep. Sch. Dist.*,
   817 F. Supp. 1319 (E.D. Tex. 1993)......................................................37

*Alabama Coushatta Tribe of Texas v. Am. Tobacco Co.*,
   46 F. App'x 225, 2002 WL 1939835 (5th Cir. July 15, 2002) (per curiam) ...................9, 10

*Alfred L. Snapp & Son v. Puerto Rico*,
   458 U.S. 592 (1982).......................................................38

*Allegheny Gen. Hosp. v. Philip Morris, Inc.*,
   228 F.3d 429 (3d Cir. 2000)........................................32

*Allen v. IM Sols., LLC*,
   94 F. Supp. 3d 1216 (E.D. Okla. 2015) ......................................34, 36

*Am. Biomedical Group, Inc. v. Techtrol, Inc.*,
   374 P.3d 820 (Okla. 2016)........................................32

*Anthony v. Slaid*,
   52 Mass. 290 (1846) .......................................................8

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).......................................................5, 27

*Ashley County v. Pfizer, Inc.*,
   552 F.3d 659 (8th Cir. 2009) .......................................23

*Assiniboine & Sioux Tribes v. Mont.*,
   568 F. Supp. 269 (D. Mont. 1983)........................................37

*Atkinson v. Halliburton Co.*,
   905 P.2d 772 (Okla. 1995)........................................17

*Baker v. Smith & Wesson Corp.*,
   2002 WL 31741522 (Del. Super. Ct. Nov. 27, 2002).....................................11, 13

*Bd. of Supervisors of Fairfax Cty. v. U.S. Home Corp.*,
   1989 WL 646518 (Va. Cir. Ct. Aug. 14, 1989) .......................................12

*Bennett v. Skyline Corp.*,
52 F. Supp. 3d 796 (N.D. W. Va. 2014) ...................................................34

*Billingsley v. North*,
298 P.2d 418 (Okla. 1956) ...................................................................30

*Boudinot v. State ex rel. Cannon*,
340 P.2d 268 (Okla. 1959) ...................................................................22

*Brill v. Walt Disney Co.*,
246 P.3d 1099 (Okla. Civ. App. 2010) ...................................................31

*Brock v. Thompson*,
948 P.2d 279 (Okla. 1997) ...................................................................33

*State ex rel. Burk v. Oklahoma City*,
522 P.2d 612 (Okla. 1973) ...................................................................22

*Burlington N. & Santa Fe Ry. Co. v. Grant*,
505 F.3d 1013 (10th Cir. 2007) ...........................................................21

*Camden Cty. Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp.*,
273 F.3d 536 (3d Cir. 2001)...................................................................23

*Cantwell v. De La Garza*,
2018 WL 5929638 (W.D. Okla. Nov. 13, 2018) ....................................35

*Canyon County v. Syngenta Seeds, Inc.*,
519 F.3d 969 (9th Cir. 2008) ...............................................................11

*AKC ex rel. Carroll v. Lawton Indep. Sch. Dist. No. 8*,
9 F. Supp. 3d 1240 (W.D. Okla. 2014) ...........................................34, 35

*Cherokee Nation v. Purdue Pharma L.P.*,
Case No. CJ-18-86 (Okla. Dist. Ct. June 19, 2018) (attached as Ex. A) ........................ *passim*

*Chilkat Indian Village v. Johnson*,
870 F.2d 1469 (9th Cir. 1989) ...............................................................20

*City of Chicago v. Beretta USA Corp.*,
821 N.E.2d 1099 (Ill. 2004)...........................................................7, 8, 12

*City of Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co.*,
719 F.2d 322 (9th Cir. 1983) ...............................................................11

*City of Miami v. Citigroup Inc.*,
801 F.3d 1268 (11th Cir. 2015) ...........................................................33

*City of Perry v. Procter & Gamble Co.*,
    188 F. Supp. 3d 276 (S.D.N.Y. 2016) ................................................................... 23

*City of Tulsa v. Bank of Oklahoma, N.A.*,
    280 P.3d 314 (Okla. 2011) ............................................................................... 30, 31, 33

*City of Tulsa v. State ex rel. Pub. Emps. Relations Bd.*,
    967 P.2d 1214 (Okla. 1998) ................................................................................ 18, 32

*Claborn v. Plains Cotton Co-op. Ass'n*,
    211 P.3d 915 (Okla. Ct. Civ. App. 2009), *overruled on other grounds*,
    *Howard v. Zimmer, Inc.*, 299 P.3d 463 (Okla. 2013) ........................................... 25

*County of Erie, New York v. Colgan Air, Inc.*,
    711 F.3d 147 (2d Cir. 2013) ................................................................................... 11

*County of San Luis Obispo v. Abalone All.*,
    223 Cal. Rptr. 846 (Cal. Ct. App. 1986) ............................................................... 12

*Cresser v. Am. Tobacco Co.*,
    662 N.Y.S.2d 374 (N.Y. Sup. Ct. 1997) ................................................................ 34

*Detroit Bd. of Educ. v. Celotex Corp.*,
    493 N.W.2d 513 (Mich. Ct. App. 1992) ................................................................. 23

*Dill v. Rader*,
    583 P.2d 496 (Okla. 1978) ..................................................................................... 35

*District of Columbia v. Air Florida, Inc.*,
    750 F.2d 1077 (D.C. Cir. 1984) ............................................................................. 11

*Estate of Doyle v. Sprint/Nextel Corp.*,
    248 P.3d 947 (Okla. Ct. App. 2010) ...................................................................... 29

*E. States Health & Welfare Fund v. Philip Morris, Inc.*,
    188 Misc. 2d 638 (N.Y. Sup. Ct. 2000) ................................................................... 8

*Employers Mut. Cas. Co. v. Mosby*,
    943 P.2d 593 (Okla. 1997) ..................................................................................... 10

*Epps v. Ellison*,
    200 P. 160 (Okla. 1921) ......................................................................................... 24

*Estados Unidos Mexicanos v. DeCoster*,
    229 F.3d 332 (1st Cir. 2000) .................................................................................. 36

*In re Estate of Bleeker*,
    168 P.3d 774 (Okla. 2007) ..................................................................................... 12

*Tillman ex rel. Estate of Tillman v. Camelot Music, Inc.*,
　408 F.3d 1300 (10th Cir. 2005) ...................................................................31, 33

*State ex rel. Fallis v. Mike Kelly Constr. Co.*,
　638 P.2d 455 (Okla. 1981)....................................................................................22

*Gaines v. Providence Apartments*,
　750 P.2d 125 (Okla. 1987).....................................................................................6

*Ganim v. Smith & Wesson Corp.*,
　1999 WL 1241909 (Conn. Super. Ct. Dec. 10, 1999), *aff'd*, 780 A.2d 98
　(Conn. 2001) .........................................................................................................12

*Gaylord Entm't Co. v. Thompson*,
　958 P.2d 128 (Okla. 1998)....................................................................................34

*Hackford v. Babbitt*,
　14 F.3d 1457 (10th Cir. 1994) ..............................................................................37

*Harvell v. Goodyear Tire & Rubber Co.*,
　164 P.3d 1028 (Okla. 2006)..................................................................................31

*Henry v. Merck and Co., Inc.*,
　877 F.2d 1489 (10th Cir. 1989) ..........................................................................6, 29

*Hilb Rogal & Hobbs Co. v. Rick Strategy Partners, Inc.*,
　2006 WL 5908727 (E.D. Va. Feb. 10, 2006)........................................................40

*Hoagland v. Okla. Gas & Elec. Co.*,
　2016 WL 3523755 (W.D. Okla. June 22, 2016)....................................................25

*Holmes v. Sec. Investor Protection Corp.*,
　503 U.S. 258 (1992)...............................................................................................6

*State of Okla. ex rel. Hunter v. Purdue Pharma L.P.*,
　2019 WL 4019929 (Okla. Dist. Ct. Aug. 26, 2019)....................................18, 19, 24

*Int'l Bhd. of Teamsters, Local 734 Health & Welfare Tr. Fund v. Philip Morris
Inc.*, 196 F.3d 818 (7th Cir. 1999) ...............................................................8, 10, 32

*J.S. v. Harris*,
　227 P.3d 1089 (Okla. Civ. App. 2009) ................................................................28

*State ex rel. Jennings v. Purdue Pharma L.P.*,
　2019 WL 446382 (Del. Super. Ct. Feb. 4, 2019)...........................................23, 35

*Joyce v. M & M Gas Co.*,
　672 P.2d 1172 (Okla. 1983)...................................................................................6

*Kaw Nation v. Springer*,
    341 F.3d 1186 (10th Cir. 2003) ........................................................19

*Kickapoo Traditional Tribe of Tex. v. Chacon*,
    46 F. Supp. 2d 644 (W.D. Tex. 1999).............................................37

*Kickapoo Tribe of Okla. v. Lujan*,
    728 F. Supp. 791 (D.D.C. 1990) .................................................37, 38

*Kirkpatrick v. Chrysler Corp.*,
    920 P.2d 122 (Okla. 1996).............................................................18

*Kratz v. Kratz*,
    905 P.2d 753 (Okla. 1995) .............................................................10

*Larrimore v. Am. Nat. Ins. Co.*,
    89 P.2d 340 (Okla. 1939) ...............................................................25

*Laubenstein v. Bode Tower, L.L.C.*,
    392 P.3d 706 (Okla. 2016) .............................................................21

*Lockhart v. Loosen*,
    943 P.2d 1074 (Okla. 1997) ...........................................................25

*Lowery v. Echostar Satellite Corp.*,
    160 P.3d 959 (Okla. 2007) .............................................................27

*MacArthur v. San Juan County*,
    497 F.3d 1057 (10th Cir. 2007) ......................................................37

*Mbaku v. Carrington Mortg. Servs., LLC*,
    735 F. App'x 533 (10th Cir. 2018) ...............................................5, 27

*McCluney v. Joseph Schlitz Brewing Co.*,
    649 F.2d 578 (8th Cir. 1981), *aff'd*, 454 U.S. 1071 (1981) ..................39

*Meinders v. Johnson*,
    134 P.3d 858 (Okla. Civ. App. 2005) .............................................22

*State ex rel. Miller v. Philip Morris Inc.*,
    577 N.W.2d 401 (Iowa 1998) ...........................................................9

*Montana v. United States*,
    450 U.S. 544 (1981).......................................................................38

*Mousavi v. John Christner Trucking, LLC*,
    2019 WL 1756539 (N.D. Okla. Apr. 19, 2019) ...............................25

*In re Multidistrict Vehicle Air Pollution M.D.L. No. 31*,
    481 F.2d 122 (9th Cir. 1973) ...................................................................36

*N.C. Corff P'ship, Ltd. v. OXY USA, Inc.*,
    929 P.2d 288 (Okla. Civ. App. 1996) ......................................................22

*In re Nat'l Prescription Opiate Litig.*,
    2019 WL 3737023 (N.D. Ohio June 13, 2019)........................................26

*Navajo Nation v. Superior Court of State of Wash. for Yakima Cnty.*,
    47 F. Supp. 2d 1233 (E.D. Wash. 1999) *aff'd*, 331 F.3d 1041 (9th Cir. 2003) .......................37

*Nichols v. Mid-Continent Pipe Line Co.*,
    933 P.2d 272 (Okla. 1996)........................................................................22

*NMP Corp. v. Parametric Technology Corp.*,
    958 F. Supp. 1536 (N.D. Okla. 1997).......................................................29

*Nuncio v. Rock Knoll Townhome Vill., Inc.*,
    389 P.3d 370 (Okla. Civ. App. 2016) .......................................................13

*Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*,
    498 U.S. 505 (1991).................................................................................39

*Oliphant v. Suquamish Indian Tribe*,
    435 U.S. 191 (1978).................................................................................39

*Patterson v. Beall*,
    19 P.3d 839 (Okla. 2000)..........................................................................17

*Pendergraft v. Bd. of Regents of Okla. Colls.*,
    2019 WL 3806639 (W.D. Okla. Aug. 13, 2019) ..........................33, 34, 35

*Peterson v. Grisham*,
    594 F.3d 723 (10th Cir. 2010) ..................................................................35

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985).................................................................................39

*Plains Commerce Bank v. Long Family Land & Cattle Co.*,
    554 U.S. 316 (2008)............................................................................36, 37

*The Quapaw Tribe of Oklahoma v. Blue Tee Corp.*,
    653 F. Supp. 2d 1166 (N.D. Okla. 2009)..................................................38

*Puerto Rico ex rel. Quiros v. Bramkamp*,
    654 F.2d 212 (2d Cir. 1981).....................................................................40

*Roberson v. Paine Webber, Inc.*,
   998 P.2d 193 (Okla. Civ. App. 1999) ..................................................................36

*Rosson v. Coburn*,
   876 P.2d 731 (Okla. Ct. Civ. App. 1994), *overruled on other grounds,*
   *Howard v. Zimmer, Inc.*, 299 P.3d 463 (Okla. 2013) ..........................................25

*Ryan v. Eli Lilly & Co.*,
   514 F. Supp. 1004 (D.S.C. 1981)..........................................................................34

*Safe Streets Alliance v. Hickenlooper*,
   859 F.3d 865 (10th Cir. 2017) ..............................................................................10

*Satsky v. Paramount Comm., Inc.*,
   7 F.3d 1464 (10th Cir. 1993) ................................................................................19

*Schovanec v. Archdiocese of Okla. City*,
   188 P.3d 158 (Okla. 2008).....................................................................................34

*SEC v. Shields*,
   744 F.3d 633 (10th Cir. 2014) ................................................................................5

*Pennsylvania ex rel. Shapp v. Kleppe*,
   533 F.2d 668 (D.C. Cir. 1976)..............................................................................40

*Smith v. Barker*,
   419 P.3d 327 (Okla. Civ. App. 2017) ...................................................................13

*Sonnenreich v. Philip Morris Inc.*,
   929 F. Supp. 416 (S.D. Fla. 1996) ........................................................................34

*Soo Line R. Co. v. Overton*,
   992 F.2d 640 (7th Cir. 1993) ................................................................................40

*State of North Dakota v. Purdue Pharma*,
   Case No. 08-2018-cv-01300 (Burleigh Dist. Ct. May 10, 20119) (Order)............23

*State of São Paulo of Federative Republic of Brazil v. Am. Tobacco Co.*,
   919 A.2d 1116 (Del. 2007) ....................................................................................9

*State v. Black Hills Power, Inc.*,
   354 P.3d 83 (Wyo. 2015).......................................................................................11

*State v. Philip Morris Inc.*,
   1997 WL 540913 (Md. Cir. Ct. May 21, 1997).................................................8, 9

*Tate v. Browning-Ferris, Inc.*,
   833 P.2d 1218 (Okla. 1992)...................................................................................12

*Taylor v. City of Claremore*,
   2019 WL 3482965 (N.D. Okla. July 31, 2019) ...................................................34

*Thompson v. Presbyterian Hosp., Inc.*,
   652 P.2d 260 (Okla. 1982) ..............................................................................5, 6, 7

*Thompson v. Williams*,
   406 P.3d 599 (Okla. Ct. Civ. App. 2017) ...........................................................26

*Thrifty Rent-A-Car System, Inc. v. Toye*,
   25 F.3d 1058, 1994 WL 175692 (10th Cir. 1994) (unpublished) .........................33

*Tomlinson v. Love's Country Stores, Inc.*,
   854 P.2d 910 (Okla. 1993) .................................................................................29

*Transp. All. Bank, Inc. v. Arrow Trucking Co.*,
   2011 WL 221863 (N.D. Okla. Jan. 21, 2011) ................................................34, 37

*Trinity Baptist Church v. Bhd. Mut. Ins. Servs., LLC*,
   341 P.3d 75 (Okla. 2014) ...................................................................................27

*Twyman v. GHK Corp.*,
   93 P.3d 51 (Okla. Civ. App. 2004) .......................................................................5

*United Food & Commercial Workers Unions, Emp'rs Health & Welfare Fund v. Philip Morris, Inc.*,
   223 F.3d 1271 (11th Cir. 2000) ......................................................................8, 10

*United States v. Olin Corp.*,
   606 F. Supp. 1301 (N.D. Ala. 1985) ...................................................................19

*United States v. Santee Sioux Tribe of Neb.*,
   254 F.3d 728 (8th Cir. 2001) ..............................................................................37

*United States v. Sdoulam*,
   398 F.3d 981 (8th Cir. 2005) ..............................................................................34

*Walker County v. Tri-State Crematory*,
   643 S.E.2d 324 (Ga. Ct. App. 2007) ...................................................................11

*Weaver v. Legend Senior Living, LLC.*,
   2017 WL 3088416 (W.D. Okla. July 20, 2017) ....................................................31

*Young v. Bob Howard Auto., Inc.*,
   52 P.3d 1045 (Okla. Civ. App. 2002) ..................................................................28

*Zagorski v. McAdam*,
   2014 WL 2982669 (W.D. Okla. July 1, 2014) ......................................................35

**Statutes**

18 U.S.C. § 1151 .................................................................................................38

21 U.S.C. § 812 ...................................................................................................1

21 U.S.C. § 826 ...............................................................................................1, 28

Okla. Stat. Ann. tit. 25, § 5 ................................................................................29

Okla. Stat. Ann. tit. 42, § 43 ..............................................................................10

Okla. Stat. Ann. tit. 43, § 551-317 .....................................................................12

Okla. Stat. Ann. tit. 50, § 1 ...........................................................................13, 22

Okla. Stat. Ann. tit. 50, § 10 ..............................................................................20

Okla. Stat. Ann. tit. 63, § 2-302 .........................................................................14

Okla. Stat. Ann. tit. 63, § 2-303 .....................................................................14, 16

Okla. Stat. Ann. tit. 63, § 2-304 .........................................................................15

Okla. Stat. Ann. tit. 63, § 2-305 .........................................................................15

Okla. Stat. Ann., tit. 76, § 57.2 ..........................................................................30

**Other Authorities**

21 C.F.R. § 1303.11 .............................................................................................1

21 C.F.R. § 1303.21 .............................................................................................1

Controlled Substances Quotas, 83 Fed. Reg. 32,784 (July 16, 2018).............................2

Letter from Senators Richard Durbin, *et al.* to Chuck Rosenberg, Acting Adm'r,
   DEA (July 11, 2017), https://www.durbin.senate.gov/download/2018-opioid-
   production-quotas-letter; Drug Enforcement Agency, Aggregate Production
   Quota History for Selected Substances 2003–2013 (Oct. 2, 2012),
   https://web.archive.org/web/20130904184612/
   http:/www.deadiversion.usdoj.gov/quotas/quota_history.pdf ................................................28

Drug Enforcement Agency, Aggregate Production Quota History for Selected
   Substances 2003–2013 (Oct. 2, 2012),
   https://web.archive.org/web/20130904184612/
   http:/www.deadiversion.usdoj.gov/quotas/quota_history.pdf ................................................28

Okla. Admin. Code §§ 475:10-1-1 *et seq.* ........................................................... *passim*

Restatement (Third) of Torts: Liab. for Econ. Harm § 8. ......................................................20, 23

U.S. Dep't of Health & Human Servs., *Facing Addiction in America: The Surgeon General's Report on Alcohol, Drugs, and Health*, glossary at 4-22 (2016), https://addiction.surgeongeneral.gov/sites/default/files/surgeon-generals-report.pdf .........................................................................................................2

Defendants AmerisourceBergen Drug Corp., Cardinal Health, Inc., Cardinal Health 110, LLC and McKesson Corporation (collectively "Distributors") hereby move to dismiss the Petition ("Petition" or "Pet.") of Cherokee Nation (the "Nation").

## INTRODUCTION[1]

The problem of opioid abuse is real, but the attempt by the Nation to fix liability on Distributors is misplaced.  Distributors do not manufacture opioids or promote them to doctors—pharmaceutical manufacturers do that.  Pet. ¶ 32.  Nor do they dispense opioids to patients—pharmacies do that.  *Id.*  Nor do they write prescriptions for opioids—doctors do that.  *Id.*  Rather, Distributors merely deliver FDA-approved medicines to State-licensed pharmacies based on the orders placed by those pharmacies to fill prescriptions written by doctors.  *Id.*  And Distributors are only permitted to ship opioids subject to quotas set by the federal government based on its assessment of what amount of the medications is necessary to meet legitimate medical need.[2]

The Petition alleges that Distributors "caus[ed] the Cherokee Nation to become flooded with prescription opioids."  Pet. ¶ 2.  But the Nation's prior lawsuit against opioid manufacturers ("Manufacturers") contradicts that assertion.  In that lawsuit, the Nation alleged that Manufacturers "employed long-running, deceptive, and deceitful marketing campaigns, advocating for the drug's expanded use while downplaying or outright misstating the dangers of opioid drugs."  Petition ¶ 4, *Cherokee Nation v. Purdue Pharma L.P.*, Case No. CJ-18-86 (Okla. Dist. Ct. June 19, 2018) (the

---

[1] All emphases have been added and internal quotation marks and citations omitted unless otherwise noted.

[2] The U.S. Drug Enforcement Administration ("DEA") is required to "establish production quotas … each calendar year" based upon its determination of "the estimated medical, scientific, research, and industrial needs of the United States." 21 U.S.C. §§ 812, 826(a); 21 C.F.R. §§ 1303.11, 1303.21.

"Purdue Pet.") (attached as Ex. A).[3]  As a result of this marketing campaign, the Nation alleged, the standard of care for the treatment of chronic pain changed, "result[ing] in the vast overprescribing and distribution of opioids."  Purdue Pet. ¶ 7.  If, as the Nation claims, the increase in opioid prescriptions written by Oklahoma doctors and filled by Oklahoma pharmacists was driven by a marketing campaign that did not involve Distributors, then Distributors were not the cause of the resulting "flood" of prescriptions.  Distributors have no ability or duty to second-guess a doctor's decision to prescribe opioids or a pharmacists' decision to fill that prescription.

The Petition also accuses Distributors of failing to prevent diversion, which it describes as the transfer of opioids "from legitimate channels of distribution into the illicit black market, and in to the hands of people who use opioids for non-medical purposes."  Pet. ¶ 5.[4]  But the diversion alleged in the Petition occurs only after Distributors relinquish control over opioid medicines.  Distributors have no ability—and, under Oklahoma law, no duty—to control patients who sell or give away their medicines to family or friends.  Nor do Distributors have the ability to control thieves who steal pills from medicine cabinets, or drug dealers who unlawfully traffic in prescription opioids.  Standing between Distributors' alleged conduct (i.e., shipping "too many" pills) and the Nation's alleged injury from diversion are at least (1) doctors who wrote prescriptions, (2) pharmacists who dispensed prescriptions, (3) patients who illegally sold or gave

_____

[3] On a motion to dismiss, a court may take judicial notice of information contained in prior court files.  *See* St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp., 605 F.2d 1169, 1172 (10th Cir. 1979) ("[F]ederal courts, in appropriate circumstances, may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue.")

[4] *See also* U.S. Dep't of Health & Human Servs., Facing Addiction in America: The Surgeon General's Report on Alcohol, Drugs, and Health, glossary at 4-22 (2016), https://addiction.surgeongeneral.gov/sites/default/files/surgeon-generals-report.pdf;  see  also Controlled Substances Quotas, 83 Fed. Reg. 32,784 (July 16, 2018) (defining diversion as the "redirection" of prescription opioids "into illicit channels").

away their medicine, (4) thieves or drug dealers trafficking in prescription opioids, heroin and fentanyl, and (5) end users who became addicted to or overdosed on illegally ingested pills. Because the connection between Distributors' alleged misconduct and the Nation's alleged injury depends on multiple, independent, intervening events and actors, the Nation fails to allege proximate causation as a matter of law.  *See* Part I.A.

Two additional defects doom each of the Nation's claims.  First, insofar as the Nation seeks to recover for medical and expenses incurred as a result of personal injury to its citizens, the claims are barred by the common law rule prohibiting recovery for derivative injuries.  *See* Part I.B. Second, insofar as the Nation seeks to recover for governmental services incurred as a result of Distributors' alleged wrongdoing, the claims are barred by the common law free public services doctrine, which prohibits recovery for the costs of providing government services from alleged tortfeasors absent legislative authorization.  *See* Part I.C.

The Nation's claims of negligence *per se* and nuisance should be dismissed for the additional reason that the Nation has not identified any statutory or regulatory duty that Distributors breached.  Under Oklahoma law, to prevail on either claim, the Nation must demonstrate, *inter alia*, that Distributors' acts or omissions violated a legal duty.  While the Nation asserts that the Oklahoma Controlled Substances Act ("CSA") requires Distributors to report suspicious order of opioids to regulators and to refrain from shipping such orders, that argument is contrary to the text and structure of the statute and its implementing regulations.  *See* Part II.

Additionally, the negligence *per se* claim should be dismissed because the Nation is not within the class of people intended to be protected by the Oklahoma CSA—which is an essential prerequisite to a claim of negligence *per se*.  *See* Part IV.  The nuisance claim should be dismissed for the additional reasons that (a) the Nation's request for abatement seeks relief that the Oklahoma

Attorney General already obtained on behalf of all Oklahoma residents in a separate lawsuit, *see* Part III.A, (b) the Nation fails to plead any "special injury" distinct from that suffered by Oklahoma residents generally, *see* Part III.B, (c) the Nation does not allege that Distributors controlled the instrumentality of the nuisance at the time the Nation's alleged injury occurred, *see* Part III.C, and (d) the Nation fails to allege that Distributors interfered with a "public right," *see* Part III.D.

The Nation's common-law negligence and gross negligence claims should likewise be dismissed, for three separate reasons.  First, Distributors do not owe a common-law duty to the Nation, *see* Part V.A.  Second, the Nation fails to plead the heightened elements of gross negligence, *see* Part V.B.  And third, Oklahoma's innocent seller statute—which sharply limits the liability of participants in a supply chain other than manufacturers—bars these claims, *see* Part V.C.

The Nation's unjust enrichment claim should be dismissed because the Petition does not properly allege that the Nation "enriched" Distributors or that there is anything unjust about allowing Distributors to retain funds received from their pharmacy customers in exchange for the delivery of FDA-approved medicines.  *See* Part VI.  And the civil conspiracy claim fails because the Nation does not allege (a) an *intentional* tort, (b) an *illicit* agreement among Distributors and pharmacies, or (c) an "unlawful, overt act" in support of the alleged conspiracy.  *See* Part VII.

Finally, although the Petition should be dismissed entirely for the above deficiencies, the Nation's *parens patriae* claims also fail in whole or part because the Nation (a) does not allege an injury on behalf of "all" or even a "substantial segment" of its citizens, and (b) may not assert Oklahoma-law claims on behalf of citizens who live outside Oklahoma.  *See* Parts VIII & IX.

In short, and as addressed in detail below, the Petition should be dismissed because the Nation's claims against Distributors suffer from fundamental legal flaws.

## **LEGAL STANDARD**

To withstand a motion to dismiss, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *SEC v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim is plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Mbaku v. Carrington Mortg. Servs., LLC*, 735 F. App'x 533, 535 (10th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). "But a pleading that offers only 'labels and conclusions or a formulaic recitation of the elements of a cause of action' does not meet this standard." *Id.* "Nor does a complaint that 'tenders naked assertions devoid of further factual enhancement.'" *Id.*

## **ARGUMENT**

### I.     **THE NATION'S CLAIMS FAIL FOR THREE THRESHOLD REASONS.**

#### A.     **The Nation Fails To Allege Proximate Causation.**

The Nation alleges common-law claims for nuisance and negligence. These claims should be dismissed because the Nation cannot establish proximate causation, a necessary element of these claims. *See, e.g.*, *Thompson v. Presbyterian Hosp., Inc.*, 652 P.2d 260, 263 (Okla. 1982) (negligence); *Twyman v. GHK Corp.*, 93 P.3d 51, 61 (Okla. Civ. App. 2004) (nuisance).

The question of proximate causation is properly resolved on a motion to dismiss. A court may determine as a matter of law that intervening factors break the causal nexus between a defendant's alleged conduct and the resulting alleged injury, thereby precluding the plaintiff's ability to establish proximate cause. *Thompson*, 652 P.2d at 264.

Under Oklahoma law, "[t]he proximate cause of an event must be that which in a natural and continuous sequence, unbroken by an independent cause, produces the event and without which the event would not have occurred." *Gaines v. Providence Apartments*, 750 P.2d 125, 126–

27 (Okla. 1987); *see also Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258, 268 (1992) ("among the many shapes th[e] concept [of proximate cause] took at common law was a demand for some direct relation between the injury asserted and the injurious conduct alleged"). When, by contrast, this direct relation is absent—when the alleged conduct "only creates a condition which thereafter reacts with subsequent, independent, unforeseeable, distinct agency and produces an injury"—the Oklahoma Supreme Court has held that "the original [conduct] is the remote rather than the proximate cause thereof." *Gaines*, 750 P.2d at 127.

"An intervening factor sufficient to break the causal nexus is a supervening cause." *Henry v. Merck and Co., Inc.*, 877 F.2d 1489, 1495 (10th Cir. 1989) (applying Oklahoma law). When there is a "supervening cause," the defendant's conduct is deemed a "mere condition" that cannot serve as the basis for an actionable tort claim. *Thompson*, 652 P.2d at 264. A subsequent cause is supervening if it is: "(1) independent of the original act, (2) adequate of itself to bring about the result, and (3) one whose occurrence was not reasonably foreseeable." *Id.* (finding anesthesiologist administering Demerol to be supervening cause in medical malpractice claim against the prescribing surgeon). Thus, a third party's subsequent negligent or criminal activity is a supervening cause that breaks the causal nexus and defeats a showing of proximate causation. *See, e.g.*, *Henry*, 877 F.2d at 1496 (subsequent independent criminal act was a supervening cause that broke the causal nexus); *Joyce v. M & M Gas Co.*, 672 P.2d 1172, 1173 (Okla. 1983) (subsequent criminal and negligent acts were supervening causes that broke causal nexus).

The Nation elsewhere has alleged that Manufacturers caused the opioid public health crisis through a "years-long marketing campaign advocating for the prescription of opioid drugs to treat a large range of chronic pain—in contravention of scientific and medical findings against the use of opioids for such pain—[that] has resulted in the vast overprescribing and distribution of

prescription opioids." Purdue Pet. ¶ 7. If, as the Nation has alleged, Manufacturers caused the opioid epidemic through a "marketing campaign" that "resulted in the vast overprescribing" of opioids, the Nation cannot establish proximate causation as to Distributors.

On the other hand, insofar as the Nation alleges that the crisis was caused not by good-faith prescribing but by illegal diversion, *see* Pet. ¶ 5, the Nation cannot establish that Distributors were the proximate cause of that injury because diversion occurs only due to supervening causes *after* Distributors shipped opioids to their customers. Without both a doctor who prescribed the medicine and a pharmacist who dispensed it, the medications supplied to pharmacies by Distributors would have remained on the shelf, reaching no one. Moreover, before diversion could possibly cause harm to the Nation, at least ***two criminal acts*** must occur after Distributors ship medicines to DEA-registered pharmacies: (1) the illicit sale or transfer of a prescription medicine to someone other than its intended recipient, and (2) the unlawful use of the drug by an end user. Distributors' shipments were thus a "mere condition" for the independent, necessarily criminal actions of several third parties further down the chain of causation. *Thompson*, 652 P.2d at 264.

The Illinois Supreme Court's decision in *City of Chicago v. Beretta USA Corp*., 821 N.E.2d 1099 (Ill. 2004), demonstrates why the Nation cannot establish proximate causation here. In *Beretta*, Chicago brought public nuisance claims against handgun dealers alleging that the dealers' negligence caused the City to incur increased costs arising from gun violence. The Illinois Supreme Court rejected that claim, explaining that "[i]f a defendant's breach of duty furnishes a condition by which injury is made possible and a third person, acting independently, subsequently causes the injury, the defendant's creation of the condition is not a proximate cause of the injury." *Id*. at 1133; *see id.* at 1137 ("the existence of the alleged nuisance in the city of Chicago is several times removed from the initial sale of individual weapons by these defendants"). The same

7

principle is dispositive here. Opioid medications, even more so than guns, are lawful products with beneficial uses. Proximate causation cannot be established, as a matter of law, where the abuse of opioids is "several times removed" from distribution of those medications by Distributors.

**B.      The Derivative Injury Rule Bars the Nation's Claims for Damages.**

Had the Nation's citizens not suffered personal injury in the form of addiction and drug overdoses, the Nation would not have incurred the increased medical and other costs it claims as damages. *See* Pet. ¶¶ 143–44, 148, 156, 165. Thus, to the extent that the Nation has suffered injury, it is derivative of the personal injury of its citizens. The Nation is precluded from recovering for such derivative injuries as a matter of law.

"The usual common-law rule is that a [third-party payor] has no direct cause of action in tort against one who injures the [payor's] beneficiary, imposing increased costs upon the [payor]." *United Food & Commercial Workers Unions, Emp'rs Health & Welfare Fund v. Philip Morris, Inc.*, 223 F.3d 1271, 1274 (11th Cir. 2000) (citing *Anthony v. Slaid*, 52 Mass. 290, 290–91 (1846)).[5] This rule applies with full force when sovereigns, including Native American tribal nations, seek to assert claims for expenses incurred in the course of providing services to their residents. *See Alabama Coushatta Tribe of Texas v. Am. Tobacco Co.*, 46 F. App'x 225, 2002 WL 1939835, at *1 (5th Cir. July 15, 2002) (per curiam) (affirming dismissal of sovereign tribe's complaint against tobacco companies "because it … suffered no direct injury"); *Acoma Pueblo v. Am. Tobacco Co.*,

---

[5] *See also, e.g.*, *Int'l Bhd. of Teamsters, Local 734 Health & Welfare Tr. Fund v. Philip Morris Inc.*, 196 F.3d 818, 822 (7th Cir. 1999) ("For more than 100 years state and federal courts have adhered to the principle (under both state and federal law) that the victim of a tort is the proper plaintiff, and that insurers or other third-party providers of assistance and medical care to the victim may recover only to the extent their contracts subrogate them to the victim's rights."); *E. States Health & Welfare Fund v. Philip Morris, Inc.*, 188 Misc. 2d 638, 646 (N.Y. Sup. Ct. 2000) (same); *State v. Philip Morris Inc.*, 1997 WL 540913, at *9 (Md. Cir. Ct. May 21, 1997) ("At common law a plaintiff had no right to recover damages from a defendant tortfeasor as a result of the defendant's injuries, harm, or lack of care to a third person ….").

No. 99-cv-01049, at *2, *7 (D.N.M. July 30, 2001) (dismissing tribe's common-law claims for "exceptionally high expenditures for provision of tobacco-related health care" in light of the common-law "principles which bar recovery without a direct injury") (attached as Ex. B).[6]

*Alabama Coushatta Tribe of Texas v. American Tobacco Company* demonstrates why the derivative-injury rule bars the Nation's claims. There, the Alabama Coushatta Tribe alleged that certain tobacco companies "exploited … their customers by failing to disclose the harmful and addictive nature of their product" and "targeted Native Americans and Native American youth to induce them to use [] harmful products."[7] The district court dismissed the tribe's claims, holding that the tribe could not establish that it had suffered a direct injury as a result of defendants' alleged conduct. *See Alabama Coushatta Tribe Of Texas*, 2002 WL 1939835, at *1. The Fifth Circuit affirmed, rejecting the tribe's argument that it could establish direct injury because of "its sovereign status and the fact that the injuries were alleged to have been suffered by the Tribe itself, apart from its members." *Id.* Instead, the court held that the tribe's claim was barred because the alleged injury to the tribe was entirely derivative of the harm suffered by its members. *Id. See also United Food and Commercial Workers Unions, Employers Health and Welfare Fund*, 223

---

[6] *See also, e.g.*, *State of São Paulo of Federative Republic of Brazil v. Am. Tobacco Co.*, 919 A.2d 1116, 1125 (Del. 2007) (collecting "[m]ultitudinous" decisions "unanimously" holding "that third-party payors or providers of medical services, including … *a Native American tribe*, have no cognizable claims under federal statutory law or state common law to recover medical expenses from the tobacco companies, because the plaintiffs' alleged injuries were entirely derivative of the injuries to the smoker-consumers of the tobacco companies' products"); *State ex rel. Miller v. Philip Morris Inc.*, 577 N.W.2d 401, 403, 406 (Iowa 1998) (State precluded from bringing "derivative" claim to recoup costs of providing "health care and other services to citizens" necessitated by their tobacco use); *Philip Morris*, 1997 WL 540913, *13 ("[T]he State had no right at common law, and consequently has no right now, to assert claims in its own name against Defendants as tortfeasors for the harms Defendants allegedly caused to third party smokers, unless such claims are made in the name of each of the individually injured third party medicaid program recipients under the equitable doctrine of subrogation.").

[7] Brief of Appellant at 3, *Alabama Coushatta Tribe Of Texas v. Am. Tobacco Co.*, 46 F. App'x 225 (5th Cir July 15, 2002) (No. 01-41198), 2002 WL 32180513, at *3.

F.3d at 1273 n.5 ("a health-care provider has no cause of action against a defendant who injures the health-care provider's ward, causing the health-care provider to incur increased expenses"); *Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865, 890 (10th Cir. 2017) (plaintiff "who complains of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts is generally said to stand at too remote a distance to recover").[8]

Likewise here, the Nation has no direct cause of action against Distributors arising from the personal injuries of the Nation's citizens. Instead, to recover for such injuries, the Nation would need to assert valid subrogation claims on behalf of its allegedly injured citizens, which would be subject to the same defenses that would be available to Distributors in direct actions by those citizens. *See, e.g.*, *Employers Mut. Cas. Co. v. Mosby*, 943 P.2d 593, 595 (Okla. 1997) ("The subrogee steps into the shoes of its claimant and takes the claim subject to defenses based on the date of accrual to the claimant."); *see also Int'l Bhd. of Teamsters*, 196 F.3d at 821 (government cannot "bypass the elements of subrogation actions—principally, that the insurer demonstrate the existence of a tort and the lack of any defenses to liability"—by "suing directly"). Because the Nation has not asserted any such subrogation claim, its attempt to recover healthcare and other expenses incurred from the treatment of allegedly injured citizens fails as a matter of law.

### C.      The Free Public Services Doctrine Bars the Nation's Claims.

The Nation seeks to recoup expenditures for governmental services that it allegedly provided to its citizens, including law enforcement, social services and medical expenses. Pet.

---

[8] The lack of a common-law claim on the part of derivatively-injured parties is precisely why Oklahoma, like most states, has a hospital lien statute. Okla. Stat. Ann. tit. 42, § 43. These statutes grant hospitals an interest in any recovery that an indigent patient recovers from a third party that injured her. Courts recognize that these statutes are "in derogation of the common law" because, absent such a statute, a party that only indirectly suffers loss as a result of a tortious act has no common-law claim against the tortfeasor who caused the injury. *See Kratz v. Kratz*, 905 P.2d 753, 756 (Okla. 1995).

¶¶ 7, 148, 165.  But claims for such damages are barred by the free public services doctrine, which precludes governments from recovering in tort for the cost of providing public services to citizens.

The "general common-law rule" is that, "absent authorizing legislation," the cost of public services "is to be borne by the public as a whole, not assessed against the tortfeasor whose negligence creates the need for the service."  *District of Columbia v. Air Florida, Inc.*, 750 F.2d 1077, 1080 (D.C. Cir. 1984).  Numerous jurisdictions have applied the doctrine to preclude governments at all levels from asserting claims seeking reimbursement of costs incurred in the performance of public duties.  *See, e.g.*, *State v. Black Hills Power, Inc.*, 354 P.3d 83, 87 (Wyo. 2015) ("Absent a legislative grant of authority, the State of Wyoming may not generally recover its fire suppression and/or emergency service costs from a party whose negligence created the need for the services.").[9]  Oklahoma follows this and other common-law principles absent legislation to

---

[9] *See also County of Erie, New York v. Colgan Air, Inc.*, 711 F.3d 147, 150–51 (2d Cir. 2013) (doctrine barred claims against airline for costs of responding to crash); *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 979–80 (9th Cir. 2008) (the "common-law doctrine barring government recovery of the costs of public safety services in tort" means that the "costs of … law enforcement and public health care services are not recoverable damages under civil RICO"); *City of Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co.*, 719 F.2d 322, 324 (9th Cir. 1983) (barring recovery under Arizona law, absent express authorization by "statute or regulation," for the "normal provision of police, fire, and emergency services"); *Walker County v. Tri-State Crematory*, 643 S.E.2d 324, 327 (Ga. Ct. App. 2007) ("Georgia, like many jurisdictions, has adopted the common-law free public services doctrine."); *Baker v. Smith & Wesson Corp.*, 2002 WL 31741522, at *4–5 (Del. Super. Ct. Nov. 27, 2002) (adopting "the general rule in force in other jurisdictions [] that public expenditures made in the performance of governmental functions are not recoverable from a tortfeasor in the absence of a specific statute"); *Ganim v. Smith & Wesson Corp.*, 1999 WL 1241909, at *6 n.7 (Conn. Super. Ct. Dec. 10, 1999) (noting "general rule prohibiting recoupment of municipal expenditures"), *aff'd*, 780 A.2d 98 (Conn. 2001); *Bd. of Supervisors of Fairfax Cty. v. U.S. Home Corp.*, 1989 WL 646518, at *3 (Va. Cir. Ct. Aug. 14, 1989) (adopting "general rule that a municipal corporation may not recover for emergency services rendered in situations caused by a private tortfeasor"); *County of San Luis Obispo v. Abalone All.*, 223 Cal. Rptr. 846, 851 (Cal. Ct. App. 1986) ("[A] government entity may not, as the County seeks to do in this case, recover the costs of law enforcement absent authorizing legislation.")

the contrary.[10]

*City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, demonstrates the point.  There, the Illinois Supreme Court held that the free public services doctrine barred claims brought by the City of Chicago against gun manufacturers and distributors seeking to recover compensation for law enforcement and medical expenditures incurred as a result of gun violence.  *Id*. at 1143–47.  As the court explained, where "[g]overnmental entities … currently bear the cost in question" and "have taken no action to shift it elsewhere," the "legislature and its public deliberative processes, rather than the court, is the appropriate forum to address such fiscal concerns."  *Id.* at 1144–45.

It is telling that the Oklahoma Legislature has authorized recovery for the cost of public services only in limited circumstances.  For example, the Uniform Child Custody Jurisdiction and Enforcement Act authorizes the government to recover "all direct expenses and costs incurred by the district attorney and law enforcement officer" in specified circumstances.[11]  Okla. Stat. Ann. tit. 43, § 551-317.  The fact that the Legislature "enacted statutes allowing some recoveries suggests, by negative implication, that the [Legislature] typically expects the State and local governments to cover their expenses through taxes and fees."  *Baker*, 2002 WL 31741522, at *5.

Here, because the Oklahoma Legislature has not authorized the Nation to recover costs associated with the "opioid crisis," its attempt to recover those expenses from Distributors is barred as a matter of law under the free public services doctrine.

---

[10] *See Tate v. Browning-Ferris, Inc.*, 833 P.2d 1218, 1225 (Okla. 1992) ("By statutory mandate the common law remains in full force in this state, unless a statute explicitly provides to the contrary."); *In re Estate of Bleeker*, 168 P.3d 774, 781 (Okla. 2007) ("At this stage of American unwritten law's development and absent any Oklahoma legislative guidance on the point, we are constrained to follow the common law developed by other state jurisdictions over a period longer than a century of jurisprudence.").

[11] Due to the costs involved in child custody actions, this provision allows recovery against the non-prevailing party when public officials incur expenses "to locate children and enforce custody and visitation determinations."  Okla. Stat. Ann. tit. 43, § 551-317 cmt.

## II.   THE NATION'S NUISANCE AND NEGLIGENCE *PER SE* CLAIMS FAIL BECAUSE THE NATION HAS NOT IDENTIFIED ANY STATUTORY OR REGULATORY DUTIES OWED BY DISTRIBUTORS.

Beyond the threshold and dispositive issues addressed in Part I, the Nation's statutory nuisance and negligence *per se* claims are also barred because they depend on a fundamental misunderstanding of law:  that Distributors have legal "duties" arising under the Oklahoma CSA. Because no such "duties" exist, the Nation's statutory nuisance and negligence per se claims fail as a matter of law and must be dismissed.

"For an act or omission to be a nuisance in Oklahoma, it ***must be unlawful***."  *Nuncio v. Rock Knoll Townhome Vill., Inc.*, 389 P.3d 370, 374 (Okla. Civ. App. 2016); *see also* Okla. Stat. Ann. tit. 50, § 1 (nuisance "consists in ***unlawfully*** doing an act, or omitting to perform a duty, which act or omission … [a]nnoys, injures or endangers the comfort, repose, health, or safety of others").  Likewise, negligence per se requires "the violation of a statutory duty" that is "***fixed and defined by law***" and "imposed for the protection of person or property."  *Smith v. Barker*, 419 P.3d 327, 333 (Okla. Civ. App. 2017) (bolded emphasis in original).  Accordingly, to prevail on either of those claims, the Nation must demonstrate, *inter alia*, that Distributors' acts or omissions violated a legal duty.

The Petition alleges that this requirement is satisfied by Distributors' purported "duties" arising under the Oklahoma CSA and its implementing regulations.  *See* Pet. ¶ 56 ("Distributor[s] … are governed by the [Oklahoma CSA] and the duties imposed in the statute and regulations."); *see also id.* ¶¶ 57–63, 199–200.[12]  Specifically, the Nation alleges that the Oklahoma CSA imposes legal "duties" on Distributors to (1) "identify and report downstream suspicious orders of

---

[12] For the reasons explained in Part V.A, below, Distributors do not have a common-law duty to report to regulators or to refuse to ship "suspicious orders"—and certainly do not have any such common-law duty running to the Nation.

controlled substances to law enforcement," and (2) "terminate orders if there are indications of diversion." *Id.* ¶ 59.[13] The Nation is wrong. No such "duties" exist under the Oklahoma CSA.

**No reporting duty.** The Nation is incorrect to suggest that the Oklahoma CSA or its implementing regulations give rise to a legal "duty" to report suspicious orders. *See, e.g.*, Pet. ¶ 59. In fact, the Oklahoma CSA and its implementing regulations concern the registration process and specify criteria largely for the physical handling of controlled substances while in a wholesale distributor's custody and control. The regulations provide no basis on which to find an independent "duty" that could sustain a statutory nuisance or negligence *per se* claim.

To distribute a controlled substance lawfully in Oklahoma, a distributor must apply for a registration with the OBN and renew that registration annually. Okla. Stat. Ann. tit. 63, § 2-302(A); Okla. Admin. Code § 475:10-1-9(b). The Oklahoma legislature directed that the OBN "register an applicant … unless [it] determines that the issuance of such registration is inconsistent with the public interest." Okla. Stat. Ann. tit. 63, § 2-303(A). "In determining the public interest" for purposes of registration, the statute instructs the OBN to consider certain factors, including the applicant's "[m]aintenance of effective controls against diversion." *Id.* § 2-303(A)(1).[14]

---

[13] The Petition also contains stray references to other "duties" that purportedly arise from the Oklahoma CSA and its implementing regulations. *See, e.g.*, Pet. ¶¶ 60, 62 (alleging that Distributors must "keep records and maintain inventories" of controlled substances and "notify [State authorities] of any theft or significant loss of any controlled dangerous substances"). But the Nation does not allege that Distributors breached those purported duties. Instead, the gravamen of the Petition is that Distributors acted negligently by shipping and failing to report certain orders of prescription opioids. *See, e.g., id.* ¶ 82, 84 (alleging that Distributors "supplied quantities of prescription opioids" that "should have been stopped or investigated as suspicious orders" and "failed to adequately control their supply lines to prevent diversion").

[14] The same factors are relevant to the OBN's consideration whether to suspend or revoke a registration. *See* Okla. Stat. Ann. tit. 63, § 2-304(A)(4) (referencing same considerations for suspensions or revocations of registrations).

14

The Oklahoma CSA's implementing regulations echo the text of the statute. *See* Okla. Admin. Code §§ 475:10-1-1 *et seq.* (setting forth "the requirements to be met in order to obtain an OBN registration"). Pursuant to the Oklahoma Administrative Code, "[a]ll applicants and registrants shall provide effective controls and procedures to guard against theft and diversion of controlled dangerous substances." *Id.* § 475:20-1-2(a). The next sentence of the regulation specifies what those "effective controls" are: "In order to determine whether a registrant has provided effective controls against diversion, the Director shall require adherence to ***the security requirements as set forth generally in the* [*Oklahoma CSA and*] *this Chapter* [*20*]** as standards for the physical security controls and operating procedures necessary to prevent diversion." *Id.*

The regulations further provide that "[*s*]***ubstantial compliance*** with the standards set forth in [Chapter 20] ***may be deemed sufficient*** by [the OBN] after evaluation of the overall security system …." *Id.* § 475:20-1-2(b). This "substantial compliance" standard confirms that the "effective controls" provisions are only for purposes of registration and do not establish independent legal "duties." If the OBN is permitted to grant or renew a registration even if the registrant is not fully compliant with these requirements, or where the registrant has failed fully to meet the requirements so long as it "substantially complying," then those registration provisions cannot give rise to independently actionable and binding legal "duties."[15]

Chapter 20 of the regulations largely addresses the physical handling of controlled substances. For example, Chapter 20 instructs that "[e]ach registered premise shall have a security alarm system," "[a]ll retail storage areas shall be equipped with self-closing, self-locking doors," and "[t]he retail storage areas shall be accessible only to an absolute minimum number of

---

[15] Furthermore, before the OBN may permanently suspend or revoke a wholesale distributor's registration, an individualized proceeding before the agency is required, including an order to show cause and a hearing. *See* Okla. Stat. Ann. tit. 63, § 2-305.

authorized employees." *Id.* § 475:20-1-3. The Nation does not allege that Distributors violated any of these physical security requirements.

Chapter 20 further provides that each registrant "shall design and operate a system to disclose to the registrant suspicious orders of controlled dangerous substances" and "shall inform the OBN of suspicious orders when discovered by the registrant." *Id.* § 475:20-1-5(b). As previously noted, however, compliance with that reporting provision is merely ***one component*** of the OBN's broad assessment of the registrant's "overall security system" for purposes of determining whether the registrant is in "[s]ubstantial compliance" with the effective controls provisions. *Id.* § 475:20-1-2(a)–(b). Moreover, that assessment is used, in turn, only to determine whether registration is "[]consistent with the public interest," Okla. Stat. Ann. tit. 63, § 2-303(A)—***not*** whether the registrant has acted "unlawfully" or should be subject to civil or criminal penalties.

In short, this registration framework does not impose a legal "duty" that can support a statutory nuisance or negligence *per se* action against Distributors. Rather, as the foregoing discussion demonstrates, it sets forth the factors that the OBN considers when it makes registration and revocation determinations based upon "substantial compliance" with the overall regulatory scheme for effective controls. *See* Okla. Admin. Code § 475:20-1-2(b).

**No duty not to ship.** Although the Nation asserts that, under the Oklahoma CSA and its implementing regulations, Distributors must "terminate orders if there are indications of diversion," Pet. ¶ 59, it does not cite any statutory or regulatory provision imposing such a "no-shipping" requirement. There is none.

Lacking any textual basis, the Nation attempts to divine this requirement from the same "effective controls" regulatory provision discussed above. *See id.* (alleging that "[t]o comply with [the effective control provisions], distributors must … terminate orders if there are indications of

16

diversion").   As previously noted, however, those provisions relate primarily to ensuring the physical security of controlled substances while they are in the custody and under the control of registrants.   Significantly, these provisions are governed by a "substantial compliance" standard that permits OBN to allow a registrant to operate even if it is not fully complying with these requirements.   Most important, these provisions do ***not*** set forth any requirement that registrants stop shipment of suspicious orders pending a due diligence investigation into whether the order is likely to be diverted.

The only security requirement in the regulations that mentions suspicious orders is Okla. Admin. Code § 475:20-1-5(b).   That registration provision states that applicants shall (i) "design and operate a system to disclose to the registrant suspicious orders of controlled substances" and (ii) "inform" OBN "of suspicious orders when discovered by the registrant."   *Id*.   What is conspicuously missing is any statement (or even suggestion) that suspicious orders should not be shipped.   The omission of a no-shipping requirement in a regulatory provision setting forth details about suspicious orders demonstrates that no such requirement exists.   *See, e.g.*, *Patterson v. Beall*, 19 P.3d 839, 845 (Okla. 2000) ("[T]he maxim 'expressio unius est exclusio alterius,' that the mention of one thing in a statute impliedly excludes another thing, is used to determine legislative intent."); *Atkinson v. Halliburton Co.*, 905 P.2d 772, 776 (Okla. 1995) (same).

"[I]t is the duty of a court to give effect to legislative acts, not to amend, repeal or circumvent them."   *City of Tulsa v. State ex rel. Pub. Emps. Relations Bd.*, 967 P.2d 1214, 1221 (Okla. 1998); *see also id.* ("This Court has no power to rewrite legislation simply because the legislative definition may not comport with our conception of prudent public policy.").   Accordingly, it would be legal error for this Court to read a "no shipping" requirement into a detailed regulatory regime that does not contain one.

17

\* \* \*

In sum, neither the Oklahoma CSA nor its implementing regulations impose "duties" on Distributors to report to regulators or refuse to ship suspicious orders.  Accordingly, the Nation's nuisance and negligence per se claims fail as a matter of law.

## III.    THE NATION'S PUBLIC NUISANCE CLAIM SHOULD BE DISMISSED FOR ADDITIONAL REASONS.

### A.    The Nation's Claim for Abatement of a Public Nuisance Would Violate the Rule Against Double Recoveries.

Oklahoma follows the universally recognized one-satisfaction rule, which prohibits double recoveries for the same injuries.  *Kirkpatrick v. Chrysler Corp.*, 920 P.2d 122, 127 (Okla. 1996).

The rule comes into play here because the State of Oklahoma has already prevailed in litigation against Manufacturers seeking abatement of an alleged public nuisance arising out of the opioid crisis.  *See State of Okla. ex rel. Hunter v. Purdue Pharma L.P.*, 2019 WL 4019929 (Okla. Dist. Ct. Aug. 26, 2019).[16]  Thus, the Nation is seeking the same remedy of abatement that the State of Oklahoma has already obtained.

The nuisance addressed in *Purdue Pharma* unquestionably is the same nuisance alleged here.  *Compare Purdue Pharma*, 2019 WL 4019929, at \*9 ("the oversupply of opioids") *with* Pet. ¶ 140 ("the over-saturation of opioids").  The court in *Purdue Pharma* made a finding of public nuisance resulting from "the oversupply of opioids" that has "negatively impacted the entire State."  2019 WL 4019929, at \*14.  This finding as to the entire State of Oklahoma necessarily encompasses the fourteen Oklahoma counties at issue in the Nation's Petition.  *See* Pet. ¶ 11.

---

[16] The *Purdue Pharma* litigation is on appeal, but the core point remains that the Nation is subsumed within the judgment already entered in favor of the State of Oklahoma, and it should not be permitted to litigate the same issue anew in this case.

Similarly, the abatement remedy granted in *Purdue Pharma* overlaps entirely with the remedy sought here.  Most notably, the Nation seeks funds for "medical care, additional therapeutic care, prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease," Pet. ¶ 7, but the abatement order in *Purdue Pharma* already provides for "a comprehensive Opioid Use Disorder ('OUD') treatment program serving ***all Oklahoma residents*** who need OUD treatment services," 2019 WL 4019929, at *15.

It does not matter that the Nation was not the plaintiff in *Purdue Pharma*.  The State sought—and obtained—abatement in its *parens patriae* capacity, i.e., for and on behalf of all the State's citizens, including the Nation's citizens.  *See United States v. Olin Corp.*, 606 F. Supp. 1301, 1305 (N.D. Ala. 1985) ("In a proper *paren[s] patriae* action, a state is deemed to represent all of its citizens …..").  For that reason, the difference in nominal plaintiffs is inconsequential. *See, e.g., Satsky v. Paramount Comm., Inc.*, 7 F.3d 1464, 1470 (10th Cir. 1993) ("When a state litigates common public rights, the citizens of that state are represented in such litigation by the state and are bound by the judgment.").

**B.    The Nation Does Not Allege a Special Injury.**

When a tribal government sues under the laws of another sovereign, as the Nation does here, it is considered a private plaintiff, and it may sue only if, and to the extent that, a private right of action is available.  *See, e.g., Kaw Nation v. Springer*, 341 F.3d 1186, 1191–92 (10th Cir. 2003) (dismissing case for no private right of action); *Chilkat Indian Village v. Johnson*, 870 F.2d 1469, 1472 (9th Cir. 1989) (same).  Here, Oklahoma's nuisance statute grants a right of action for public nuisance to private plaintiffs, but only to the extent the nuisance is "specially injurious" to the plaintiff and "not otherwise."  Okla. Stat. Ann. tit. 50, § 10.  Therefore, the Nation must satisfy this requirement to maintain its claim for public nuisance, and it cannot do so.

The Nation's alleged injury is not "special," by definition, because it is the same injury alleged by the State (and other public plaintiffs).  The claim that there were "too many" opioids prescribed, dispensed and distributed in Oklahoma is the same claim made by the State, which sued to abate the same alleged nuisance.  *See* Part III.A *supra*.  Thus, the Nation does not assert a "special injury"—one unique to it as a private plaintiff—but the very injury allegedly suffered by the public generally and which the public's representative has already acted to vindicate.

Because the Nation's alleged harm is derivative of harm to individual citizens, that claimed harm also could never qualify as "specially injurious" to the Nation.  *See supra* Part I.B.  Although the Nation claims to have suffered "unique harms" to its "proprietary interests," Pet. ¶ 149, the actual costs it allegedly incurred are all related to individual abuse of opioids, e.g., "(1) medical care …; (2) counseling and rehabilitation services; (3) treatment of infants born with opioid-related medical conditions," and the like, Pet. ¶ 7.

The special-injury principle applies with particular force here, because the State and multiple Oklahoma cities and counties are already litigating for the same remedy (abatement) for the same alleged nuisance.  Permitting the Nation to sue in public nuisance here would be inconsistent with the purposes of the special injury requirement:  to avoid "multiply[ing] the amount of litigation or the defendant's liabilities unduly."  Restatement (Third) of Torts: Liab. for Econ. Harm § 8, cmt. c.  The Nation thus lacks standing under the special-injury rule to bring a public nuisance claim.

### C.     The Nation Does Not Allege Control Over the Instrumentality of the Nuisance.

Under Oklahoma law, a defendant cannot be liable on a nuisance claim unless it exercised control over the instrumentality of the nuisance at the time it causes harm.  As the Tenth Circuit has recognized, an "individual[] may be held liable to the extent he was responsible for the

maintenance of a nuisance that was under his ***possession or control***." *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1026 (10th Cir. 2007).

Yet the Nation alleges harm occurs ***not*** when opioids are within Distributors' possession or control, but afterward—when pills are "diverted from legitimate channels of distribution into the illicit black market, and into the hands of people who use opioids for non-medical purposes." Pet. ¶¶ 5. Once Distributors deliver the medications to a pharmacy, they do not control (i) to whom doctors prescribe the medications, or (ii) to whom pharmacies dispense them, or (iii) what any patient does with the medications after she receives them. Accordingly, the Nation cannot maintain a nuisance claim based on these allegations of diversion, because this necessarily occurs after opioids are no longer in Distributors' "possession or control." *Burlington N. & Santa Fe Ry.*, 505 F.3d at 1026.

### D.   The Nation Does Not Adequately Allege a Connection to Real Property or Interference with a Public Right.

The law of nuisance in Oklahoma has been historically concerned with the misuse of, or interference with, land and real property. *See, e.g., Laubenstein v. Bode Tower, L.L.C.,* 392 P.3d 706,709 (Okla. 2016) ("We have said that a nuisance arises from an unreasonable, unwarranted, or unlawful use ***of property***."). The Nation's claim impermissibly goes beyond that sphere.

Oklahoma's nuisance statute, Okla. Stat. Ann. tit. 50, § 1 et seq., encompasses the common-law concepts of public and private nuisance. *See Nichols v. Mid-Continent Pipe Line Co.*, 933 P.2d 272, 276 (Okla. 1996). Although the statute is phrased broadly,[17] it has been applied

---

[17] The statute provides that "[a] nuisance consists in unlawfully doing an act, or omitting to perform a duty, which act either: … [a]nnoys, injures or endangers the comfort, repose, health, or safety of others; or … [o]ffends decency; or … [u]nlawfully interferes with, obstructs or tends to obstruct, or renders dangerous for passage, any lake or navigable river, stream, canal or basin, or any public park, square, street or highway; or … [i]n any way renders other persons insecure in life, or in the use of property … ." Okla. Stat. tit. 50, § 1.

21

more narrowly.  Public nuisance law in Oklahoma is generally limited to addressing either improper use of, or interference with the enjoyment of, real property.  Many Oklahoma public nuisance decisions concern the pollution of land or water.  *See, e.g., N.C. Corff P'ship, Ltd. v. OXY USA, Inc.,* 929 P.2d 288, 293–96 (Okla. Civ. App. 1996) (groundwater pollution from oil and gas wells); *Meinders v. Johnson,* 134 P.3d 858, 860, 867–68 (Okla. Civ. App. 2005) (sub-surface pollution from mineral exploration).  Some concern the misuse of private property for other sorts of objectionable purposes.  *E.g., State ex rel. Fallis v. Mike Kelly Constr. Co.,* 638 P.2d 455, 456 (Okla. 1981) ("operation of [] open saloon"); *Boudinot v. State ex rel. Cannon,* 340 P.2d 268, 269 (Okla. 1959) ("noise and odor arising from" defendant's "keeping a large number of cats on her residential property").  Others concern interference with public lands and roads.  *E.g., State ex rel. Burk v. Oklahoma City,* 522 P.2d 612, 615 (Okla. 1973) (construction of building on public street).

The Nation alleges that it has suffered a variety of harms, including derivative expenses (*e.g.,* healthcare costs, social services, criminal justice), arising from injuries to consumers of opioid medications.  *See* Pet. ¶ 7.  In simple terms, the Nation's claim sounds entirely in products liability, not public nuisance.  Nuisance and products liability are separate and distinct bodies of law, and courts across the nation have held that they must remain that way.

Reflecting this distinction, a North Dakota court dismissed a nearly identical public nuisance claim—brought under a nearly identical public nuisance statute—against opioid manufacturers on the basis that "[n]o North Dakota court has extended the public nuisance statutes to cases involving the sale of goods."  *State of North Dakota v. Purdue Pharma,* Case No. 08-2018-cv-01300, at *23 (Burleigh Dist. Ct. May 10, 20119) (Order) (attached as Ex. C) (dismissing similar claims, including public nuisance claim, because manufacturer of opioids has no control over the product once it enters the market).

22

Consistent with this legal principle, other courts presiding over nearly identical public nuisance claims have dismissed those claims because "[t]here is a clear national trend to limit public nuisance to land use" rather than product-based claims. *State ex rel. Jennings v. Purdue Pharma L.P.,* 2019 WL 446382, at *12 (Del. Super. Ct. Feb. 4, 2019). Indeed, state and federal courts across the country—in cases involving a wide array of products—have agreed that public nuisance liability should not be imposed as a substitute for products liability. *See, e.g., Camden Cty. Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp.,* 273 F.3d 536, 540 (3d Cir. 2001) ("[T]he courts have enforced the boundary between the well-developed body of product liability law and public nuisance law.").[18]

In the same vein, the Restatement (Third) of Torts: Liability for Economic Harm expressly rejects the expansion of public nuisance to economic harms caused by products:

> Tort suits seeking to recover for public nuisance have occasionally been brought against the makers of products that have caused harm, such as tobacco, firearms, and lead paint. These cases vary in the theory of damages on which they seek recovery, but often involve claims for economic losses the plaintiffs have suffered on account of the defendant's activities; they may include the costs of removing lead paint, for example, or of providing health care to those injured by smoking cigarettes. ***Liability on such theories has been rejected by most courts, and is excluded by this Section, because the common law of public nuisance is an inapt vehicle for addressing the conduct at issue.***

Third Restatement, § 8, cmt. g.

The Nation may rely on an Oklahoma trial court's decision finding a Manufacturer liable for public nuisance. *See State ex rel. Hunter v. Purdue Pharma L.P.*, 2019 WL 4019929 (Okla.

---

[18] *See also Ashley County v. Pfizer, Inc.,* 552 F.3d 659, 671–72 (8th Cir. 2009) (cold medicine) (same); *City of Perry v. Procter & Gamble Co.,* 188 F. Supp. 3d 276, 291 (S.D.N.Y. 2016) (flushable wipes) ("The parties do not cite, and the Court is not aware of, any cases applying Iowa law that recognize a nuisance claim arising out of the sale or use of a product as opposed to the use of property."); *Detroit Bd. of Educ. v. Celotex Corp.,* 493 N.W.2d 513, 521 (Mich. Ct. App. 1992) (asbestos) ("The law of nuisance is fraught with conditional rules and exceptions that turn on the facts of individual cases, and the cases almost universally concern the use or condition of property, not products.").

Dist. Ct. Aug. 26, 2019). That decision, however, is directly contrary to settled law in Oklahoma and across the country on the scope of public nuisance, as discussed above. For example, the court in *Purdue Pharma* relied on *Epps v. Ellison*, 200 P. 160 (Okla. 1921), for the proposition that the Oklahoma nuisance statute does not require a connection to property. *Purdue Pharma*, 2019 WL 4019929, at *11. But in *Epps*, the defendant used its own land to operate a cotton mill that produced "loud offensive noises[,] … dust and lint[,] … and steam and exhaust" which rendered the "dwelling houses and premises of the plaintiff unfit for habitation." 200 P. at 160. Thus, *Epps* does not support the extension of nuisance liability beyond its limited sphere to the distribution of FDA-approved medicines. Moreover, the *Purdue Pharma* court's fallback holding that the defendant manufacturer "pervasively, systemically and substantially used real and personal property, private and public, as well as the public roads, buildings and land of the State of Oklahoma," 2019 WL 4019929, at *11, does not apply here, because the Nation does not allege that Distributors conducted such activity within the Nation's tribal jurisdiction.

## IV. THE NATION CANNOT MEET ITS BURDEN FOR PLEADING A CLAIM OF NEGLIGENCE *PER SE*.

The Petition alleges that Distributors "had a duty under the [Oklahoma CSA and its implementing regulations], violation of which has harmed the public health and safety of the Cherokee Nation." Pet. ¶ 199. According to the Nation, Distributors' "actions and omissions in violations of these laws constitute negligence *per se*." *Id.* ¶ 203.

To plead negligence *per se*, however, an Oklahoma plaintiff must allege that its injury is "of the type intended to be prevented by the statute" and that it "was a member of the class meant to be protected by the statute." *Lockhart v. Loosen*, 943 P.2d 1074, 1078 (Okla. 1997). The Nation cannot satisfy that burden here. Indeed, under similar circumstances, courts applying Oklahoma

law routinely dismiss claims of negligence *per se* based on claimed violations of statutory or regulatory duties.[19]

The federal MDL court's decision dismissing the negligence *per se* claim of the Muscogee Nation is especially instructive here.  In that case, the Muscogee Nation alleged that Distributors violated purported duties arising under the federal and Oklahoma CSAs.  *See In re Nat'l Prescription Opiate Litig.*, 2019 WL 3737023 (N.D. Ohio June 13, 2019).  Distributors argued that the Muscogee Nation could not rely on those statutes (or their implementing regulations) to supply the duty element of its negligence *per se* claim because those statutes were not intended to protect governments from costs flowing from increased rates of addiction.  The Muscogee Nation

---

[19] *See, e.g.*, *Mousavi v. John Christner Trucking, LLC*, 2019 WL 1756539, at *6 (N.D. Okla. Apr. 19, 2019) (violation of Federal Motor Carrier Safety Regulations could not support negligence *per se* claim as there is "no authority suggesting that the FMCSR were intended to protect drivers from harming themselves" as opposed to "the driving public"); *Hoagland v. Okla. Gas & Elec. Co.*, 2016 WL 3523755, at *3 (W.D. Okla. June 22, 2016) *Hoagland v. Okla. Gas & Elec. Co.*, 2016 WL 3523755, at *3 (W.D. Okla. June 22, 2016) ("The particular rule plaintiff references appears to be directed only to employees, and he has offered no authority supporting a conclusion that the referenced regulation necessarily defines the duty of care owed to him, a third party non-employee. As a result, []violation of OSHA standards … are not a basis for applying a negligence per se standard in the circumstances of this case."); *Claborn v. Plains Cotton Co-op. Ass'n*, 211 P.3d 915, 919 (Okla. Ct. Civ. App. 2009) (finding that non-employee plaintiff did not fall within the class of persons meant to be protected by OSHA regulations), *overruled on other grounds*, *Howard v. Zimmer, Inc.*, 299 P.3d 463 (Okla. 2013); *Rosson v. Coburn*, 876 P.2d 731, 736 (Okla. Ct. Civ. App. 1994) (no negligence *per se* under Social Security Act and its implementing regulations because it was not enacted to protect specific individuals), *overruled on other grounds, Howard v. Zimmer, Inc.*, 299 P.3d 463 (Okla. 2013); *Lockhart*, 943 P.2d at 1078–79 ("When the straightforward language of the act is considered, it is obvious (1) that the plaintiff is not a member of the class meant to be protected by the statute's language and (2) the act's language does not create a duty of care which is owed to someone other than a sexual partner."); *Larrimore v. Am. Nat. Ins. Co.*, 89 P.2d 340, 343 (Okla. 1939) (no negligence *per se* in case involving rat poison that caught on fire because "the purpose of the [asserted] statute is to protect persons and animals from injury by being poisoned" and "[t]he injury here was not the class of injury intended to be prevented by the statute"); *Thompson v. Williams*, 406 P.3d 599, 600–01 (Okla. Ct. Civ. App. 2017) (where statute "was enacted for the purpose of protecting agricultural crops," its violation "does not constitute negligence per se because bodily harm from a motor vehicle accident is not the type of injury intended to be prevented by the statute, and Plaintiff is not within the class of persons the Legislature intended to protect").

responded that the statutes were enacted for the benefit of the public at large, including the sovereign governments who act on their behalf.  The MDL court rejected that argument, holding that the Oklahoma CSA was "not intended to protect sovereigns … from spending more on addiction-related public services when rates of addiction increase."  *Id.* at *13.  Thus, applying Oklahoma law, the MDL court dismissed the Muscogee Nation's negligence *per se* claim based on purported violations of the Oklahoma CSA.  *Id.*  This Court should do the same.

## V.   THE NATION'S NEGLIGENCE CLAIMS SHOULD BE DISMISSED FOR ADDITIONAL REASONS.

In addition to the threshold issues addressed in Part I, the Nation's negligence claims are deficient and should be dismissed because (a) Distributors did not owe any common-law duty to the Nation, (b) the Nation fails to plead the elements of gross negligence, and (c) Oklahoma's innocent seller statute bars these claims.

### A.   The Nation Has Failed To Identify A Common-Law Duty Owed by Distributors to the Nation.

Under Oklahoma law, "[t]he existence of a legal duty is a question of law for the court," *Trinity Baptist Church v. Bhd. Mut. Ins. Servs*., *LLC*, 341 P.3d 75, 82 (Okla. 2014), and is "the threshold question in any negligence action," *Lowery v. Echostar Satellite Corp*., 160 P.3d 959, 964 (Okla. 2007).  Because the Nation cannot identify a common-law duty that Distributors owe to it, the negligence claim should be dismissed.

First, a nuisance claim requires that the alleged harm have been "foreseeable" to Distributors.  *Id.*  The Nation offers no specific allegations to support this core requirement of its negligence claim, and instead offers only the conclusory assertion that the Nation's harm was "reasonably foreseeable" to Distributors.  Pet. ¶ 86.  That mere assertion of the legal conclusion does not meet the Nation's burden that "the plaintiff [must] plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

26

*Mbaku v. Carrington Mortg. Servs., LLC*, 735 F. App'x 533, 535 (10th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). Further, that conclusory assertion is belied by the Nation's own allegations in an earlier lawsuit filed against Manufacturers. There, the Nation alleged that through "canny marketing," Manufacturers "advocat[ed] for the prescription of opioid drugs to treat a large range of chronic pain—in contravention of scientific and medical findings against the use of opioids for such pain—[that] has resulted in the vast overprescribing and distribution of prescription opioids." Ex. A, Purdue Pet. ¶¶ 5, 7. As a result of this change in the standard of care, DEA authorized a 39-fold increase of the manufacturing quotas for prescription opioids between 1993 and 2015, based on its expert judgment that there was an increasing legitimate medical need for opioids throughout the United States.[20] The Petition includes no factual allegations to establish that Distributors had any reason to believe that the increased shipments of opioid medicines, as approved by DEA, were anything other than a reflection of changes in the standard of care. Particularly in light of the Nation's own prior allegations, the Petition here includes no "factual content" to establish that harm to the Nation's citizens (or the Nation) was foreseeable to Distributors at the time the shipments were made.

Second, although the Petition asserts that Distributors were "negligent or reckless" in failing to prevent third parties' misconduct, Pet. ¶ 162, Distributors have no duty to prevent the conduct of third parties who illegally divert opioids after they have left Distributors' custody and control. "Oklahoma follows the common-law principle of negligence that generally no duty is owed to aid or protect another. Nor does a person have a duty to anticipate and prevent the

---

[20] *See* 21 U.S.C. § 826(a); Letter from Senators Richard Durbin, *et al.* to Chuck Rosenberg, Acting Adm'r, DEA (July 11, 2017), https://www.durbin.senate.gov/download/2018-opioid-production-quotas-letter; Drug Enforcement Agency, Aggregate Production Quota History for Selected Substances 2003–2013 (Oct. 2, 2012), https://web.archive.org/web/20130904184612/http:/www.deadiversion.usdoj.gov/quotas/quota_history.pdf.

intentional or criminal acts of a third party," unless the defendant "is under a special responsibility toward the person harmed" or the defendant's own conduct "has created or exposed the other to a recognizable high degree of risk of harm." *J.S. v. Harris*, 227 P.3d 1089, 1092 (Okla. Civ. App. 2009); *see also Young v. Bob Howard Auto., Inc.*, 52 P.3d 1045, 1047–48 (Okla. Civ. App. 2002) (even defendant with relationship of invitor to invitee does not "owe[] a duty to protect [plaintiff] from the criminal acts of a third party" where defendant did not have actual or constructive knowledge of the specific third party's criminal activity). Here, the State has not pled any facts suggesting that Distributors have a "special relationship" with those who use or abuse prescription opioids that could give rise to any such duty. *See Henry v. Merck and Co., Inc.*, 877 F.2d 1489, 1493 (10th Cir. 1989) (no "special relationship" where the parties did not have "any relationship … prior to the injury"); *Estate of Doyle v. Sprint/Nextel Corp.*, 248 P.3d 947, 950–52 (Okla. Ct. App. 2010) (no duty as plaintiff had "attenuated relationship with" cell phone company that sold phone resulting in car accident).

Finally, the Nation's negligence claim requires pleadings sufficient to establish that the defendant owes a duty ***to the plaintiff***. *Tomlinson v. Love's Country Stores, Inc.,* 854 P.2d 910, 915 (Okla. 1993). Even accepting (contrary to the regulations and statute) the Nation's allegations that Distributors have a "duty" to report suspicious opioid orders, Distributors owed that obligation to their regulators, not the Nation. There is no reporting or other duty that runs from Distributors to the Nation. Distributors—who purchase FDA-approved medicines from Manufacturers and sell them to State-licensed pharmacies—do not have any relationship with the Nation that conceivably could give rise to such a duty.

### B.     The Petition Fails To Allege Gross Negligence.

Under Oklahoma law, "[t]here are three degrees of negligence, namely, slight, ordinary and gross. The latter includes the former." Okla. Stat. Ann. tit. 25, § 5. "Thus, gross negligence is

the same as a negligence claim, differing only as to the degree." *NMP Corp. v. Parametric Technology Corp.,* 958 F. Supp. 1536, 1546 (N.D. Okla. 1997). Because gross negligence is merely a heightened degree of negligence, the Nation's failure to plead the elements of ordinary negligence (as explained in Part V.A above) is also fatal to the gross negligence claim.

Moreover, gross negligence requires "intentional failure to perform a manifest duty in reckless disregard of consequences or in callous indifference to life, liberty, or property." *Id*. The Nation has pled no facts suggesting that Distributors "failed to perform a manifest duty in reckless disregard of consequences" to the Nation or in "callous indifference" to "life, liberty, or property."

### C.     The Nation's Claim Is Barred By Oklahoma's Innocent Seller Statute.

Distributors do not manufacture opioid products. Rather, as the Petition makes clear, Distributors' role in the opioid supply chain is limited to filling orders placed by DEA-registered and state-licensed pharmacies. Pet. ¶¶ 13–16, 59, 84.

In a statutory provision effective November 1, 2014, Oklahoma codified the elements of a negligence claim against such non-manufacturing product sellers:

> A product seller other than a manufacturer is liable to a claimant on the basis of negligence if the claimant establishes that:
>
> 1.     The product seller sold the product involved in such action;
>
> 2.     The product seller did not exercise reasonable care:
>    a. in assembling, inspecting, or maintaining such product, or
>    b. in passing on warnings or instructions from such product's manufacturer about the dangers and proper use of such product; and
>
> 3.     Such failure to exercise reasonable care was a proximate cause of the harm complained of by the claimant.

Okla. Stat. Ann., tit. 76, § 57.2(G).

The Petition contains no allegation that any Distributor failed to exercise reasonable care in "assembling, inspecting, or maintaining" any opioid product it sold or in "passing on" the

manufacturers' warnings or instructions for those products. The Nation's negligence, gross negligence and negligence *per se* claims are therefore barred by the innocent seller statute.

## VI.     THE NATION'S UNJUST ENRICHMENT CLAIM SHOULD BE DISMISSED.

The Nation's unjust enrichment claim fails for several reasons.

As a threshold matter, unjust enrichment is an "equitable theory," *City of Tulsa v. Bank of Oklahoma, N.A.*, 280 P.3d 314, 322 (Okla. 2011), and it is a "general principle[] of equity" that a plaintiff must "show[] that no adequate statutory or legal remedy is available," *Billingsley v. North*, 298 P.2d 418, 422 (Okla. 1956). The Nation fails to allege that it lacks a remedy at law. *See* Pet. ¶¶ 166–75. In fact, it seeks recovery for the exact same alleged underlying conduct under the legal remedies of nuisance and negligence. *See id.* ¶¶ 134–65. Consequently, the Nation's unjust enrichment claim is barred as a matter of law. *See Harvell v. Goodyear Tire & Rubber Co.*, 164 P.3d 1028, 1035 (Okla. 2006) ("Where the plaintiff has an adequate remedy at law, the court will not ordinarily exercise its equitable jurisdiction to grant relief for unjust enrichment."); *see also Tillman ex rel. Estate of Tillman v. Camelot Music, Inc.*, 408 F.3d 1300, 1309 (10th Cir. 2005) ("district court properly dismissed" unjust enrichment claim because "Oklahoma law provides that courts are not to invoke their equitable jurisdiction when an adequate legal remedy is available").

Furthermore, the unjust enrichment claim is barred because it is duplicative of the Nation's nuisance and negligence claims. *See, e.g.*, *Brill v. Walt Disney Co.*, 246 P.3d 1099, 1106 (Okla. Civ. App. 2010) (rejecting unjust enrichment claim because it was "merely derivative of" plaintiff's other claims); *Weaver v. Legend Senior Living, LLC.*, 2017 WL 3088416, at *4 (W.D. Okla. July 20, 2017) (dismissing unjust enrichment claim as "duplicative of" other claims).

Even setting aside these threshold bars, the Nation's unjust enrichment claim fails on its own terms. To state a claim for unjust enrichment, a plaintiff must allege "enrichment to another,

coupled with a resulting injustice." *City of Tulsa*, 280 P.3d at 319.  The Nation does not plead either of these elements.

First, the Nation fails to allege facts showing that it enriched Distributors.  The Nation vaguely alleges that it "conferred a benefit" on Distributors "by paying for … the costs of the harm caused by Defendants' negligent distribution," and that the Nation's "expenditures … in providing healthcare services to people who use opioids have added to Defendants' wealth [and] … helped sustain Defendants' businesses."  Pet. ¶¶ 168–69.  But those expenditures cannot give rise to a claim for unjust enrichment because the Nation does not (and cannot) allege that Distributors had a legal obligation to provide healthcare services to the Nation's citizens.  *See City of Tulsa*, 280 P.3d at 319–20 ("One is not unjustly enriched … by retaining benefits involuntarily acquired which law and equity give him absolutely without any obligation on his part to make restitution."); *Am. Biomedical Group, Inc. v. Techtrol, Inc.*, 374 P.3d 820, 828 (Okla. 2016) (same); *Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 447 (3d Cir. 2000) (hospital's payments for tobacco-related health costs did not unjustly enrich tobacco companies because they "had no legal obligation to pay the medical expenses of smokers").

The Nation's theory that it can recover for the alleged social costs of Distributors' business activities, moreover, sweeps far too broadly.  Virtually every commercial activity creates "externalities" of some sort.  But there is no support in Oklahoma law for the proposition that the Nation (or anyone else) can assert an unjust enrichment claim to recover for such costs under an unjust enrichment theory.  *See, e.g.*, *Int'l Bhd. of Teamsters, Local 734 Health & Welfare Tr. Fund v. Philip Morris Inc.*, 196 F.3d 818, 823 (7th Cir. 1999) ("[N]o rule of law requires persons whose acts cause harm to cover all of the costs, unless these acts were legal wrongs.").

31

An example may illustrate the point.  The use and abuse of alcohol by the Nation's citizens undoubtedly generates increased social costs or "externalities"—including increased health care expenses and crime, for example.  But the Nation does not have a claim for unjust enrichment against liquor distributors because those distributors do not have any obligation to pay for expenses relating to alcohol use and abuse.  There is no principled basis on which to distinguish claims against pharmaceutical distributors and liquor distributors.

To hold that the Nation has a claim against Distributors based on the harms caused by the misuse and abuse of the products they sell would open the floodgates to claims against the sellers of all lawful products.  The Oklahoma Supreme Court has consistently rejected efforts to expand unjust enrichment law to embrace such novel theories of recovery.  *See City of Tulsa*, 280 P.3d at 320 ("To find a valid unjust enrichment claim in such a matter would have a chilling effect on economic development."); *see also City of Miami v. Citigroup Inc.*, 801 F.3d 1268, 1274, 1277 (11th Cir. 2015) (being "forced to pay for [a defendant's] externalities" does "not fit within an unjust enrichment framework").

Second, there is nothing remotely unjust about permitting Distributors to retain funds they received pursuant to valid contracts with their retail pharmacy customers.  Any funds that Distributors received in connection with opioid sales were paid by pharmacies under contracts for the purchase of FDA-approved medicines.  It is not unjust to permit Distributors to retain money paid to them for the purchase of products they delivered to their customers.  For this reason, too, the unjust enrichment claim should be dismissed.  *See Tillman ex rel. Estate of Tillman,* 408 F.3d at 1309 (rejecting unjust enrichment claim because defendant's receipt of funds from third party pursuant to contract "did not result in an injustice to [plaintiff's decedent]"); *Thrifty Rent-A-Car System, Inc. v. Toye,* 25 F.3d 1058 (Table), 1994 WL 175692, at *8 (10th Cir. 1994) (unpublished)

(plaintiff's "complaint that [enforcing defendants' valid contract] will allow defendants to reap what it considers an unfair profit is not the kind of injustice envisioned by the law of unjust enrichment").

## VII.   THE NATION'S CIVIL CONSPIRACY CLAIM SHOULD BE DISMISSED.

The various flaws in the Nation's substantive claims also doom its civil conspiracy claim. Under Oklahoma law, "[a] civil conspiracy consists of a combination of two or more persons to do an unlawful act, or to do a lawful act by unlawful means." *Pendergraft v. Bd. of Regents of Okla. Colls.*, 2019 WL 3806639, at *6 (W.D. Okla. Aug. 13, 2019) (quoting *Brock v. Thompson*, 948 P.2d 279, 294 (Okla. 1997)).   "The essential elements are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result."   *Id.* (quoting *Schovanec v. Archdiocese of Okla. City*, 188 P.3d 158, 175 (Okla. 2008)).   Here, the Nation's civil conspiracy claim fails for three reasons.

First, the Nation has not pled facts establishing an underlying tortious act by Distributors. "[P]articipation in a civil conspiracy is not, by itself an actionable tort."   *Allen v. IM Sols., LLC*, 94 F. Supp. 3d 1216, 1223 (E.D. Okla. 2015) (citations omitted).   "Rather, a civil conspiracy claim requires the existence of an underlying tort or wrongful act committed by one or more of the conspirators in furtherance of the conspiracy."[21]   The underlying tort, moreover, must be ***intentional***; mere negligence is not enough.   *See Schovanec*, 188 P.3d at 175.[22]   Here, the Nation

---

[21] *See also Transp. All. Bank, Inc. v. Arrow Trucking Co.*, 2011 WL 221863, at *6 (N.D. Okla. Jan. 21, 2011) (similar); *Taylor v. City of Claremore*, 2019 WL 3482965, at *12 (N.D. Okla. July 31, 2019) ("Civil conspiracy 'does not itself create liability.'   Instead, 'a civil conspiracy claim enlarges the pool of potential defendants from whom a plaintiff may recover for an underlying tort.'" (quoting *Gaylord Entm't Co. v. Thompson*, 958 P.2d 128, 148 & n.85 (Okla. 1998)).

[22] *See also, e.g.*, *United States v. Sdoulam*, 398 F.3d 981, 987 (8th Cir. 2005) ("one cannot conspire (continued...)

does not assert any intentional torts against Distributors, and this defect is fatal to its civil conspiracy claim.

Second, the Nation does not allege—even in a conclusory manner—that Distributors made an illicit agreement. "A civil conspiracy claim must allege specific facts showing an agreement and concerted action amongst the defendants." *AKC ex rel. Carroll v. Lawton Indep. Sch. Dist. No. 8*, 9 F. Supp. 3d 1240, 1244 (W.D. Okla. 2014). "Disconnected circumstances, any … of which are just as consistent with lawful purposes as with unlawful purposes, are insufficient to establish a conspiracy." *Peterson v. Grisham*, 594 F.3d 723, 730 (10th Cir. 2010) (quoting *Dill v. Rader*, 583 P.2d 496, 499 (Okla. 1978)).

Here, although the Nation alleges that "[t]he Distributor Defendants continuously supplied prescription opioids to the Pharmacy Defendants" and that "[t]he Pharmacy Defendants continuously paid the Distributor Defendants to supply large quantities of prescription opioids," Pet. ¶¶ 177, 179, there are no allegations demonstrating a "meeting of minds" or conspiratorial agreement to engage in unlawful conduct. That failure, too, requires dismissal of the Nation's civil conspiracy claim.[23] Indeed, the Delaware court overseeing the opioid litigation in that state

---

to commit a negligent or unintentional act"); *Bennett v. Skyline Corp.*, 52 F. Supp. 3d 796, 815 (N.D. W. Va. 2014) (noting "distinction between negligence and an intentional tort for purposes of a civil conspiracy action"); *Cresser v. Am. Tobacco Co.*, 662 N.Y.S.2d 374, 378 (N.Y. Sup. Ct. 1997) (for civil conspiracy, "the underlying tort must be an intentional one since there can hardly be an agreement to commit a negligent act"); *Sonnenreich v. Philip Morris Inc.*, 929 F. Supp. 416, 419 (S.D. Fla. 1996) ("Logic and case law dictate that a conspiracy to commit negligence is a non sequitur."); *Ryan v. Eli Lilly & Co.*, 514 F. Supp. 1004, 1012 (D.S.C. 1981) ("There is no such thing as a conspiracy to commit negligence ….").

[23] *See, e.g.*, *Peterson*, 594 F.3d at 731 ("Merely because defendants published their books in close temporal proximity to one another does not demonstrate there was an illegal agreement to engage in a massive joint defamatory attack."); *AKC*, 9 F. Supp. 3d at 1245 (dismissing civil conspiracy claim where "plaintiffs' Complaint is deficient in showing an agreement"); *see also Pendergraft*, 2019 WL 3806639, at *7 ("Plaintiff has failed to plead sufficient facts to indicate that [defendants] had an agreement or 'meeting of the minds'"); *Cantwell v. De La Garza*, 2018 WL 5929638, at *4 (W.D. Okla. Nov. 13, 2018) (similar).

dismissed a civil conspiracy claim against Distributors for precisely this reason.  *See State ex rel. Jennings v. Purdue Pharma L.P.*, 2019 WL 446382, at *14 (Del. Super. Ct. Feb. 4, 2019) ("The State has merely alleged parallel conduct by Defendants"; "[t]here are no allegations of a concerted action, an agreement to commit an underlying wrong, awareness of an agreement, or action in accordance with that agreement.").

Third, the Nation fails to allege that Distributors committed an "unlawful, overt act[]" in furtherance of any conspiracy.  *Pendergraft*, 2019 WL 3806639, at *6.  "[A] conspiracy between two or more persons to injure another is not enough; an underlying unlawful act is necessary to prevail on a civil conspiracy claim."  *Zagorski v. McAdam*, 2014 WL 2982669, at *6 (W.D. Okla. July 1, 2014) (quoting *Roberson v. Paine Webber, Inc*., 998 P.2d 193, 201 (Okla. Civ. App. 1999)). Further, the overt act must be done "in furtherance of the conspiracy"—i.e., the defendant must have "a specific intent to further the unlawful activity which is the object of the conspiracy."  *Allen v. IM Sols., LLC*, 94 F. Supp. 3d 1216, 1223–24 (E.D. Okla. 2015).  Here, the Nation fails to allege even one instance in which Distributors committed an unlawful act in support of a purported conspiracy.  While the Nation alleges that Distributors sold FDA-approved medicines to licensed pharmacies, *see* Pet. ¶¶ 32, 177–79, "an ordinary business relationship, without more, does not constitute a conspiracy."  *Allen*, 94 F. Supp. 3d at 1224.  Accordingly, the Nation's civil conspiracy claim should be dismissed.

## VIII.   THE NATION DOES NOT HAVE STANDING TO ASSERT ITS *PARENS PATRIAE* CLAIMS.

The preceding arguments would resolve the case and lead to a complete dismissal of the Petition.  But even setting aside these arguments, the Nation lacks standing to assert its *parens patriae* claims.  *See* Pet. ¶¶ 10, 12 (purporting to bring suit under "*parens patriae* authority" on behalf of all Cherokee Nation members, regardless of where they live).

The *parens patriae* doctrine developed to allow states—which, along with the federal government, are the "twin sovereigns in our constitutional scheme"—to bring suit "in appropriate circumstances … to vindicate interests of their citizens." *In re Multidistrict Vehicle Air Pollution M.D.L. No. 31*, 481 F.2d 122, 131 (9th Cir. 1973). As such, it "creates an exception to normal rules of standing … [and] has been narrowly construed." *Estados Unidos Mexicanos v. DeCoster*, 229 F.3d 332, 335 (1st Cir. 2000).

The Nation's sovereignty, moreover, "is limited in ways state [sovereignty] is not." *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 340 (2008). The sovereignty that Indian tribes "retain is of a unique and limited character … center[ed] on the land held by the tribe and on tribal members within the reservation." *Id.* at 327. Thus, while tribes have certain sovereign powers of government within Indian Country, a tribe's "inherent sovereignty ceases at the reservation's borders." *MacArthur v. San Juan County*, 497 F.3d 1057, 1071 (10th Cir. 2007).

In the context of the limited sovereignty afforded to Indian tribes, the *parens patriae* "doctrine is reserved for actions which are asserted on behalf of *all* of the sovereign's citizens." *United States v. Santee Sioux Tribe of Neb.*, 254 F.3d 728, 734 (8th Cir. 2001) (emphasis in original); *Navajo Nation v. Superior Court of State of Wash. for Yakima Cnty.*, 47 F. Supp. 2d 1233, 1240 (E.D. Wash. 1999) *aff'd*, 331 F.3d 1041 (9th Cir. 2003) ("The Navajo Nation has failed to prove it is acting on behalf of all of its members in order to litigate as *parens patriae*.").[24]

---

[24] *See also Assiniboine & Sioux Tribes v. Mont.*, 568 F. Supp. 269, 277 (D. Mont. 1983) (rejecting argument that tribes' "sovereign status allows them to bring suit on behalf of those within their jurisdiction" as *parens patriae* because tribes were not "acting on behalf of the collective interests of *all* [their] citizens" (emphasis in original)); *Ala. & Coushatta Tribes of Tex. v. Trs. of Big Sandy Indep. Sch. Dist.*, 817 F. Supp. 1319, 1327 (E.D. Tex. 1993) ("the Tribe is not representing the interests of all its members in this case, as the doctrine of *parens patriae* requires"); *Kickapoo Traditional Tribe of Tex. v. Chacon*, 46 F. Supp. 2d 644, 652 (W.D. Tex. 1999) ("the Court cannot agree that the Tribe has demonstrated that it has standing under the *parens patriae* doctrine … because the rights which it seeks to assert are … not those of the Tribe as a whole").

Here, the Nation alleges in a conclusory fashion that the "entire community of Cherokee Nation and Cherokee Nation citizens" have been affected, Pet. ¶ 135, but courts "are not bound by [such] conclusory allegations" when evaluating a party's standing to sue, *Hackford v. Babbitt*, 14 F.3d 1457, 1465 (10th Cir. 1994). Because the Petition contains no well-pled allegations that prescription opioid use and abuse affects all of the Nation's citizens, the Nation's *parens patriae* claims fail. *See, e.g.*, *Kickapoo Tribe of Okla. v. Lujan*, 728 F. Supp. 791, 795 (D.D.C. 1990) (rejecting *parens patriae* standing because "the Tribe would not be representing the interests of all members as the doctrine of *parens patriae* requires").

Although a state may "qualify for *parens patriae* standing" by alleging injury to a "sufficiently substantial segment of its population," *Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592, 607 (1982), a long line of cases, reflecting the more limited sovereignty of Indian tribes, has not applied this "substantial segment" test to *parens patriae* claims asserted by tribes and has instead required "a sovereign tribe [to] be acting on behalf of all of its members in order to litigate as *parens patriae*," *Kickapoo Tribe of Okla.,* 728 F. Supp. at 795; *accord* n.24 and accompanying text. But, even assuming the Nation need only allege injury to a "substantial segment" of its population, its *parens patriae* claims would still fail. For instance, the Nation alleges that it has approximately 335,000 citizens and that there were approximately "350 opioid-related deaths within the [] Nation between 2003 and 2014." Pet. ¶¶ 12, 41. As unfortunate as any death may be, the alleged death of approximately 0.1% of its population over the course of more than a decade simply does not constitute injury to a "substantial segment" of its population. No other allegations of the Petition suffice to allege injury to a "substantial segment" of the Nation's population.

At a minimum, the Nation's *parens patriae* claims should be limited to conduct that occurred on tribal land or to harm allegedly incurred by citizens who live within Indian Country.

"Indian tribes cannot exercise power inconsistent with their diminished status as sovereigns." *Montana v. United States*, 450 U.S. 544, 565 (1981).  The Nation only has "jurisdiction over the activities of its members, and limited authority over the activities of non-members, on land designated as 'Indian Country' under 18 U.S.C. § 1151(a)."  *The Quapaw Tribe of Oklahoma v. Blue Tee Corp.*, 653 F. Supp. 2d 1166, 1180 (N.D. Okla. 2009).  Yet the 14-county area invoked in the Petition, Pet. ¶ 11, is far broader than the Nation's "Indian Country,"[25] and thereby encompasses conduct and people who are outside the Nation's sovereign authority.  Because the Nation cannot invoke a sovereign capacity that it does not have, the Nation's *parens patriae* claims fail to the extent they are premised on conduct outside tribal land.  *See Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 208 (1978) ("Indian tribes are prohibited from exercising … those powers of autonomous states that are … *inconsistent with their status*.").

## IX.   THE NATION CANNOT ASSERT CLAIMS ON BEHALF OF NON-OKLAHOMA RESIDENTS.

The Nation purports to assert claims under Oklahoma law on behalf of non-Oklahoma residents for alleged conduct that did not occur in Oklahoma and did not cause harm in Oklahoma.  *See, e.g.*, Pet. ¶¶ 12, 55–63, 181, 199–207.  For two separate reasons, the Nation's attempt to assert claims on behalf of non-Oklahoma residents fails as a matter of law.

First, the claims violate due process.  In order to assert claims under Oklahoma law, Oklahoma "must have a significant contact or significant aggregation of contacts to the claims asserted by ***each member of the plaintiff class***, contacts creating state interests, in order to ensure

---

[25] The Nation does not have a reservation, nor does it allege otherwise.  *See* Pet. ¶ 11 (alleging only a 14-county "jurisdictional area").  The Nation's Indian country is limited, in effect, to tribal trust land and allotments.  *See* 18 U.S.C. § 1151 (defining "Indian country" to include "reservation[s]," "dependent Indian communities," and "Indian allotments"); *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505, 511 (1991) (treating tribal trust land as Indian country).

that the choice of [Oklahoma] law is not arbitrary or unfair." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821–22 (1985). The Petition does not allege **any** contacts with Oklahoma in connection with the Nation's claims on behalf of non-Oklahoma residents, much less a significant contact or significant aggregation of contacts.[26]

Second, "the presence or absence of a more appropriate party or parties capable of bringing suit" must be "consider[ed] in determining whether to allow a state to proceed as *parens patriae*." *Puerto Rico ex rel. Quiros v. Bramkamp*, 654 F.2d 212, 217 (2d Cir. 1981); *see also Pennsylvania ex rel. Shapp v. Kleppe*, 533 F.2d 668, 675 (D.C. Cir. 1976) ("the presence or absence of a more appropriate party or parties capable of bringing the suit" is "influential" in determining whether a state has *parens patriae* standing). Here, there are more appropriate parties capable of bringing suit on behalf of non-Oklahoma residents: the allegedly injured citizens themselves and the Attorneys General of the states in which those people live.

The "possibility of double recovery," moreover, further "weigh[s] against a finding of *parens patriae* standing" as to non-Oklahoma residents. *Puerto Rico ex rel. Quiros*, 654 F.2d at 217 n.8; *see also Pennsylvania ex rel. Shapp*, 533 F.2d at 675 n.42 ("the threat of double recovery stands as a major obstacle to any state action for damages"). The Nation seeks to recover in its *parens patriae* capacity for alleged harm that is properly recovered, if at all, by its citizens, *see*

---

[26] "When considering fairness in this context, an important element is the expectation of the parties." *Shutts*, 472 U.S. at 822. Because Distributors' "rational expectations [we]re not based upon the laws of [Oklahoma], it violates due process to breach those expectations by applying the unexpected law" to claims premised upon injury to residents of states other than Oklahoma. *McCluney v. Joseph Schlitz Brewing Co.*, 649 F.2d 578, 582 (8th Cir. 1981), *aff'd*, 454 U.S. 1071 (1981); *see also Soo Line R. Co. v. Overton*, 992 F.2d 640, 645 (7th Cir. 1993) ("the contacts with Minnesota were casual and insignificant and, therefore, application of Minnesota law … was constitutionally impermissible"); *Hilb Rogal & Hobbs Co. v. Rick Strategy Partners, Inc.*, 2006 WL 5908727, at *10 (E.D. Va. Feb. 10, 2006) ("The implication … that a plaintiff can determine what state's law will apply by asserting a cause of action under a particular state's law in its complaint is patently absurd.").

*supra* Part I.B.  To the extent that any sovereign has *parens patriae* standing to assert claims on behalf of those individuals, moreover, it would be the Attorneys General of the states in which they reside.  Indeed, many of the individuals the Nation purports to represent in this lawsuit live in states—including Arkansas and Washington—whose Attorneys General have already brought claims against Distributors based on exactly the same conduct and injury as alleged here.  For this reason, too, the Nation should be precluded from asserting claims on behalf of individuals who reside outside Oklahoma.

## CONCLUSION

For the foregoing reasons, the Nation's claims against Distributors should be dismissed.

Dated March 16, 2020

Respectfully submitted,

*s/Stuart D. Campbell*
Stuart D. Campbell, OBA #11246
Kaylee Davis-Maddy, OBA #31534
DOERNER, SAUNDERS, DANIEL
& ANDERSON, L.L.P.
700 Williams Center Tower II
Two West Second Street
Tulsa, Oklahoma 74103-3522
Telephone 918-582-1211
Facsimile 918-591-5360
scampbell@dsda.com
kmaddy@dsda.com

*Counsel to Defendant McKesson*
*Corporation*

*s/D. Michael McBride, III*
*(Signed with permission by filing counsel)*
D. Michael McBride III, OBA  #15431
Susan E. Huntsman, OBA #18401
CROWE & DUNLEVY
A Professional Corporation
500 Kennedy Building
321 S. Boston Ave.
Tulsa, O K 74103
Telephone 918-592-9800
Facsimile 918-592-9801
mike.mcbride@crowedunlevy.com
susan.huntsman@crowedunlevy.com

*Counsel for Defendant AmerisourceBergen*
*Drug Corporation*

*s/ Ryan A. Ray*
*(Signed with permission by filing counsel)*
Joel L. Wohlgemuth, OBA #9811
Ryan A. Ray, OBA #22281
NORMAN  WOHLGEMUTH  CHANDLER  JETER
BARNETT & RAY, P.C.
2900 Mid-Continent Tower
401 S. Boston Ave.
Tulsa, OK 74103

41

Tel:     (918) 583-7571
Fax:     (918) 584-7846
E-mail:rar@nwcjlaw.com
          jlw@nwcjlaw.com

*Counsel for Defendants Cardinal Health, Inc. and Cardinal Health 110, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that the following parties are being served with a copy of this document on this March 16, 2020, in accordance with the Federal Rules via CM/ECF or as otherwise indicated below:

M. Todd Hembree
Chrissi Ross Nimmo
John Young
Washington, DC 20036
The Cherokee Nation
P.O. Box 948
Tahlequah, OK 74464

Stephen N. Zack
Tyler Ulrich
Patricia A. Melville
BOIES SCHILLER FLEXNER, LLP
100 SE 2nd Street, Suite 2800
Miami, Florida 33131

Richard Fields
FIELDS LAW PLLC
2000 Massachusetts Ave.
Washington, DC 20036

William S. Ohlemeyer
BOIES SCHILLER FLEXNER, LLP
333 Main Street
Armonk, NY 10504

Frank Sullivan, III
SULLIVAN & SULLIVAN, PLLC
P.O. Box 768, 105 N. Oak
Sallisaw, Oklahoma 74955

*s/Stuart D. Campbell*

5302649.1

42