**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| THE CHEROKEE NATION,<br><br>      Plaintiff,<br><br>vs.<br><br><br>MCKESSON CORPORATION;<br>CARDINAL HEALTH, INC.;<br>CARDINAL HEALTH 110, LLC;<br>AMERISOURCEBERGEN DRUG<br>CORPORATION;<br>CVS PHARMACY, INC.;<br>OKLAHOMA CVS PHARMACY, LLC;<br>WALGREENS BOOTS ALLIANCE, INC.;<br>WALGREEN CO.;<br>WAL-MART STORES, INC.,<br><br><br>      Defendants. | Case No. 6:18-cv-00056-RAW<br><br>JURY TRIAL DEMANDED |

**<u>FIRST AMENDED COMPLAINT</u>**

## TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................. 1

II.    PARTIES ........................................................................................................ 5

       A.    Plaintiff ............................................................................................. 5

       B.    Defendants ........................................................................................ 6

III.   JURISDICTION AND VENUE ..................................................................... 9

IV.    FACTUAL BACKGROUND ........................................................................ 10

       A.    Defendants contributed to the creation of a devastating opioid crisis in
             Cherokee Nation. ............................................................................ 10

       B.    Defendants had duties to identify, report, and take steps to halt suspicious
             orders, and to prevent diversion at the point of sale. ........................................ 16

             1.    The common law........................................................................ 17

             2.    Defendants' own conduct. .................................................... 18

             3.    Federal anti-drug diversion statutes and regulations. .......................... 20

             4.    Duties under Oklahoma controlled substances law. ............................ 26

             5.    Legal duties applicable to Pharmacy Defendants. .............................. 29

       C.    Defendants deliberately disregarded their duties. ........................................... 41

             1.    The distribution and dispensing numbers alone establish gross
                   negligence. ............................................................................ 41

             2.    Defendants have been repeatedly investigated and fined for their
                   wrongdoing. ............................................................................ 47

             3.    Defendants continued to violate their duties regardless of prior
                   regulatory actions........................................................................ 60

       D.    Defendants have injured and continue to injure Cherokee Nation. .................. 67

       E.    Defendants' concealment and conspiracy........................................................ 70

V.     CLAIMS FOR RELIEF ............................................................................... 73

       COUNT I: NUISANCE ............................................................................... 73

COUNT II: NEGLIGENCE/GROSS NEGLIGENCE ................................................. 76

COUNT III: UNJUST ENRICHMENT........................................................................ 78

COUNT IV: CIVIL CONSPIRACY ........................................................................... 79

PRAYER FOR RELIEF ............................................................................................. 82

## I.    INTRODUCTION

1.      Plaintiff, the Cherokee Nation ("Plaintiff" or "Cherokee Nation"), brings this First Amended Complaint for compensatory, punitive, other damages, restitution, and abatement.

2.      Prescription opioids are powerful pain-reducing medications. When used properly, they can help manage pain for certain patients. But, even then, these drugs can cause addiction, overdose, and death. When used to treat chronic pain, or when used for non-medical purposes, those risks are amplified.

3.      In recent years, opioid use for non-medical purposes has grown dramatically, resulting in an epidemic of abuse. Nationwide, millions of Americans are addicted to prescription opioids, and tens of thousands die annually from opioid overdoses.

4.      According to the Centers for Disease Control and Prevention ("CDC"), in Oklahoma, where Cherokee Nation is located, 2,315 people died of drug overdoses between 2014 and 2016, and the "main driver" of these deaths was prescription and illicit opioids.[1] Data from the Substance Abuse and Mental Health Services Administration indicates that over 194,000 people use prescription opioids for non-medical purposes in Oklahoma alone.[2]

5.      Oklahoma, where the majority of Cherokee Nation's citizens reside, has led the country in opioid abuse. Oklahoma has ranked number one nationally for the non-medical use of

---

[1] CDC, *Drug Overdose Death Data*, https://www.cdc.gov/drugoverdose/data/statedeaths.html (last updated December 19, 2017) (777 deaths in 2014; 725 deaths in 2015; 813 deaths in 2016).
[2] Substance Abuse and Mental Health Servs. Admin., *National Survey on Drug Use and Health: Comparison of 2002–2003 and 2013–2014 Population Percentages (50 States and the District of Columbia)* 16–17 (2015), http://www.samhsa.gov/data/sites/default/files/NSDUHsaeLongTermCHG2014/NSDUHsaeLongTermCHG2014.pdf.

prescription opioids for adults.[3] In recent years, more overdose deaths in Oklahoma involved hydrocodone or oxycodone than alcohol, cocaine, methamphetamine, heroin, and all other illegal drugs combined.[4]

6.      Deaths of Cherokee Nation citizens contribute to these statewide statistics. The U.S. Surgeon General has visited the tribal representatives in Oklahoma and declared that the "prescription opioid epidemic that is sweeping across the U.S. has hit Indian country particularly hard." Cherokee Nation has suffered injury different in kind from the general public.

7.      The opioid epidemic in Cherokee Nation could have been, and should have been, prevented by Defendant companies acting within the U.S. drug distribution industry, which are some of the largest corporations in America. These drug wholesalers and retailers have profited greatly by causing Cherokee Nation to become flooded with prescription opioids.

8.      Studies suggest that a substantial number of the opioid prescriptions issued in Oklahoma each year are diverted to non-medical uses. These conclusions about opioid diversion are further supported by Drug Enforcement Administration ("DEA") data showing that in recent years Oklahoma, where Cherokee Nation is located, has seen annual distribution exceeding 660 milligrams per citizen, and 5,923 milligrams per opioid user.[5]

---

[3] Rachel N. Lipari et al., Substance Abuse and Mental Health Servs. Admin., *State and Substate Estimates of Nonmedical Use of Prescription Pain Relievers* (2017), https://www.samhsa.gov/data/sites/default/files/report_3187/ShortReport-3187.html.
[4] *See* CDC, Wide-Ranging Online Data for Epidemiologic Research (WONDER), http://wonder.cdc.gov.
[5] Drug Enf't Admin., ARCOS 3 - Report 1, *Retail Drug Distribution By Zip Code Within State by Grams Weight*, https://www.deadiversion.usdoj.gov/arcos/retail_drug_summary/2013/2013_rpt1.pdf; https://www.deadiversion.usdoj.gov/arcos/retail_drug_summary/2014/2014_rpt1.pdf; https://www.deadiversion.usdoj.gov/arcos/retail_drug_summary/2015/2015_rpt1.pdf; https://www.deadiversion.usdoj.gov/arcos/retail_drug_summary/report_yr_2016.pdf.

9. As detailed below, Defendants have legal obligations to combat diversion, which they have routinely and continuously failed to do. They have taken advantage of the massively increased demand for prescription opioids for non-medical uses (which demand was itself created by Defendants' conduct) by profiting heavily from the sale of opioids that they knew, or should have known, were being diverted from the legitimate supply chain to illegitimate channels of distribution and use. The failure of Defendants to comply with their legal obligations to prevent diversion and to alert authorities to potential diversion continues today, despite (a) the well-known harm resulting from the opioid crisis, and (b) substantial fines levied against multiple Defendants relating to diversion. As a result of these shortcomings, unauthorized opioid users in and around Cherokee Nation have ready access to opioids from Defendants' supply lines.

10. The misconduct of Defendants, including their consistent failure to comply with their legal obligations and their concealment thereof, has led to an epidemic of prescription opioid abuse. American Indians, including Cherokee Nation, have been significantly impacted by this epidemic. American Indians suffer the highest per capita rate of opioid overdoses.[6]

11. Hundreds of American Indians have died of opioid overdoses in recent years. And the number of lethal overdoses hardly captures the impact of Defendants' conduct on Cherokee Nation citizens. For every opioid overdose death, it is estimated that there are 10 treatment admissions for abuse, 32 emergency room visits, 130 people who are addicted to opioids, and 825 non-medical users of opioids.[7]

---

[6] National Congress of American Indians Policy Research Center, *Reflecting on a Crisis Curbing Opioid Abuse in Communities* (Oct. 2016), http://www.ncai.org/policy-research-center/research-data/prc-publications/Opioid_Brief.pdf.

[7] Jennifer DuPuis, *The Opioid Crisis in Indian Country*, at 37, https://www.nihb.org/docs/06162016/Opioid%20Crisis%20Part%20in%20Indian%20Country.pdf (last visited Apr. 10, 2020); Gery P. Guy, Jr. et al., *Emergency Department Visits Involving*

12.     Studies have reported that American Indian teens abuse prescription opioids at rates 60% higher than white youths.[8] The opioid epidemic has also injured even the youngest members of Indian society. In 1992, in the United States, only 2% of pregnant women admitted for drug treatment services abused opioids. By 2012, opioids accounted for 38% of all drug treatment admissions of pregnant women.[9] Many tribal women have become addicted to prescription opioids and have used these drugs during their pregnancies. As a result, many tribal infants suffer from opioid withdrawal and Neonatal Abstinence Syndrome, which can have adverse short- and long-term developmental consequences.[10]

13.     Defendants' prescription opioid diversion on and around Cherokee Nation contributes to a range of additional social problems, including child abuse and neglect, and family dysfunction. Cherokee children are regularly removed from their families as a result of prescription opioid dependency and abuse by both children and parents—all of which directly or indirectly affect substantially all citizens of Cherokee Nation. These removals harm children and families, and they harm Cherokee Nation itself, particularly when children are placed with families outside Cherokee Nation. Other social problems caused by the opioid epidemic include criminal behavior, poverty, public blight, unemployment, loss of productivity, and social despair.

---

*Opioid Overdoses, U.S., 2010–2014*, 54 AM. J. OF PREVENTIVE MEDICINE (Jan. 2018), http://www.ajpmonline.org/article/S0749-3797(17)30494-4/fulltext.

[8] Linda R. Stanley, *Rates of Substance Use of American Indian Students in 8th, 10th, and 12th Grades Living on or Near Reservations: Update, 2009–2012*, PUB. HEALTH REP. (Mar.–Apr. 2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3904895/table/T1/.

[9] Naana Afua Jumah, *Rural, Pregnant, and Opioid Dependent: A Systematic Review*, 10 SUBSTANCE ABUSE 35 (2016), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4915786/.

[10] Jean Y. Ko et al., *CDC Grand Rounds: Public Health Strategies to Prevent Neonatal Abstinence Syndrome*, 66 MORBIDITY AND MORTALITY WEEKLY REPORT 242 (Mar. 10, 2017), https://www.cdc.gov/mmwr/volumes/66/wr/pdfs/mm6609a2.pdf.

14.     Damages suffered by Cherokee Nation include the costs of (a) medical care, therapeutic and prescription drugs, and other treatments for patients suffering from opioid-related addiction, overdoses, or disease; (b) law enforcement by Cherokee Nation's own law enforcement agencies and public safety measures necessitated by the ongoing opioid crisis; (c) opioid-related counseling and rehabilitation services; (d) welfare for children whose parents suffer from opioid-related disease or incapacitation; (e) increased crime, property damage, and public blight caused by opioids.

15.     These costs were incurred not by reason of an accident or emergency situation necessitating the normal provision of police, fire, and emergency services, but rather to address public harm caused by a persistent course of deceptive and unlawful conduct by Defendants.

16.     Cherokee Nation seeks: (a) injunctive relief; (b) compensatory damages; (c) punitive damages; (d) restitution; (e) disgorgement of all amounts unjustly obtained by Defendants; (f) abatement; (g) attorneys' fees and costs; and (h) such further relief as justice may require.

## II.     PARTIES

### A.     Plaintiff

17.     Cherokee Nation is a sovereign Indian nation that occupies all or part of 14 Counties in Northeast Oklahoma, which are Adair, Cherokee, Craig, Delaware, Mayes, McIntosh, Muskogee, Nowata, Ottawa, Rogers, Sequoyah, Tulsa, Wagoner, and Washington ("the 14 Counties"). Cherokee Nation's jurisdiction is recognized by state, federal, and tribal law. Cherokee Nation is not a citizen of any state for purposes of diversity jurisdiction. Cherokee Nation has

approximately 385,000 citizens, the majority of which live in and around Cherokee Nation.[11] Cherokee Nation citizens comprise a significant percentage of the population in these counties.

18.     The Attorney General of Cherokee Nation brings this action in the exercise of her powers on behalf of the Cherokee Nation, in its proprietary capacity and under its *parens patriae* authority, in the public interest to protect the health, safety, and welfare of the citizens of Cherokee Nation. Cherokee Nation is not asserting claims that belong to individual Cherokee citizens, nor seeking to recover on behalf of individual citizens based on those individuals' personal injuries or wrongful deaths. Instead, Cherokee Nation is seeking damages for harm to Cherokee Nation as a tribal sovereign, including recovery of the funds Cherokee Nation had to spend on opioid-related care that would otherwise have been available to provide services to its citizens.

### B.     Defendants

19.     Defendants have distributed, supplied, sold, and placed into the stream of commerce the prescription opioids in and around Cherokee Nation. All Defendants were engaged in "wholesale distribution," as defined under state and federal law. Additionally, three of the Defendants—Walmart, Walgreens, and CVS—also dispensed opioids at retail pharmacies, and therefore had additional duties to prevent drug diversion at the point of sale. Defendants' unlawful conduct in the distribution and dispensing of prescription opioids is a substantial cause for the opioid crisis in Cherokee Nation.

20.     Defendant McKesson Corporation ("McKesson"), through its various DEA registered subsidiaries and affiliated entitles, is a wholesale distributor of prescription opioids. McKesson was listed seventh on the Fortune 500 in 2019, with annual revenue of $208 billion. McKesson is authorized to conduct business in Oklahoma and has distributed substantial amounts

---

[11] The Cherokee Reservation is called the "Cherokee Nation Jurisdictional Area."

of prescription opioids in Oklahoma and Cherokee Nation. McKesson is a Delaware business entity with its principal place of business in California.

21.     Defendant Cardinal Health, Inc., through its various DEA registered subsidiaries and affiliated entitles including defendant Cardinal Health 110, LLC (together, "Cardinal"), is a wholesale distributor of prescription opioids. Cardinal was listed sixteenth on the Fortune 500 in 2019, with annual revenue of $136 billion. Cardinal is authorized to conduct business in Oklahoma and has distributed substantial amounts of prescription opioids in Oklahoma and in Cherokee Nation. Cardinal Health, Inc., is an Ohio business entity with its principal place of business in Ohio. Cardinal Health 110, LLC, is a Delaware business entity with its principal place of business in Ohio.

22.     Defendant AmerisourceBergen Drug Corporation ("AmerisourceBergen"), through its various DEA registered subsidiaries and affiliated entitles, is a wholesale distributor of prescription opioids. AmerisourceBergen was listed tenth on the Fortune 500 in 2019, with annual revenue of $167 billion. AmerisourceBergen is authorized to conduct business in Oklahoma and has distributed substantial amounts of prescription opioids in Oklahoma and in Cherokee Nation. AmerisourceBergen is a Delaware business entity with its principal place of business in Pennsylvania.

23.     Defendant Walgreens Boots Alliance, Inc., through its various DEA registered subsidiaries and affiliated entitles—including defendant Walgreen Co. (together, "Walgreens")—is both a distributor of prescription opioids and a retail dispenser of prescription opioids through a national chain of pharmacies, including locations in Cherokee Nation. Walgreens was listed seventeenth on the Fortune 500 in 2019, with annual revenue of $131,537. According to Walgreens' 2019 Annual Report, Walgreens operates 9,277 retail pharmacies in the United States

and filled 1.2 billion prescriptions on a 30-day adjusted basis in 2019. Walgreens is authorized to conduct business in Oklahoma and has both distributed and dispensed substantial amounts of prescription opioids in Oklahoma and in Cherokee Nation. Walgreen Co. is an Illinois business entity with its principal place of business in Illinois. Walgreens Boots Alliance, Inc., is a Delaware business entity with its principal place of business in Illinois.

24.   Defendant Walmart Inc. (formerly known as "Wal-Mart Stores, Inc.") ("Walmart"), through its various DEA registered subsidiaries and affiliated entitles, is both a distributor of prescription opioids and a retail dispenser of prescription opioids through a national chain of pharmacies, including locations in Cherokee Nation. Walmart was the number one company listed on the Fortune 500 in 2019, with annual revenue of more than half a trillion dollars. Walmart is authorized to conduct business in Oklahoma and has both distributed and dispensed substantial amounts of prescription opioids in Oklahoma and in Cherokee Nation. Walmart is a Delaware business entity with its principal place of business in Arkansas.

25.   Defendant CVS Pharmacy, Inc., through its various DEA registered subsidiaries and affiliated entitles—including defendant Oklahoma CVS Pharmacy LLC (together, "CVS")— is both a distributor of prescription opioids and a retail dispenser of prescription opioids through a national chain of pharmacies, including locations in Cherokee Nation. CVS's parent company (CVS Health) was listed eighth on the Fortune 500 in 2019, with annual revenue of $194 billion dollars. CVS is authorized to conduct business in Oklahoma and has both distributed and dispensed substantial amounts of prescription opioids in Oklahoma and in Cherokee Nation. CVS Pharmacy, Inc., is a Rhode Island business entity with its principal place of business in Rhode Island.

Oklahoma CVS Pharmacy LLC is an Oklahoma business entity with its principal place of business in Rhode Island.[12]

26.     All of the actions described in this complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or done by Defendants' officers, Defendants' affairs within the course and scope of their duties and employment, and/or with Defendants' actual, apparent, and/or ostensible authority.

## III.     **JURISDICTION AND VENUE**

27.     This case was removed from the District Court of Sequoyah County, State of Oklahoma. The transferee court in the Multidistrict Litigation *In Re: National Prescription Opiate Litigation*, MDL No. 2804 (N.D. Ohio) denied Cherokee Nation's motion for remand and ruled that jurisdiction exists under 28 U.S.C. § 1442.

28.     This Court has personal jurisdiction over all Defendants because each Defendant has substantial contacts and business relationships with Oklahoma, including consenting to be sued in Oklahoma by registering an agent for service of process and/or obtaining a distributor license, and has purposefully availed itself of business opportunities in Oklahoma, including by distributing or selling prescription opioids in Oklahoma and on and around Cherokee Nation.

29.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in this judicial district and because all Defendants are subject to this Court's jurisdiction.

---

[12] All references to "Defendants" refer to all of the Defendants in this action, i.e., McKesson, Cardinal, AmerisourceBergen, Walgreens, Walmart, and CVS. References to "Pharmacy Defendants" refer to the Defendants that also own and operate national retail pharmacy chains, i.e., Walgreens, Walmart, and CVS.

## IV.   FACTUAL BACKGROUND

### A.   Defendants contributed to the creation of a devastating opioid crisis in Cherokee Nation.

30.     "Opioids" are a class of drugs that bind with opioid receptors in the brain. They produce multiple effects on the human body, the most significant of which are analgesia, euphoria, and respiratory depression. Opioids include all drugs derived in whole or in part from the opium poppy—natural, synthetic, and semi-synthetic opioids. Prescription opioids and heroin, for example, are both synthesized from the opium poppy and have similar molecular structures. The opium poppy contains various opium alkaloids, three of which are used in the pharmaceutical industry today: morphine, codeine, and thebaine.

31.     Prescription opioids are powerful, highly addictive painkillers that include oxycodone, hydrocodone, morphine, and codeine. Patients develop tolerance to the analgesic effect of opioids relatively quickly. As tolerance increases, a patient typically requires progressively higher doses in order to obtain the same perceived level of pain reduction. The same is true of the euphoric effects of opioids—the "high." However, opioids depress respiration, and at high doses can and often do arrest respiration altogether. At higher doses, the effects of withdrawal are more severe. Depending on the dose and the length of time the opioids were used, withdrawal symptoms include severe anxiety, nausea, vomiting, headaches, agitation, insomnia, tremors, hallucinations, delirium, pain, and other serious symptoms, which may persist for months after a complete withdrawal from opioids.

32.     According to the CDC, from 2006 through 2017, Oklahoma ranked between 4th and 8th in the nation in total opioid prescribing rates each year. In 2017, there were 479 opioid prescriptions dispensed every hour across the State.

33.     The 14 Counties of Cherokee Nation were flooded with opioid pills around this time period. According to the DOJ's Automated Reports and Consolidated Ordering System ("ARCOS"),[13] between 2006 and 2014, Defendants shipped more than half a billion dosage units of prescription opioids into the 14 Counties, with the following numbers for each of Defendants:

   a.  AmerisourceBergen: 94,243,792 dosage units;

   b.  CVS: 8,456,500 dosage units;

   c.  Cardinal: 61,710,128 dosage units;

   d.  McKesson: 152,759,968 dosage units;

   e.  Walmart: 97,613,016 dosage units;

   f.  Walgreens: 140,004,032 dosage units;

34.     No segment of the Cherokee Nation's population was spared from the harmful effects of Defendants' reckless oversupply of opioids. From 1994 to 1996, there was only 1 unintentional overdose involving oxycodone in Oklahoma. From 2012 to 2014, there were 484. From 2007 to 2012, two thirds of all children who died from an unintentional poisoning died from a prescription opioid. Since 2011, more people have died from opioids in Oklahoma than from car accidents.

35.     According to recent county-level estimates by the CDC about drug poisoning deaths between 2003 and 2017, it is estimated there were about 3,300 such deaths in the 14

---

[13] ARCOS is an automated drug reporting system which monitors the flow of Schedule II controlled substances, which include prescription opioids, from their point of manufacture through commercial distribution channels to point of sale. ARCOS accumulates data on distributors' controlled substances acquisition/distribution transactions, which are then summarized into reports used by the DEA to identify any diversion of controlled substances into illicit channels of distribution.

Counties during that time frame.[14] Since Cherokee citizens make up a large percentage of the population in the 14 Counties, they suffered a large percentage of that harm.

36.     For every Cherokee Nation citizen who died from opioids, there are countless others suffering from addiction and other devastating effects of these drugs. For every opioid-related death within Cherokee Nation, there are numerous hospital admissions and emergency room visits related to opioids, as well as instances of dependence and non-medical use of opioids, all of which have adverse consequences on the Cherokee Nation.

37.     Nationwide data collected from 2002 to 2017 describing rates of "pain reliever use disorder" among different segments of the population (which reflects use and abuse of prescription opioids) indicates the prescription opioid crisis affects tribal communities about twice as hard as non-tribal populations.

38.     Cherokee Nation has taken proactive measures in its own healthcare system to fight against prescription opioid abuse. It was an early adopter of using information technologies to combat opioid diversion. Cherokee Nation healthcare providers implemented and relied on a prescription monitoring program ("PMP") before use of PMP was required. Cherokee Nation doctors access and review their patients' prescription histories directly at the point of care. Cherokee Nation also cracked down on opioid distributors promoting Cherokee Nation doctors to prescribe opioids, and modified its prescription drug "formulary" to eliminate certain prescription opioids such as hydrocodone that are most widely distributed and/or sold by Defendants. But these measures are not effective in the face of Defendants' conduct.

---

[14] *See* Centers for Disease Control and Prevention, *NCHS - Drug Poisoning Mortality by County: United States*, DATA.CDC.GOV (Apr. 29, 2019), https://data.cdc.gov/NCHS/NCHS-Drug-Poisoning-Mortality-by-County-United-Sta/rpvx-m2md (visited April 9, 2020).

39.     The dramatic rise in heroin use in recent years is a direct result of prescription opioid diversion. From 2007 to 2012, heroin deaths in Oklahoma increased approximately ten-fold. Nationally, opioid overdose deaths and heroin use have increased in lockstep with opioid sales volumes.

40.     The CDC recently reported that the strongest risk factor for a heroin use disorder is prescription opioid use. In one national study covering the period 2008 to 2010, 77.4% of the participants reported using prescription opioids before initiating heroin use. Studies indicate 75% of those who began their opioid abuse in the 2000s started with a prescription opioid. People who are dependent on prescription opioid painkillers are 40 times more likely to become dependent on heroin.

41.     The overdose rate among American Indians, including Cherokee Nation citizens, is significantly higher than the rest of the population. American Indians in general are more likely than other racial/ethnic groups in the United States to die from drug-induced deaths. Among American Indian tribes, Cherokee Nation has been particularly hard hit by the effects of the Defendants' opioid diversion. Oklahoma, where most Cherokee Nation citizens reside, has led the country in opioid abuse.

42.     It has been reported that by 12th grade, nearly 13 percent of American Indian teens have used OxyContin, one of the deadliest opioids when misused. The use of OxyContin by American Indian 12th-graders was about double the national average. A 2014 study funded by the National Institute on Drug Abuse found a much higher prevalence of drug and alcohol use in the American Indian 8th and 10th graders compared with national averages. American Indian students' annual heroin and OxyContin use was about two to three times higher than the national averages in those years. The fact that American Indian teens, including Cherokee Nation children, are able

to obtain OxyContin at these alarming rates indicates the degree to which drug diversion has created a secondary market for opioids.

43.     Sadly, even Cherokee Nation's youngest citizens bear the consequences of the opioid abuse epidemic. Many Cherokee infants are born addicted to prescription opioids and suffer from opioid withdrawal and Neonatal Abstinence Syndrome. The impact of Neonatal Abstinence Syndrome can be life-long. Most Neonatal Abstinence Syndrome babies are immediately transferred to a neonatal intensive care unit for a period of days, weeks or even months, depending on the severity of the symptoms and complications related to the prenatal exposure to opioids. This can require an emergency helicopter evacuation from Cherokee Nation hospital to Tulsa for extraordinary emergency care to save the life of the newborn child. In many cases, disabilities follow these children through elementary school and beyond.

44.     It has been reported that pregnant American Indian women are up to 8.7 times more likely to be diagnosed with opioid dependency or abuse compared to the next highest race/ethnicity. On information and belief, these statistics apply similarly to pregnant women who are Cherokee citizens or the mothers of Cherokee children.

45.     As a result of Defendants' conduct, Cherokee Nation's Indian Child Welfare ("ICW") office, whose sole responsibility is to receive reports of child abuse and/or neglect, has seen a steady increase in the number of adults who abuse prescription opioid drugs over the last five years. In recent years, as much as 40% of the ICW cases involving deprived children involved opioid abuse.

46.     Many of the babies or children who come into the custody of ICW to be placed in foster or adoptive homes were born with opioid dependence. This makes it difficult to find foster parents because of the associated health problems and the considerable difficulties in caring for

these babies. As a result, a significant number of Cherokee children are being placed in homes of non-Cherokee families. More than two-thirds of the Cherokee children who require foster or adoptive care must be placed with non-Cherokee families. Approximately 1,000 Cherokee children are placed in foster or adoptive homes every year. The Cherokee Nation, as protector of its history and culture, is irreparably injured when Cherokee children are sent to foster homes or adopted by non-Cherokee families.

47.     In recent years, the amount of visits to Cherokee Nation's Behavioral Health Department have increased substantially. Cherokee Nation's Behavioral Health Department in Tahlequah alone has handled approximately 900 to 1,000 visits per month, or approximately 10,800 to 12,000 visits per year, from people seeking its services. At least half of those visits (around 5,700) are from people who have an addiction or substance-abuse problem. Of those 5,700 people, approximately half involve opioid abuse. Cherokee Nation also provides Behavioral Health and Substance Abuse Treatment in nine other clinics within the 14 Counties.

48.     The opioid crisis is especially harmful to Cherokee Nation's healthcare system because tribal communities, including Cherokee Nation, are already at a healthcare disadvantage compared to non-tribal communities. For example, according to a recent report from the U.S. Commission on Civil Rights, the average life span, infant mortality rates, and instances of substance abuse are all significantly worse in Indian Country compared to national averages.

49.     Defendants' misconduct has caused significant harms and trauma to Cherokee Nation society, and to its youth. The effects of trauma are compounded through the interconnectedness of Cherokee Nation, where individuals living in the community are highly connected through extended familial networks. Adverse childhood experiences among Cherokee Nation children related to opioid use and addiction result in household dysfunction, which in turn

results in greater likelihood of addictive disorders. These kinds of harms affect all or substantially all Cherokee Nation citizens, and harms them in ways that are different from the harms to non-tribal communities.

50.     As a result of the opioid crisis, more and more Cherokee Nation resources are devoted to addiction-related problems, leaving a diminished pool of available resources to devote to positive societal causes like education, cultural preservation, and social programs. Meanwhile, the prescription opioid crisis diminishes the Cherokee Nation's available workforce, decreases productivity, increases poverty, and consequently requires greater government assistance expenditures by the Cherokee Nation.

51.     Defendants' conduct has ensured that Cherokee Nation will continue to experience the adverse consequences, and its citizens will continue to suffer from addiction rates and related injuries higher than national averages and, commensurately, that Defendants will continue to profit by supplying opioids to the area.

**B.      Defendants had duties to identify, report, and take steps to halt suspicious orders, and to prevent diversion at the point of sale.**

52.     Defendants had duties under both statutory and common law to maintain effective controls, and to investigate, report, and to take steps halt orders for prescription opioids that they knew or should have known were suspicious. Walmart, Walgreens, and CVS also had statutory and common law duties preventing them from systematically filling suspicious opioid orders without performing adequate due diligence. This does not require corporate decision makers to

override pharmacy judgments case by case, but rather to ensure there are effective procedures in place so that pharmacies perform their duties. The sources of duties are described below.[15]

### 1. The common law.

53.     Under the common law, Defendants, like all people, have a duty to act reasonably under the circumstances and owed such duties to Cherokee Nation.

54.     Defendants had a duty to exercise reasonable care in delivering dangerous narcotic substances. By flooding Cherokee Nation with more opioids than could be used for legitimate medical purposes—and by filling and failing to report orders that they knew or should have realized were likely being diverted for illicit uses—Defendants breached that duty. In doing so, Defendants not only failed to prevent foreseeable harm, but *created* foreseeable and preventable harm to Cherokee Nation and its citizens.

55.     Any reasonably-prudent company handling tens of millions of pills of highly dangerous controlled substances would have anticipated the danger of opioid diversion and protected against it by, for example, (a) taking greater care in hiring, training, and supervising employees; (b) providing greater oversight, security, and control of supply channels; (c) looking more closely at the purchasing and dispensing trends and patterns, taking into consideration the size of local populations in which the pills were being consumed; (d) investigating demographic or epidemiological facts concerning the increasing demand for narcotic painkillers in and around Oklahoma and Cherokee Nation; (e) informing pharmacists about opioid diversion; (f) using their specialized knowledge about the supply and demand for controlled substances to prevent

---

[15] Unless stated otherwise, all duties apply to all Defendants. There are some duties specific to the Defendants that dispensed prescription opioids at retail points of sale, which can be referred to as dispensing duties or pharmacy duties. These duties are independently sufficient for all claims in the Counts below that are based on breach of duty.

oversupply, rather than to facilitate it; and (g) in general, simply following applicable statutes, regulations, professional standards, and guidance from government agencies.

### 2.   Defendants' own conduct.

56.   One who engages in affirmative conduct, and thereafter realizes or should realize that such conduct has created an unreasonable risk of harm to another, is under a duty to exercise reasonable care to prevent the threatened harm. Each Defendant assumed a duty, when speaking publicly about opioids and their efforts to combat diversion, to speak accurately and truthfully.

57.   Defendants have themselves recognized the magnitude of the problem and have made statements assuring the public they recognize their duty to curb the opioid epidemic.

58.   For example, a Cardinal executive claimed that Cardinal uses "advanced analytics" to monitor its supply chain; Cardinal assured the public it was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal activity."[16]

59.   McKesson has publicly stated that it has a "best-in-class controlled substance monitoring program to help identify suspicious orders," and is "deeply passionate about curbing the opioid epidemic in our country."[17]

60.   Defendant AmerisourceBergen, too, has taken the public position that it is "work[ing] diligently to combat diversion and [is] working closely with regulatory agencies and other partners in pharmaceutical and healthcare delivery to help find solutions that will support appropriate access while limiting misuse of controlled substances." A company spokeswoman also

---

[16] Lenny Bernstein et al., *How Drugs Intended for Patients Ended up in the Hands of Illegal Users: 'No One Was Doing Their Job'*, WASH. POST (Oct. 22, 2016), http://wapo.st/2vCRGLt.
[17] Scott Higham et al., *Drug Industry Hired Dozens of Officials from the DEA as the Agency Tried to Curb Opioid Abuse*, WASH. POST (Dec. 22, 2016), http://wapo.st/2uR2FDy.

provided assurance that, "[a]t AmerisourceBergen, we are committed to the safe and efficient delivery of controlled substances to meet the medical needs of patients."

61.     Moreover, in furtherance of their effort to affirmatively conceal their conduct and avoid detection, Defendants, through their trade associations, the Healthcare Distribution Management Association ("HDMA") (now known as Healthcare Distribution Alliance ("HDA"), and the National Association of Chain Drug Stores ("NACDS"), filed an amicus brief in *Masters Pharmaceuticals* before the D.C. Circuit, which made the following statements:[18]

> a.   "HDMA and NACDS members not only have statutory and regulatory responsibilities to guard against diversion of controlled prescription drugs, but undertake such efforts as responsible members of society."
>
> b.   "Distributors take seriously their duty to report suspicious orders, utilizing both computer algorithms and human review to detect suspicious orders based on the generalized information that *is* available to them in the ordering process."

62.     Through the above statements made on their behalf by their trade associations, and other similar statements assuring their continued compliance with their legal obligations, Defendants not only acknowledged that they understood their obligations under the law, but they further affirmed that their conduct was in compliance with those obligations.

63.     Additionally Walgreens, CVS, and Walmart made statements in their advertising and promotions to the effect that consumers can rely on their pharmacies, and their expert

---

[18] Brief for HDMA and NACDS as Amici Curiae in Support of Neither Party, *Masters Pharms., Inc. v. U.S. Drug Enf't Admin.*, No. 15-1335, 2016 WL 1321983, at *3–4, 25. (D.C. Cir. Apr. 4, 2016).

pharmacists know and care about their customers and fill only appropriate prescriptions. *See infra*, ¶¶ 142–51.

64.     At the very least, these assurances created a duty to act reasonably by following through with such statements. Further, these false representations concealed from the public and Cherokee Nation the Defendants' wrongdoing that contributed to the public nuisance that is the opioid epidemic.

### 3.     Federal anti-drug diversion statutes and regulations.

65.     The Federal Controlled Substances Act ("FCSA") sets the standard of conduct that opioid distributors must follow. It was designed to halt the "widespread diversion of [controlled substances] out of legitimate channels into the illegal market." 208 H.R. Rep. No. 91-1444, *reprinted in* 1979 U.S.C.C.A.N. at 4572. The FCSA, along with its implementing regulations, impose duties on opioid distributors to maintain effective controls against the diversion of prescription opioids, and to report and take steps to halt suspicious orders of prescription opioids.

66.     Each Defendant was required to register with the DEA to distribute Schedule II controlled substances. *See* 21 U.S.C. § 822(a)(1); 21 U.S.C. § 823(b), (e); 28 C.F.R. § 0.100. As registrants, Defendants were required to "provide effective controls and procedures to guard against theft and diversion of controlled substances." 21 C.F.R. § 1301.71(a). They were required to "design and operate a system to disclose . . . suspicious orders of controlled substances." 21 C.F.R. § 1301.74(b). Defendants were further required to take steps to halt suspicious orders. Defendants violated their obligations under federal law.

67.     As opioid distributors, Defendants were also required to "inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant." 21 C.F.R. § 1301.74(b). In other words, they cannot be passive observers. The FCSA authorizes

the imposition of a civil penalty of up to $10,000 for each violation of 21 C.F.R. §1301.74(b). *See* 21 U.S.C. § 842(a)(5), (c)(1)(B).

68.     Defendants must also "notify the Field Division Office of the Administration in his or her area, in writing, of any theft or significant loss of any controlled substances within one business day of discovery of the theft or loss." 21 C.F.R. § 1301.74(c). "Thefts and significant losses must be reported whether or not the controlled substances are subsequently recovered or the responsible parties are identified and action taken against them." *Id.*

69.     Defendants were required to maintain "complete and accurate record[s]" of "all stocks" on hand and of "each such substance manufactured, received, sold, delivered, or otherwise disposed of by him." 21 U.S.C. § 827.

70.     The MDL court in the *In Re National Prescription Opiates MDL*, MDL No. 2804 (N.D. Ohio), which presided over the *Cherokee Nation* case until it was remanded, issued an order in the MDL bellwether case construing Defendants' duties under the FCSA, in which the court found:

> Plaintiffs ask the Court to determine that, as a matter of law, the Controlled Substances Act ("CSA"), 21 U.S.C. §§ 801 et seq., and its implementing regulations, 21 C.F.R. §§ 1301 et seq., require defendants who are "registrants" to: (1) identify suspicious orders of controlled substances; (2) report to the Drug Enforcement Administration ("DEA") suspicious orders when discovered; and (3) decline to ship a suspicious order unless and until, through due diligence, the registrant can determine the order is not likely to be diverted into illegal channels. For the reasons set forth below, the Court GRANTS Plaintiffs' first Motion (MDL ECF No. 1887).

71.     Opioid distributors must also report "acquisition/distribution transactions" of Schedule II drugs, including prescription opioids, through ARCOS. 21 C.F.R. § 1304.33.

72.     It is unlawful to "refuse or negligently fail to make, keep, or furnish any record, report, notification, declaration, order or order form, statement, invoice, or information required" by the FCSA. 21 U.S.C. § 842(a)(5).

73.     It is also unlawful to knowingly or intentionally "furnish false or fraudulent material information in, or omit any material information from, any application, report, record, or other document required to be made, kept, or filed" under the FCSA. 21 U.S.C. § 843(a)(4).

74.     Lastly, distributors must review information made available by the DEA through ARCOS. 21 U.S.C. 827(f). ARCOS accumulates data on distributors' controlled substances transactions, which are then summarized into reports used by the DEA to identify any diversion of controlled substances into illicit channels of distribution. 21 C.F.R. § 1304.33. ARCOS data includes (a) "[t]he total number of distributor registrants that distribute controlled substances to a pharmacy or practitioner registrant, aggregated by the name and address of each pharmacy and practitioner registrant," and (b) "[t]he total quantity and type of opioids distributed, listed by Administration Controlled Substances Code Number, to each pharmacy and practitioner registrant." 21 U.S.C. § 827(f). The data includes Defendants' transactions.

75.     The FCSA and its implementing regulations created a closed system of distribution for all controlled substances and listed chemicals. Congress specifically designed the closed chain of distribution to prevent the diversion of legally produced controlled substances into the illicit market. Moreover, the closed-system was specifically designed to ensure that there are multiple ways of identifying and preventing diversion through active participation by registrants within the drug delivery chain. All registrants—which includes manufacturers, distributors, and dispensers of controlled substances—must adhere to specific recordkeeping, monitoring, and reporting requirements and other duties that are designed to identify or prevent diversion. When registrants

at any level fail to fulfill their obligations, the necessary checks and balances collapse. The result is the scourge of opioids that has occurred in Cherokee Nation.

76.     To ensure that even opioids produced within a quota are not diverted, federal regulations issued under the FCSA mandate that all registrants, manufacturers and distributors alike, "design and operate a system to disclose to the registrant suspicious orders of controlled substances." 21 C.F.R. § 1301.74(b). Registrants are not entitled to be passive (but profitable) observers, but rather "shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant." *Id*. "Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." *Id*. Other red flags may include, for example, ordering the same controlled substance from multiple distributors.

77.     These criteria are disjunctive and are not all inclusive. For example, if an order deviates substantially from a normal pattern, the size of the order does not matter and the order should be reported as suspicious. Likewise, a distributor need not wait for a normal pattern to develop over time before determining whether a particular order is suspicious. The size of an order alone, regardless of whether it deviates from a normal pattern, is enough to trigger the responsibility to report the order as suspicious. The determination of whether an order is suspicious depends not only on the ordering patterns of the particular customer but also on the patterns of the entirety of the customer base and the patterns throughout the relevant segment of the industry. For this reason, identification of suspicious orders serves also to identify excessive volume of the controlled substance being shipped to a particular region.

78.     These federal statutes and regulations reflect a standard of conduct and care below which reasonably prudent distributors would not fall. Together, these laws and industry guidelines

make clear that opioid distributors possess and are expected to possess specialized and sophisticated knowledge, skill, information, and understanding of both the market for scheduled prescription narcotics and of the risks and dangers of the diversion of prescription narcotics when the supply chain is not properly controlled.

79.    Further, these laws and industry guidelines make clear that Defendants have a duty and responsibility to exercise their specialized and sophisticated knowledge, information, skill, and understanding to prevent the oversupply of prescription opioids and to prevent the diversion of prescription opioids into the illicit market.

80.    Defendants have a duty to be vigilant, and are expected to be vigilant, in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes.

81.    Defendants were aware of these duties. In addition to being put on notice by statutes and regulations themselves, opioid distributors also received detailed, specific instructions for identifying and minimizing the risk of opioid diversion.

82.    To combat prescription opioid diversion, the DEA has provided readily-available guidance to distributors on the requirements of suspicious order reporting.

83.    Since 2006, the DEA has briefed distributors regarding legal, regulatory, and due diligence responsibilities. During these briefings, the DEA pointed out the red flags distributors should look for to identify potential diversion.

84.    Since 2007, the DEA has hosted at least five conferences to provide registrants (including distributors) with updated information about diversion trends and regulatory changes

that affect the drug supply chain and suspicious order reporting.[19] On information and belief, all of the major distributors, including many, if not all, of the Defendants or their agents, attended at least one of these conferences.

85.     These conferences discussed, among other things, guidance on suspicious order monitoring and the distributors' obligations to conduct due diligence on controlled substance customers to help prevent diversion. For example, the conferences explained that each distributor must exercise due care in confirming the legitimacy of all orders. They also described circumstances that could indicate diversion, including ordering (a) excessive quantities of a limited variety of controlled substances while ordering few if any other drugs, or (b) the same controlled substance from multiple sources. They also covered distributors' obligations to report suspicious orders when discovered and specified that monthly transaction reports of excessive purchases did not meet the regulatory criteria for suspicious order reporting. The conferences also advised distributors that they must independently analyze a suspicious order before sale to determine if the controlled substances would likely be diverted and that filling a suspicious order and then completing the sale does not absolve a distributor from legal responsibility.

---

[19] *See, e.g.*, Drug Enf't Admin., *Distributor Conferences*,
https://www.deadiversion.usdoj.gov/mtgs/distributor/index.html; Drug Enf't Admin.,
*Manufacturer Conferences*, https://www.deadiversion.usdoj.gov/mtgs/man_imp_exp/index.html;
Drug Enf't Admin., *National Conference on Pharmaceutical and Chemical Diversion*,
https://www.deadiversion.usdoj.gov/mtgs/drug_chemical/index.html; Drug Enf't Admin.,
*Diversion Awareness Conferences*,
https://www.deadiversion.usdoj.gov/mtgs/pharm_awareness/index.html.

86.     On September 27, 2006, and December 27, 2007, the DEA's Office of Diversion Control sent letters to all registered distributors providing guidance similar to that provided at the conferences.[20]

87.     Opioid distributors were on notice that their own industry group, HDMA published Industry Compliance Guidelines for reporting suspicious orders and preventing diversion.[21]

88.     These industry guidelines further explained that, by being "[a]t the center of a sophisticated supply chain, distributors are uniquely situated to perform due diligence in order to help support the security of controlled substances they deliver to their customers."[22]

89.     Cherokee Nation is not asserting a cause of action under these statutory laws. But just as a driver's violation of a speed limit can demonstrate that he acted negligently, so, too, Defendants' violations of applicable state and federal laws and regulations show that they failed to meet the relevant standard of care.

### 4.     Duties under Oklahoma controlled substances law.

90.     Defendants also had duties under applicable Oklahoma law regarding controlled substances distribution. In addition to having common law duties under Oklahoma law, the Oklahoma Uniform Controlled Dangerous Substances Act ("Oklahoma CSA"), 63 OKLA. STAT. Ch. 2, and its implementing regulations impose duties on opioid distributors to maintain effective controls against the diversion of prescription opioids, and to report and take steps to halt suspicious

---

[20] Masters Pharmaceuticals, Inc.; Decision and Order, 80 Fed. Reg. 55,418, 55,421 (Drug Enf't Admin. Sept. 15, 2015) (No. 13–39), 2015 WL 5320504.
[21]  Healthcare Distrib. Mgmt. Ass'n (HDMA), *Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances*, filed in *Cardinal Health, Inc. v. Holder*, No. 12-5061 (D.C. Cir. Mar. 7, 2012), Doc. No. 1362415 (App. B at 1).
[22] *Id.*

orders of prescription opioids. Defendants' violation of these requirements shows that they failed to meet the relevant standard of conduct expected from them.

91.     The Oklahoma CSA acts as a system of checks and balances from the manufacturing level through delivery of the pharmaceutical drug to the ultimate user. Every person or entity who distributes or dispenses opioids must obtain a "registration" from the Director of the Oklahoma State Bureau of Narcotics and Dangerous Drugs Control. Registrants at every level of the prescription opioid supply chain must fulfill their obligations under the Oklahoma CSA, otherwise there is great potential for harm to Cherokee Nation.

92.     Under the Oklahoma CSA and the Oklahoma administrative code, distributors and dispensers must "maintain effective controls against the diversion of controlled substances." 63 OKLA. STAT. § 2-304(A)(4); OKLA. ADMIN. CODE § 475:20-1-2(a).

93.     Distributors must create and use a system to identify and report to law enforcement any suspicious orders of controlled substances. OKLA. ADMIN. CODE § 475:20-1-5(b). "Suspicious orders include orders of unusual size, orders deviating substantially from the normal pattern, and orders of unusual frequency." *Id.* To comply with these requirements, distributors must know their customers, report suspicious orders, conduct due diligence, and terminate orders that suggest diversion.

94.     To prevent unauthorized users from obtaining opioids, Oklahoma law creates a distribution monitoring system for controlled substances. The Oklahoma CSA requires distributor and dispensers of controlled dangerous substances to "keep records and maintain inventories in conformance with the record-keeping and inventory requirements of federal law and with the additional rules the Director issues." 63 OKLA. STAT. § 2-307.

95.     The Oklahoma administrative code requires that opioid distributors notify the Oklahoma State Bureau of Narcotics and Dangerous Drugs Control of any theft or significant loss of any controlled dangerous substances. OKLA. ADMIN. CODE § 475:20-1-5(c). "Thefts must be reported whether or not the controlled dangerous substances are subsequently recovered and/or the responsible parties are identified and action taken against them." *Id.*

96.     Opioid distributors and dispensers must report "any information the registrant receives concerning any violations of the Oklahoma Controlled Dangerous Substances Act and/or federal statutes and regulations related to controlled dangerous substances." OKLA. ADMIN. CODE § 475:20-1-8(b).

97.     Opioid distributors and dispensers are also required to maintain records, reports, and inventory in accordance with Oklahoma law, including by complying with their registration and opioid-tracking requirements. *See, e.g.*, OKLA. ADMIN. CODE § 475:25-1-4.

98.     The reason for the reporting rules under controlled substances laws is to create a "closed" system intended to control the supply and reduce the diversion of these drugs out of legitimate channels into the illicit market, while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control. Both because distributors handle such large volumes of controlled substances, and because they are uniquely positioned, based on their knowledge of their customers and orders, as the first line of defense in the movement of legal pharmaceutical controlled substances from legitimate channels into the illicit market, distributors' obligation to maintain effective controls to prevent diversion of controlled substances is critical. Should a registrant deviate from these checks and balances, the closed system of distribution and supply, designed to prevent diversion, collapses.

99.     Defendants were well aware they had an important role to play in this system, and also knew or should have known that their failure to comply with their obligations would have serious consequences.

### 5.     Legal duties applicable to Pharmacy Defendants.

100.    Defendants Walmart, Walgreens, and CVS also dispense prescription opioids to the public, and therefore have separate and additional duties under both federal law and Oklahoma law.

101.    In recent years these three Defendants not only distributed opioids to their own retail pharmacy locations, but they were also retail dispensers of opioids in Cherokee Nation and throughout the United States.

102.    The Pharmacy Defendants acted as the intermediary between opioid manufacturers and their large nationwide network of retail pharmacies, and dispensed opioids at the point of sale. They knew of the oversupply of prescription opioids through the data and information they had access to from handling and selling opioids at multiple points in the supply chain.

103.    They had direct knowledge of patterns and instances of improper distribution, prescribing, dispensing and use of prescription opioids in communities throughout the country, and in Cherokee Nation in particular.

104.    On information and belief, Walgreens, Walmart, and CVS even used distribution and/or dispensing data to evaluate their own sales activities and workforce.

105.    Yet, instead of taking any meaningful action to stem the flow of opioids into Cherokee Nation, they continued to participate in the oversupply and profit from it. They failed to take meaningful action to stop diversion at the retail level despite knowing about it.

106.   In their distribution activities, Walgreens, Walmart, and CVS were required to operate in accordance with the statutory provisions of the FCSA and the regulations promulgated thereunder, 21 C.F.R. §1300 et seq. Just as these Defendants must register for opioid distribution, they must also register for dispensing at the pharmacy level. 21 U.S.C. § 822(a); 21 C.F.R. §1301.11.

107.   The FCSA and its implementing regulations impose duties on the Pharmacy Defendants to maintain effective controls against the diversion of prescription opioids, to report suspicious orders of prescription opioids, and to stop filing invalid, illegitimate prescriptions, specifically, to persons that Defendants knew or should have known were diverting prescription opioids.

108.   The FCSA's implementing regulations require all registrants, including dispensing Pharmacy Defendants, to "provide effective controls and procedures to guard against theft and diversion of controlled substances." 21 C.F.R. § 1301.71(a).

109.   Dispensers must "notify the Field Division Office of the Administration in his area, in writing, of the theft or significant loss of any controlled substances." 21 C.F.R. § 1301.76.

110.   Dispensers must maintain "complete and accurate record[s]" of "all stocks" on hand and of "each such substance manufactured, received, sold, delivered, or otherwise disposed of by him." 21 U.S.C. § 827.

111.   It is unlawful to "refuse or negligently fail to make, keep, or furnish any record, report, notification, declaration, order or order form, statement, invoice, or information required" by the FCSA. 21 U.S.C. § 842(a)(5).

112.    It is also unlawful to knowingly or intentionally "furnish false or fraudulent material information in, or omit any material information from, any application, report, record, or other document required to be made, kept, or filed" under the FCSA. 21 U.S.C. § 843(a)(4).

113.    It is unlawful for registrants, including the Pharmacy Defendants, to dispense Schedule II drugs, including prescription opioids, without an effective prescription. *See* 21 U.S.C. § 829(a) (stating that such controlled substances must be dispensed pursuant to a written prescription); 21 U.S.C. § 842(a)(1) (making it unlawful for any person to deviate from this procedure). "A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a).

114.    The FCSA requires the Pharmacy Defendants' pharmacists to review each controlled substance prescription and, prior to dispensing medication, make a professional determination that the prescription is effective and valid. "The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a *corresponding responsibility* rests with the pharmacist who fills the prescription." 21 C.F.R. § 1306.04(a) (emphasis added). That "'corresponding responsibility' . . . means, among other things, that a pharmacist is obligated to refuse to fill a prescription if he knows or has reason to know that the prescription was not written for a legitimate medical purpose." *Medic-Aid Pharmacy, Revocation of Registration*, 55 FR 30043-01, 30044 (July 24, 1990) (revoking pharmacy's registration).

115.    Therefore, pharmacists must ensure that prescriptions for controlled substances are valid, and that they are issued for a legitimate medical purpose by an individual practitioner who

is approved and registered with the DEA to write prescriptions for opioids acting in the usual course of his professional practice.

116.    The DEA has informed pharmacists that "[a]n order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is an invalid prescription."[23] Filling such a prescription is illegal. As the DEA states, "The law does not require a pharmacist to dispense a prescription of doubtful, questionable, or suspicious origin. To the contrary, the pharmacist who deliberately ignores a questionable prescription when there is reason to believe it was not issued for a legitimate medical purpose may be [criminally] prosecuted."[24]

117.    Questionable or suspicious prescriptions include: (a) prescriptions written by a doctor who writes significantly more prescriptions (or in larger quantities) for controlled substances than other practitioners in the area; (b) prescriptions which should last for a month in legitimate use, but are refilled more frequently; (c) simultaneous prescriptions for antagonistic drugs, such as depressants and stimulants; (d) prescriptions that look "too good" or where the prescriber's handwriting is too legible; (e) prescriptions with atypical quantities or dosages; (f) prescriptions that do not comply with standard abbreviations and/or contain no abbreviations; (g) photocopied prescriptions; or (h) prescriptions containing different handwritings. Most of the time, these questionable or suspicious attributes are not difficult to detect or recognize; they should be apparent to an adequately trained pharmacist.

---

[23]  Michele Leonhart et al., *Pharmacist's Manual: An Informational Outline of the Controlled Substances Act*, Drug Enf't Admin., Diversion Control Div. (Revised 2010), https://www.deadiversion.usdoj.gov/pubs/manuals/pharm2/.
[24] *Id.*

118.    Pharmacists are also instructed to be suspicious of signs that a customer is seeking to divert opioids, including customers who: (a) appear to be returning too frequently; (b) are seeking to fill a prescription written for a different person; (c) appear at the pharmacy counter simultaneously, or within a short time, all bearing similar prescriptions from the same physician; (d) are not regular patrons or residents of the community, and present prescriptions from the same physician; (e) drive long distances to have prescriptions filled; (f) seek large volumes of controlled substances in the highest strength in each prescription; (g) seek a combination of other drugs with opioids such as tranquilizers and muscle relaxers that can be used to create an "opioid cocktail"; and (h) pay large amounts of cash for their prescriptions rather than using insurance. Ignoring these suspicious signs violates industry standards and DEA guidelines and is illegal under multiple laws.

119.    Other "red flags" that should alert a pharmacist to potential diversion include: (a) prescriptions that lack the technical requirements of a valid prescription, such as a verifiable DEA number and signature; (b) prescriptions written in excess of the amount needed for proper therapeutic purposes; (c) prescriptions obtained through disreputable or illegal web-based pharmacies; and (d) patients receiving multiple types of narcotic painkillers on the same day.

120.    Each prescriber of controlled substances is issued a number identification by the DEA and must sign each prescription. Industry standards require pharmacists to contact the prescriber for verification or clarification whenever there is a question about any aspect of a prescription. If a pharmacist believes the prescription is forged or altered, he or she should not fill it, but instead should call the local police. If a pharmacist believes there is a pattern of prescription abuse, the local Board of Pharmacy and the DEA must be contacted.

121.   Pharmacies, including large retail pharmacy corporations like the Pharmacy Defendants, may be held liable for their pharmacists' FCSA violations. *See, e.g., United States v. Appalachian Reg'l Healthcare, Inc.*, 246 F. Supp. 3d 1184, 1189 (E.D. Ky. Mar. 30, 2017).

122.   Cherokee Nation does not contend that officers or executives from the pharmacy corporations must personally inspect every single prescription at the pharmacy counter; rather, they must implement an effective policies and systems to make their national chain stores and the pharmacists they hire comply with legal duties.

123.   In addition to these federal laws governing pharmacy activity, Oklahoma laws, statutes, and regulations also place duties and obligations on the Pharmacy Defendants to act reasonably. This involves a duty not to create a foreseeable risk of harm to others. The Pharmacy Defendants' unlawful dispensation of prescription opioids in Oklahoma, specifically to Cherokee Nation which sits in Oklahoma, created a foreseeable risk of harm to Cherokee Nation.

124.   The Oklahoma CSA and its implementing regulations impose duties on the Pharmacy Defendants to maintain effective controls against the diversion of prescription opioids, to report suspicious orders of prescription opioids, and to stop filing invalid, illegitimate prescriptions, specifically, to persons that the Pharmacy Defendants knew or should have known were diverting prescription opioids.

125.   Under Section 353.24, of the Oklahoma Statutes, as well as Oklahoma Administrative Code Sections 535:15-3-2, 535:25-9-8, 535:10-3-1.2, it is unlawful to "[f]ail to establish and maintain effective controls against the diversion of prescription drugs into other than legitimate medical, scientific, or industrial channels." OKLA. STAT. § 353.24(A)(9). It is also unlawful to "[f]ail to have a written drug diversion detection and prevention policy." OKLA. STAT. § 353.24(A)(10).

126.    In addition, the Pharmacy Defendants must not fill invalid, illegitimate prescriptions. Pharmacists are the "last line of defense" in keeping drugs from entering the illicit market. They are meant to be the drug experts in the healthcare delivery system, and as such have considerable duties and responsibility in the oversight of patient care. They cannot blindly fill prescriptions written by a doctor—even a doctor registered under the Oklahoma CSA to dispense opioids—if the prescription is not for a legitimate medical purpose.

127.    The Oklahoma CSA requires pharmacists to review each opioid prescription and, prior to dispensing medication, determine that the prescription is effective and valid.

128.    Under the Oklahoma administrative code states: "A prescription for a controlled dangerous substance to be effective must be issued for a legitimate medical purpose by a registered or otherwise authorized individual practitioner acting in the usual course of his/her professional practice." OKLA. ADM. CODE § 475:30-1-3.

129.    Therefore, pharmacists are required to ensure that prescriptions for controlled substances are valid, and that they are issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. Additionally, the Pharmacy Defendants must "address the possible addiction or dependency of a patient to a drug dispensed by the pharmacist, if there is reason to believe that the patient may be dependent or addicted," a duty they did not adequately or uniformly perform. OKLA. ADMIN. CODE § 535:10-3.1.2(12).

130.    State pharmacy boards and national industry associations have provided extensive guidance to pharmacists concerning their duties to the public and the standard of care they are expected to meet. The guidance teaches pharmacists how to identify red flags, which indicate potential problems with a prescription. The guidance also tells pharmacists how to resolve the red flags and what to do if the red flags are unresolvable.

131.    The industry guidance tells pharmacists how to recognize stolen prescription pads; prescription pads printed using a legitimate doctor's name, but with a different call-back number that is answered by an accomplice of the drug-seeker; prescriptions written using fictitious patient names and addresses, and so on.

132.    Pharmacies must also perform due diligence before filling questionable or suspicious prescriptions. *See* ¶¶ 117-119 *supra*. (listing signs of suspicious prescriptions and likely diversion). Ignoring these signs violates industry standards and standards required by the "reasonable person" standard under basic principles of Oklahoma tort law.

133.    All of these issues have been presented in pharmacist training programs nationwide and have been used as examples by individual state boards of pharmacy and the National Association of Boards of Pharmacy.

134.    Industry standards require pharmacists to contact the prescriber for verification or clarification whenever there is a question about any aspect of a prescription order. If a pharmacist is ever in doubt, he or she must ask for proper identification. If a pharmacist believes the prescription is forged or altered, he or she should not dispense it and should call the local police. If a pharmacist believes he or she has discovered a pattern of prescription diversion, the local Board of Pharmacy and DEA must be contacted.

135.    The Pharmacy Defendants similarly knew of the risks and harms of failing to follow controlled substances laws, including widespread opioid abuse.

136.    The DEA has provided extensive guidance to pharmacists concerning their duties to the public.[25] So have state pharmacy boards[26] and national industry associations.[27] The guidance teaches pharmacists how to identify red flags, which indicate that there may be a problem with the legitimacy of a prescription presented by a patient.[28] The guidance also tells pharmacists how to resolve the red flags and what to do if the red flags are unresolvable.

137.    The Pharmacy Defendants, through their words or actions set forth in news reports and other public documents, have acknowledged these risks and assured the public that issues affecting public health and safety are their highest priority.

138.    In 2015, CVS publicly stated that, "the abuse of controlled substance pain medication is a nationwide epidemic that is exacting a devastating toll upon individuals, families and communities. Pharmacists have a legal obligation under Oklahoma and federal law to determine whether a controlled substance was issued for a legitimate purpose and to decline to fill prescriptions they have reason to believe were issued for a non-legitimate purpose."[29]

---

[25] Michele Leonhart et al., *Pharmacist's Manual: An Informational Outline of the Controlled Substances Act*, Drug Enf't Admin., Diversion Control Div. (Revised 2010), https://www.deadiversion.usdoj.gov/pubs/manuals/pharm2/.

[26] Tex. State Bd. of Pharmacy, *Abuse & Misuse of Prescription Drugs* (last visited Mar. 26, 2018), https://www.pharmacy.texas.gov/SB144.asp; Fla. Bd. of Pharmacy, *DEA Guidelines to Prescription Fraud* (June 12, 2013), http://floridaspharmacy.gov/latest-news/dea-guidelines-to-prescription-fraud/; Va. Bd. of Pharmacy, *Prescription Drug Abuse: Red Flags for Pharmacists and Pharmacy Technicians* (Aug. 6, 2014), https://youtu.be/j5CkhirlZk8.

[27] Philip Brummond et al., *American Society of Health-Systems Pharmacists Guidelines on Preventing Diversion of Controlled Substances*, 74 AM. J. OF HEALTH-SYS. PHARMACY e10 (Jan. 2017), http://www.ajhp.org/content/early/2016/12/22/ajhp160919.

[28] Va. Bd. of Pharmacy, *Prescription Drug Abuse: Red Flags for Pharmacists and Pharmacy Technicians* (Aug. 6, 2014), https://youtu.be/j5CkhirlZk8; Philip W. Brummond et al., *American Society of Health-Systems Pharmacists Guidelines on Preventing Diversion of Controlled Substances*, 74 AM. J. OF HEALTH-SYSTEM PHARMACY e10 (Jan. 2017), http://www.ajhp.org/content/early/2016/12/22/ajhp160919.

[29] *Patients Profiled at Pharmacy Counters*, KTNV (Feb. 23, 2015), http://contact1846.rssing.com/chan-30860085/all_p11.html#item217.

139.    Similarly, in 2016, Walgreens issued a press release captioned "Walgreens Leads Fight Against Prescription Drug Abuse with New Programs to Help Curb Misuse of Medications and the Rise in Overdose Deaths."[30]

140.    In 2017, Walmart acknowledged the need for a "solution to the [opioid] epidemic" and noted the epidemic has "devastated so many families and communities across America."[31]

141.    The Pharmacy Defendants' misrepresentations about their activities constituted concealment of their wrongdoing that caused the opioid epidemic. Their failure to report suspicious orders constituted additional concealment.

142.    Additionally, for many years the Pharmacy Defendants have given assurances through their national promotions and advertising that the corporations maintained nationwide policies for safe and proper drug dispensing, pharmacy practice, and professional service.

143.    For example, Walgreens' television advertisements have shown pharmacists wearing Walgreens branded medical coats saying such things as: "It's happening, right now at your local Walgreens, Pharmacists are going above and beyond, armed with expertise and advice, with one goal in mind, to better serve you, so that nothing will get between you and the care you deserve." The advertisements directs viewers to the national website Walgreens.com.

144.    Other Walgreens television commercials promote "Walgreens EXPERT PHARMACISTS" while showing a Walgreens pharmacist giving an expert consultation to a

---

[30] Press Release, Walgreens, Walgreens Leads Fight Against Prescription Drug Abuse with New Programs to Help Curb Misuse of Medications and the Rise in Overdose Deaths (Feb. 9, 2016), https://news.walgreens.com/press-releases/general-news/walgreens-leads-fight-against-prescription-drug-abuse-in-oklahoma-with-new-programs-to-help-curb-misuse-of-medications-and-the-rise-in-overdose-deaths.htm.

[31] Press Release, Walmart, Walmart Supports State of Emergency Declaration on Opioids (Oct. 26, 2017), https://news.walmart.com/2017/10/26/walmart-supports-state-of-emergency-declaration-on-opioids.

customer and stating "I really get to know my customers. We are always here to answer questions about medications and more." Other commercials tell customers to "depend on Walgreens" because "when you're a Walgreens customer, your complete prescription records are instantly available at thousands of locations nationwide," and they promote Walgreens as the company with "thousands of locations nationwide. Walgreens, the Pharmacy America Trusts, 1-800-WALGREENS, Refill your prescriptions online at Walgreens.com."

145.   Walgreens promoted itself as a national company whose "thousands of locations nationwide" were operated by Walgreens and staffed only with "expert pharmacists" who were "armed with expertise and advice," and who utilized computer technology and electronic records to investigate prescriptions and make sure they are appropriate. The obligation to follow through with these statements, as required by controlled substances statutes and regulations, was Walgreens' responsibility, and not merely the separate responsibility of individual pharmacists employed by Walgreens.

146.   CVS advertised that it hired only expert pharmacists who made sure prescriptions were appropriate. One recent CVS promotional video depicts CVS pharmacists wearing CVS-branded coats claiming that "CVS Pharmacy computer has enabled me as a pharmacist to provide better service. The computer allows me to know people more, because I spend almost no time on paperwork." The CVS computer systems "allows us to help provide better care and better services to the customers, and that's the whole idea behind the CVS Pharmacy Computer. Today's neighborhood drugstore is CVS."

147.   One CVS animated advertisement depicts CVS-branded pharmacist dispensing drugs and stating "Life is better when things work in harmony. That's why at CVS Pharmacy we

do a comprehensive check of your prescriptions to make sure they work together. CVS Pharmacy, for all the ways you care."

148.    In a promotional CVS promotional video titled "Day in the life of a CVS Pharmacy Technician," employees wearing "CVS/Pharmacy" shirts state that "we need to treat every prescription as though it were dropped off by a loved one or family member." The video emphasizes CVS pharmacy teams work every day "to make sure every prescription is filled accurately and safely"; they communicate with customers to make sure customers are properly taking their medication; and they are "working with doctors directly" helping patients "stay on track with their medications" because "we [at CVS] are in a health care profession, and what we are doing is helping people on their path to better health."

149.    CVS made assurances that all pharmacists working at its stores "make sure every prescription is filled accurately and safely," work directly with doctors and customers to make sure customers are receiving appropriate medications, perform "comprehensive checks" of prescriptions," and utilize computer technology and prescription records to ensure appropriate prescribing and dispensing practices. CVS claimed to implement these policies on a national level. The obligation to follow through with these statements, as required by controlled substances statutes and regulations, belonged to CVS—and not merely to the individual pharmacists CVS hired.

150.    Walmart also presented a public image of the safety and excellence of all the pharmacists the company hired. In a recruitment video for pharmacists on Walmart's YouTube channel, the company shows Walmart pharmacists speaking about working at the company: "the safety and the excellence we carry to our patients is phenomenal," adding that "the culture that our company has [is] respect for the individual, service, and excellence, and, of course, we always

have integrity." The commercial also states that Walmart's pharmacists "strive for excellence" and are "passionate about providing quality healthcare."

151.    In another Walmart commercial, a Walmart pharmacy customer says: "We like knowing that experienced pharmacists are handling all our needs" and "the pharmacy at Walmart takes the worry out of getting our prescriptions, so we can get out and really enjoy life."

152.    The Pharmacy Defendants are responsible for most prescription drug dispensing in this country. They have directed their national chain pharmacies to comply with nationwide policies and procedures set by the Pharmacy Defendants, even when those policies and procedures were inconsistent with pharmacies' role as the last line of defense against drug diversion.

C.    **Defendants deliberately disregarded their duties.**

1.    **The distribution and dispensing numbers alone establish gross negligence.**

153.    Even though Defendants knew the risks of diversion and made broad assurances to regulators, states, and the public, they recklessly or negligently allowed diversion to occur while they looked the other way. Their misconduct has resulted in numerous civil fines and other penalties.

154.    The distribution and dispensing numbers themselves portray a chilling picture of Defendants' gross negligence.

155.    Defendants in this action are together responsible for selling most of the prescription opioid pills that were diverted and abused in Cherokee Nation during the relevant time period.

156.    Between 2006 and 2014, McKesson shipped a total of about 152,759,968 dosage units to the 14 Counties; Cardinal shipped 61,710,128; and AmerisourceBergen shipped 94,234,792 dosage units during the same timeframe.

41

157. Also between 2006 and 2014, Walmart distributed 97,613,016 dosage units to the 14 Counties. Walgreens distributed 140,004,032 dosage units to the 14 Counties. And CVS distributed 8,456,500 to the 14 Counties.

158. The chart below, based on 2006–2014 data, shows there were more than 2,000 times when a Defendants' distribution volume to a pharmacy located in the 14 Counties increased by at least *25% quarter to quarter*. There were nearly 1,500 times when the quarter-to-quarter distribution to a single pharmacy increased by 40%:

|  | Number of 3-month periods in which distributors shipped at least 25% more high abuse opioids into an individual pharmacy compared to the previous 3-month period | Number of 3-month periods in which distributors shipped at least 40% more high-abuse opioids into an individual pharmacy compared to the previous 3-month period |
| --- | --- | --- |
| Amerisource | 395 | 268 |
| CVS | 31 | 14 |
| Cardinal | 581 | 451 |
| McKesson | 903 | 644 |
| Walmart | 60 | 16 |
| Walgreens | 61 | 31 |

159. That means Defendants' shipments to individual pharmacies in the 14 Counties were routinely increasing from quarter to quarter by unjustifiable and unexplained amounts—many times over 40% increases—without being checked.

160. In recent years, Defendants have shipped far more prescription opioids to pharmacies in Cherokee Nation than to pharmacies elsewhere in the country. In 2013, Walgreens' average per-pharmacy shipment of prescription opioids to its pharmacies in both Mayes County

and Muskogee County, Oklahoma, were about 400% higher than its average per-pharmacy shipments across the United States.

161.    In 2014, Walmart shipped twice as many prescription opioids to its pharmacies in the 14 Counties than its national per-pharmacy average. In Sequoyah County, whose population is about one-third Native American, Walmart shipped approximately 475% of its national per-pharmacy average, while Cardinal and McKesson were also both shipping 200% of their national per-pharmacy averages to pharmacies in Sequoyah County (and AmerisourceBergen also shipped an average of about 150 thousand dosage units per pharmacy to Sequoyah County the same year).

162.    The chart below, based on 2006–2014 data, further demonstrates that the Pharmacy Defendants' policies to investigate suspicious orders for opioid prescriptions were grossly negligent. There were more than 400 times when one of Defendants' retail pharmacies increased its opioid sales by at least *25% quarter to quarter*, despite the fact that populations remained relatively stable.

|  | Walgreens | CVS | Walmart |
|---|---|---|---|
| Number of 3-month periods in which a pharmacy's ordering of high-abuse opioids increased by at least **25%** over the previous 3-month period | 254 | 71 | 100 |
| Number of 3-month periods in which a pharmacy's ordering of high-abuse opioids increased by at least **40%** over the previous 3-month period | 132 | 38 | 25 |

163.    There were numerous Walgreens, CVS, and Walmart locations that doubled their ordering of opioid dosage units between 2006 and 2014, despite the fact that the relevant population remained relatively stable.

164.    Defendants did not notify regulators or law enforcement about these numerous quarter-to-quarter increases in opioid sales of more than 25% or 40%. Defendants also did not halt

the orders or refuse to fill them, even though they were facially suspicious in terms of size and frequency. This pattern of behavior by Defendants shows a reckless indifference to the consequences of their conduct. It shows Defendants were lacking slight care and diligence with respect to their special responsibilities as distributors of highly dangerous controlled substances (and for Walmart, Walgreens, and CVS—indifference to their responsibilities as dispensers, too). Defendants' actions are especially egregious because they knew the pills were going into communities in Oklahoma reeling from an opioid crisis; they knew people were dying in those communities from non-medical use of prescription opioids; yet they kept shipping and selling the drugs at increasing amounts.

165.    Examples of the opioid sales trends in Cherokee Nation counties shows the magnitude of Defendants' negligence. Adair County is a county within Cherokee Nation that is approximately 50% Cherokee. From 2006 to 2014, 8,600,060 prescription hydrocodone and oxycodone pills were supplied to Adair County, enough for 42 pills per person per year. The largest opioid distributor in Adair County was McKesson, which distributed 3,222,170 of the pills. Walmart was second (2,313,700 pills), AmerisourceBergen was third (1,802,100 pills), and Cardinal was fifth (304,590 pills).[32]

166.    A Walmart store located at Route 6 in Adair County received 2,381,830 prescription hydrocodone and oxycodone pills between 2006 and 2014, which is enough for 59 pills per year for each of the 4,450 people who live within five miles of this pharmacy.

---

[32] Hydrocodone and oxycodone accounted for three-quarters of the total opioid pill shipments to pharmacies. The source for these statistics is the analysis done by the Washington Post based on DEA data, available at: https://www.washingtonpost.com/graphics/2019/investigations/dea-pain-pill-database/ and https://www.washingtonpost.com/graphics/2019/investigations/pharmacies-pain-pill-map/.

167.   Mayes County is a county within Cherokee Nation that is approximately 30% Native American. From 2006 to 2014, there 27,117,030 prescription hydrocodone and oxycodone pills supplied to Mayes County, enough for 74 pills per person each year. The largest opioid distributor in Mayes County during that time was Cardinal, which distributed 7,077,260 of the pills. McKesson was second (5,141,710 pills), and Walmart was third (4,110,100 pills).

168.   Walmart, which self-distributed for its retail sales in Mayes County, had a location at South Mill Road in Pryor, Oklahoma. That location alone received 4,216,200 hydrocodone and oxycodone pills between 2006 and 2014, which is about enough for 95 pills per year for each of the 4,900 people who live within five miles of the pharmacy. Walmart shipped these pills to its Pryor location knowing there were also about four to five other pharmacies located within about 5 miles, which were also dispensing opioid pills to roughly the same geographic community as Walmart.

169.   Sequoyah County is a county within Cherokee Nation that is approximately 30% Native American. From 2006 to 2014, 23,565,140 prescription hydrocodone and oxycodone pills were supplied to Sequoyah County, enough for 62 pills per person per year. The largest opioid distributor in Sequoyah County during that time was AmerisourceBergen, which distributed 6,774,610 of the pills. Walmart was second (5,245,500 pills), and McKesson was third (4,106,550 pills).

170.   A Walmart located at 1101 W. Ruth Avenue in Sequoya County received 5,424,530 prescription hydrocodone and oxycodone pills between 2006 and 2014, which is about enough for 75 pills per year for each of the 8,009 people who live within five miles of this pharmacy.

171.   In McIntosh County, which is about 25% Native American, from 2006 to 2014 enough pills were distributed to provide everyone in the County with 75 pills per person per year,

with McKesson leading the way (distributing 5,293,790 of the pills) followed by Walmart (2,926,740 pills), AmerisourceBergen (2,492,800 pills), and Cardinal (1,037,380 pills).

172.   Two Walmarts located about a 1,000 feet apart in McIntosh County received more than 3 million hydrocodone and oxycodone pills during that time period, which is enough to provide about 150 pills per year to the 3,570 people who live within five miles of this pharmacy—notwithstanding the fact that two other pharmacies located within a few thousand feet of the Walmarts were also selling about another 3 million opioid pills to roughly the same community during the same timeframe.

173.   Delaware County is a county within Cherokee Nation that is approximately 30% Native American. From 2006 to 2014, 12,694,870 prescription hydrocodone and oxycodone pills were supplied to Delaware County. The largest opioid distributor was Walmart, which alone distributed 4,432,200 of the pills. McKesson was second (4,405,690 pills), Walgreens was third (2,428,850 pills), Amerisource Bergen was fourth (1,028,770 pills), and Cardinal was fifth (190,760 pills).

174.   One Walmart located at 2115 S. Main Street in Delaware County received 3,186,600 prescription hydrocodone and oxycodone pills during that time period, which is enough for *148 pills per year* for each of the 2,391 people who live within five miles of this pharmacy—notwithstanding the fact there was also a Walgreens located about 2,000 feet away, which was also flooding the same area with over 2.5 million hydrocodone and oxycodone pills during the same timeframe, as well as two other drug stores in the same vicinity. In the space of about 4,000 linear feet, the combined output of these four pharmacies was roughly enough to give every person within 5 miles an opioid pill every day for the whole nine-year time period.

175.     By contrast, just beyond the border of Cherokee Nation, in the neighboring Ossage County, opioid distribution and sales was lower. Between 2006 and 2014, there were about 15 pills per year, per capita. Just over the county boarder to Washington County (which is entirely within Cherokee Nation) and Tulsa County (partially within Cherokee Nation), the distribution volumes were about 4 times higher per capita during the same time period.

### 2.     Defendants have been repeatedly investigated and fined for their wrongdoing.

176.     Defendants' violation of their legal duties is also evidenced by the many investigations, fines, and adverse findings against Defendants by state and federal regulators, some of which are summarized below.

### a.     Cardinal.

177.     Cardinal has paid millions of dollars in multiple DEA and state actions relating to its improper management and distribution of opioids.

178.     In 2008, Cardinal paid a $34 million penalty to settle allegations about opioid diversion taking place at seven warehouses around the United States.[33] These allegations included failing to report to the DEA thousands of suspicious orders of hydrocodone that Cardinal then distributed to pharmacies that filled illegitimate prescriptions originating from rogue Internet pharmacy websites.

179.     In 2012, Cardinal reached another settlement with the DEA relating to systemic prescription opioid diversion in its Florida distribution center. Cardinal's Florida center received a two-year license suspension for supplying more than 12 million dosage units to only four area

---

[33] Press Release, U.S. Attorney's Office Dist. of Colo., Cardinal Health Inc., Agrees to Pay $34 Million to Settle Claims That it Failed to Report Suspicious Sales of Widely-Abused Controlled Substances (Oct. 2, 2008), https://www.justice.gov/archive/usao/co/news/2008/October08/10_2_08.html.

pharmacies, nearly 50 times as much oxycodone as it shipped to the rest of Florida and an increase of 241% in only two years. The DEA found that Cardinal's own investigator warned Cardinal against selling opioids to these pharmacies, but that Cardinal did nothing to notify the DEA or cut off the supply of drugs to the suspect pharmacies. Instead, Cardinal's opioid shipments to the pharmacies increased.

180.    In December 2016, Cardinal paid $44 million to settle charges that it had violated the law by failing to report suspicious orders in four states.[34] The same Florida distribution center at the heart of the 2012 settlement was again implicated in this case. The settlement also covered a Cardinal subsidiary, Kinray, LLC, which did not report a single suspicious order regarding its shipments of oxycodone and hydrocodone to more than 20 New York-area pharmacy locations that placed unusually high orders of controlled substances at an unusually frequent rate. Cardinal Health d/b/a Kinray is a licensed wholesale drug distributor in Oklahoma and, on information and belief, distributes opioids in the State.

181.    In January 2017, Cardinal paid $20 million to settle allegations by West Virginia that Cardinal had shipped increasing amounts of opioids to numerous counties without utilizing proper controls, in essence benefitting from West Virginia's problem with opioid abuse.[35]

---

[34] Press Release, U.S. Attorney's Office Dist. of Md., Cardinal Health Agrees to $44 Million Settlement for Alleged Violations of Controlled Substances Act (Dec. 23, 2016), https://www.justice.gov/usao-md/pr/cardinal-health-agrees-44-million-settlement-alleged-violations-controlled-substances-act.

[35] Eric Eyre, *2 Drug Distributors to Pay $36M to Settle WV Painkiller Lawsuits*, CHARLESTON GAZETTE-MAIL (Jan. 9, 2017), http://www.wvgazettemail.com/news-cops-and-courts/20170109/2-drug-distributors-to-pay-36m-to-settle-wv-painkiller-lawsuits.

### b.   **McKesson**

182.   McKesson has agreed to pay over $163 million to resolve government charges regarding diversion.

183.   In May 2008, McKesson paid $13.25 million to settle claims by the DEA that it had failed to maintain effective controls against diversion.[36] McKesson allegedly failed to report suspicious orders from rogue Internet pharmacies, resulting in millions of doses of controlled substances being diverted.

184.   Following the 2008 settlement, McKesson was supposed to change its ways and fix its flawed processes to prevent opioid diversion. But it did not do so. It was later revealed that McKesson's system for detecting "suspicious orders" from pharmacies was so ineffective and dysfunctional that, in a five-year period, it filled more than 1.6 million orders but reported just 16 orders as suspicious (all from a single consumer). In fact, in 2013, inspections of some of McKesson's distribution facilities found that the company did not even fully "implement or adhere to its own" compliance program.[37] In early 2017, it was reported that McKesson had agreed to pay $150 million to the federal government to settle certain opioid diversion claims that it allowed drug diversion at 12 distribution centers in 11 states.[38]

---

[36] Press Release, U.S. Attorney's Office Dist. of Colo., McKesson Corporation Agrees to Pay More than $13 Million to Settle Claims That It Failed to Report Suspicious Sales of Prescription Medications (May 2, 2008),
https://www.justice.gov/archive/usao/co/news/2008/May08/5_2b_08.html.
[37] Anders Melin and Jef Feeley, *McKesson Records Show Failed Opioid Oversight, Lawsuit Says*, BLOOMBERG (Dec. 8, 2017), https://www.bloomberg.com/news/articles/2017-12-08/mckesson-investor-claims-board-failed-oversight-duty-on-opioids.
[38] Press Release, U.S. Dep't of Justice, McKesson Agrees to Pay Record $150 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs (Jan. 17, 2017), https://www.justice.gov/opa/pr/mckesson-agrees-pay-record-150-million-settlement-failure-report-suspicious-orders.

185.    Even though McKesson had been previously sanctioned for failure to comply with its legal obligations regarding controlling diversion and reporting suspicious orders, and even though McKesson had specifically agreed in 2008 that it would no longer violate those obligations, McKesson continued to violate the laws contrary to its written agreement not to do so.

### c.    AmerisourceBergen

186.    AmerisourceBergen has paid $16 million in settlements and had certain licenses revoked as a result of allegations related to prescription opioid diversion.

187.    In 2007, AmerisourceBergen lost its license to send controlled substances from a distribution center amid allegations that it was not controlling shipments of prescription opioids to Internet pharmacies. Again in 2012, AmerisourceBergen was implicated for failing to protect against diversion of controlled substances into non-medically necessary channels.[39]

188.    In January 2017, AmerisourceBergen paid the State of West Virginia $16 million to settle allegations that it knowingly shipped increasing amounts of opioids without sufficient monitoring or control, facilitating six-fold increases in opioid consumption in some counties.[40] AmerisourceBergen was part of a drug supply chain that included doctors who wrote prescriptions for non-medical purposes and "pill mill" pharmacies that dispensed excessive numbers of painkillers. In addition to the monetary settlement, AmerisourceBergen agreed to adhere to stricter reporting guidelines within West Virginia.

---

[39] Jeff Overley, *AmerisourceBergen Subpoenaed by DEA over Drug Diversion*, LAW360 (Aug. 9, 2012, 4:28 PM), https://www.law360.com/articles/368498/amerisourcebergen-subpoenaed-by-dea-over-drug-diversion.

[40] Eric Eyre, *2 Drug Distributors to Pay $36M to Settle WV Painkiller Lawsuits*, CHARLESTON GAZETTE-MAIL (Jan. 9, 2017), http://www.wvgazettemail.com/news-cops-and-courts/20170109/2-drug-distributors-to-pay-36m-to-settle-wv-painkiller-lawsuits.

d.    **Walgreens**

189.    In 2006, the DEA sent a Letter of Admonition to Walgreens regarding record-keeping and security inadequacies at a major distribution facility. The DEA soon took issue with Walgreens' practice of impeding the DEA's oversight role by regularly providing what amounted to an unmanageable "data dump" of all potentially suspicious opioid transactions rather than only those transactions that Walgreens could not reclassify after a diligent review.

190.    By 2009, the DEA had issued an Order to Show Cause regarding dispensing practices at a San Diego pharmacy, noting that Walgreens had provided no training internally for employees dispensing controlled substances. That year Walgreens implemented a Suspicious Order Monitoring program to identify pharmacy distribution orders that exceeded tolerance and frequency thresholds. The program, however, to which Walgreens never assigned more than 11 employees nationwide, did not reduce orders that exceeded these thresholds until 2012. Even these order reductions were easily defeated, as Walgreens allowed individual retail pharmacies to "interstore"—that is, to obtain opioids from a second local pharmacy when the first pharmacy exceeded its opioid order threshold. Only in 2013 did Walgreens require individual stores to affirmatively justify orders over thresholds, but Walgreens approved greater than 95% of these requests in fiscal years 2014 and 2015.

191.    Walgreens' Suspicious Order Monitoring program was not designed to succeed. This is, in part, because Walgreens provided financial incentives to its pharmacists to fill an ever greater volume of opioid prescriptions. In 2010, for example, Walgreens used oxycodone dispensing metrics to target the managers of retail pharmacies with comparatively low dispensing figures and then instructed those managers not to "turn away" customers. Similarly, in 2011,

Walgreens implemented a sales initiative instructing pharmacists specifically to increase their Schedule II controlled substances business.

192.    In 2013, Walgreens reached an historic $80 million settlement—then the largest DEA settlement ever – to resolve allegations that it violated the FCSA. As part of that agreement, Walgreens acknowledged that "certain Walgreens retail pharmacies did on some occasions dispense certain controlled substances in a manner not fully consistent with its compliance obligations under the CSA . . . and its implementing regulations."[41]

193.    Walgreens' corporate officers not only turned a blind eye, but also facilitated the opioid boom in Florida by providing Walgreens' pharmacists with incentives through a bonus program that compensated them based on the number of prescriptions filled at the pharmacy. In fact, corporate attorneys at Walgreens suggested, in reviewing the legitimacy of prescriptions coming from pain clinics, that "if these are legitimate indicators of inappropriate prescriptions perhaps we should consider not documenting our own potential noncompliance," underscoring Walgreens' attitude that profit outweighed compliance with the law or the health of communities.[42]

194.    Walgreens agreed to exclude controlled substance prescriptions from bonus calculations for pharmacists, but prescription filling volume was still considered in bonus metrics—meaning that pharmacists doing their due diligence to resolve suspicious "red flags" associated with opioid prescriptions had less time to fill other prescriptions considered for their bonuses. Walgreens also agreed to cease distribution of opioids at certain facilities, and in 2014 Walgreens ceased distribution of opioids altogether.

---

[41] *See* Press Release, U.S. Drug Enforcement Admin., Walgreens Agrees to Pay a Record Settlement of $80 Million for Civil Penalties Under the Controlled Substances Act (June 11, 2013), https://www.dea.gov/press-releases/2013/06/11/walgreens-agrees-pay-record-settlement-80-million-civil-penalties-under.
[42] *Id.*

195.   Nevertheless, Walgreens' illegal opioid dispensing practices continued even after its historic settlement with the federal government. In 2015, Walgreens performed an audit of 2,400 pharmacies and found that, during a nine-month period, fewer than 60% were in compliance with its opioid dispensing protocols, 1,160 stores had not refused a single prescription, and only 63 pharmacies had refused 26 or more prescriptions. The audit also found that over 35,000 employees had not completed their required opioid dispensing training for that year. Even those Walgreens employees who did complete their training were instructed that the presence of an unresolved "red flag" (suspicious marker) should not necessarily result in the refusal to fill an opioid prescription.

196.   Only in 2018 did Walgreens finally end its practice of including controlled substances in its prescriptions-filled-per-day metric for evaluating pharmacists.

197.   Walgreens has also settled with a number of state attorneys general relating to dispensing practices, including West Virginia and Massachusetts.[43] The Massachusetts Attorney General's Medicaid Fraud Division found that, from 2010 through most of 2015, multiple Walgreens stores failed to monitor the opioid use of some Medicaid patients who were considered high-risk. Such patients are supposed to obtain all prescriptions from only one pharmacy, and that pharmacy is required to track the patient's pattern of prescription use. Some of the state's 160 Walgreens accepted cash for controlled substances in violation of state regulations. In response,

---

[43] Caleb Stewart, *Kroger, CVS, and Walgreens Settle Lawsuit with West Virginia for $3 Million*, WHSV (Aug. 16, 2016), http://www.whsv.com/content/news/Kroger-CVS-and-Walgreens-settle-lawsuit-with-West-Virginia-for-3-million-390332992.html.; Felice J. Freyer, *Walgreens to Pay $200,000 Settlement for Lapses with Opioids*, THE BOSTON GLOBE (Jan. 19, 2017), https://www.bostonglobe.com/metro/2017/01/18/walgreens-agrees-better-monitor-opioid-dispensing/q0B3FbMo2k3wPt4hvmTQrM/story.html.

Walgreens simply agreed to update its policies and procedures and train its staff to ensure that pharmacists properly monitor and do not accept cash payments from patients deemed high-risk.

198.    Media reports from 2019 also show that a woman acted as a pharmacist at multiple Walgreens in California for 10 years, even though she allegedly never graduated from college or pharmacy school. Walgreens hired her and even promoted her to top pharmacy positions. While posing as a pharmacist, she filled more than 750,000 prescriptions, surely including a substantial number of prescriptions for controlled substances. According to the state regulators, Walgreen could not even say if the company had ever asked to see the woman's pharmacy license. In response, Walgreens said it was investigating whether it employed other fake pharmacists. Notably, in these multiple locations, Walgreens dispensed controlled substances in violation of the responsibility for property dispensing imposed by the FCSA, without a pharmacist violating his or her own responsibility as a registrant.

**e.    CVS**

199.    CVS has paid fines totaling over $40 million as the result of a series of investigations by the DEA and the United States Department of Justice ("DOJ"). It nonetheless treated these fines as the cost of doing business and has allowed its pharmacies to continue (a) dispensing opioids in quantities significantly higher than any plausible medical need would require, and (b) violating their recordkeeping and dispensing obligations.

200.    In 2016, CVS paid $8 million to settle allegations by the DEA and the DOJ that its stores and pharmacists had been violating their legal duties and filling prescriptions with no

legitimate medical purpose.[44] CVS has resolved similar allegations by settling with Florida ($22 million),[45] Oklahoma ($11 million),[46] Massachusetts and New Hampshire ($3.5 million),[47] Texas ($1.9 million),[48] and Rhode Island ($450,000).[49]

201.    These cases included evidence that CVS filled prescriptions that were clearly forged. For example, in 2016, CVS settled with the United States to resolve allegations stemming from two DEA investigations that revealed that over 50 CVS stores in Massachusetts and New Hampshire had filled patently forged prescriptions for addictive painkillers more than 500 times between 2011 and 2014.[50] The DEA estimated the street value of the diverted drugs to be over $1 million. One forger successfully filled 131 prescriptions for hydrocodone at eight CVS stores.

---

[44] Press Release, Drug Enf't Admin., DEA Reaches $8 Million Settlement Agreement with CVS for Unlawful Distribution of Controlled Substances (Feb. 12, 2016), https://www.dea.gov/divisions/wdo/2016/wdo021216.shtml.

[45] Press Release, U.S. Attorney's Office Middle Dist. of Fla., United States Reaches $22 Million Settlement Agreement with CVS for Unlawful Distribution of Controlled Substances (May 13, 2015), https://www.justice.gov/usao-mdfl/pr/united-states-reaches-22-million-settlement-agreement-cvs-unlawful-distribution.

[46] Press Release, U.S. Attorney's Office W. Dist. of Okla., CVS to Pay $11 Million to Settle Civil Penalty Claims Involving Violations of Controlled Substances Act (Apr. 3, 2013), https://www.justice.gov/usao-wdok/pr/cvs-pay-11-million-settle-civil-penalty-claims-involving-violations-controlled.

[47] Press Release, U.S. Attorney's Office Dist. of Mass., CVS to Pay $3.5 Million to Resolve Allegations That Pharmacists Filled Fake Prescriptions (June 30, 2016), https://www.justice.gov/usao-ma/pr/cvs-pay-35-million-resolve-allegations-pharmacists-filled-fake-prescriptions.

[48] Patrick Danner, *H-E-B, CVS Fined over Prescriptions*, SAN ANTONIO EXPRESS-NEWS (Sept. 5, 2014), http://www.expressnews.com/business/local/article/H-E-B-CVS-fined-over-prescriptions-5736554.php.

[49] Press Release, U.S. Attorney's Office Dist. of R.I., Drug Diversion Claims Against CVS Health Corp. Resolved with $450,000 Civil Settlement (Aug. 10, 2015), https://www.justice.gov/usao-ri/pr/drug-diversion-claims-against-cvs-health-corp-resolved-450000-civil-settlement.

[50] Press Release, U.S. Attorney's Office Dist. of Mass., CVS to Pay $3.5 Million to Resolve Allegations That Pharmacists Filled Fake Prescriptions (June 30, 2016), https://www.justice.gov/usao-ma/pr/cvs-pay-35-million-resolve-allegations-pharmacists-filled-fake-prescriptions.

One of those stores filled 29 prescriptions for the forger over the course of just six months, an inordinate amount under the circumstances. At a different store, the same individual filled 28 forged prescriptions, even though they were identical in every respect other than the patient name. Additionally, 107 of the forged prescriptions bore the Massachusetts address of a dentist who had closed her Massachusetts practice and moved to Maine—something that should have been easily discovered by CVS pharmacists by checking the DEA website or calling the phone number on the prescriptions.

202.   CVS also paid $8 million to settle allegations by the DEA and the DOJ that its stores and pharmacists had been violating their legal duties and filling prescriptions with no legitimate medical purpose.[51] As part of the settlement, CVS acknowledged that from 2008 to 2012, some of its stores in Maryland dispensed controlled substances, including opioids, in a manner that was not fully consistent with its legal obligations, including failing to comply with the responsibility to ensure that these prescriptions were issued for a legitimate medical purpose.

203.   CVS also paid $600,000 to settle allegations by the DOJ that on over 6,000 occasions, CVS stores in Connecticut failed to keep appropriate records of prescriptions and purchase invoices.[52]

---

[51] Press Release, U.S. Attorney's Office Dist. of Md., United States Reaches $8 Million Settlement Agreement with CVS for Unlawful Distribution of Controlled Substances (Feb. 12, 2016), https://www.justice.gov/usao-md/pr/united-states-reaches-8-million-settlement-agreement-cvs-unlawfuldistribution-controlled.

[52] Press Release, U.S. Attorney's Office Dist. of Conn., CVS Pharmacy Pays $600,000 to Settle Controlled Substances Act Allegations (Oct. 20, 2016), https://www.justice.gov/usao-ct/pr/cvs-pharmacy-pays-600000-settle-controlled-substances-act-allegations.

204.    Just recently, CVS agreed to pay $535,000 to resolve allegations by the DOJ that several CVS stores violated the FCSA by filling invalid prescriptions for prescription opioids that CVS had reason to know were forged.[53]

205.    Dating back to 2006, CVS pharmacies in Oklahoma and elsewhere intentionally violated the law by filling prescriptions signed by prescribers with invalid DEA registration numbers.[54] To fill otherwise illegitimate prescriptions, CVS pharmacists substituted valid DEA registration numbers of non-prescribing practitioners, or substituted false DEA registration numbers in company computer systems, on paper prescriptions, and even in the information that the pharmacy reported to Oklahoma's Prescription Drug Monitoring Program.[55]

### f.    **Walmart**

206.    In 2009, Walmart paid $637,000 to resolve allegations of numerous record keeping violations at its pharmacies in Texas. Those allegations included that Walmart had failed to timely file records indicating loss or theft of drugs to the DEA, in violation of the FCSA.

207.    In 2011, Walmart entered an Administrative Memorandum of Agreement ("MOA")[56] with the DEA to resolve allegations that its pharmacy committed dispensing violations, including dispensing controlled substances to individuals that Walmart knew or should have known were diverting the controlled substances. As part of the MOA, Walmart agreed to

---

[53] Press Release, U.S. Drug Enforcement Admin, CVS to Pay $535,000 for Filling Invalid Prescriptions (April 16, 2019), https://www.dea.gov/press-releases/2019/04/16/cvs-pay-535000-filling-invalid-prescriptions.

[54] Press Release, U.S. Attorney's Office W. Dist. of Okla., CVS to Pay $11 Million to Settle Civil Penalty Claims Involving Violations of Controlled Substances Act (Apr. 3, 2013), https://www.justice.gov/usao-wdok/pr/cvs-pay-11-million-settle-civil-penalty-claims-involving-violations-controlled.

[55] *See* Complaint, *United States v. CVS Pharmacies*, No. 5:11-cv-1124-HE (W.D. Okla. Oct. 5, 2011).

[56] The MOA was between the DEA and "Wal-Mart Stores, Inc., on its behalf as well as on behalf of its subsidiaries that operate pharmacies registered with [the] DEA . . . ."

maintain a national "compliance program, updated as necessary, designed to **detect and prevent** diversion of controlled substances **as required by the Controlled Substances Act ("CSA") and applicable DEA regulations.**" The compliance program "shall apply to all current and future Walmart pharmacies registered with the DEA" and "shall include procedures to identify the common signs associated with diversion of controlled substances, including but not limited to, doctor-shopping, requests for early refills, altered or forged prescriptions, prescriptions written by doctors not licensed to practice medicine in the jurisdiction where the patient is located, and prescriptions written for other than a legitimate medical purpose by an individual practitioner acting outside the usual course of his professional practice." Walmart was required to institute policies and procedures to block the early refill of controlled substances, maintain and enforce a policy allowing pharmacists to obtain and review patient or doctor profiles from the Prescription Monitoring Program before dispensing controlled substances, implement procedures to routinely verify the validity of DEA registration numbers on prescriptions, implement policies and procedures designed to ensure that pharmacies comply with other applicable laws, and notify the DEA whenever Walmart refuses to fill a suspicious prescriptions for controlled substances. Additionally, the MOA provided that "Walmart acknowledges and agrees that the obligations taken in this subparagraph **do not fulfill the totality of its obligations under the CSA and its implementing regulations.**"

208.    Despite this agreement, in 2016, the DEA raided Walmart for filling suspicious opioid prescriptions of two doctors under investigation who were ultimately convicted of the illegal distribution of opioids.[57] The investigation was broadened to include Walmart's dispensing

---

[57] Jesse Eisinger & James Bandler, *Walmart Was Almost Charged Criminally Over Opioids. Trump Appointees Killed the Indictment.*, PROPUBLICA (Mar. 25, 2020),

practices, and it was discovered that between 2011 and 2017, Walmart repeatedly filled suspicious prescriptions for large doses of opioids. Walmart's own pharmacists from various states raised concerns to Walmart's national compliance department about suspicious opioid prescriptions. One compliance manager stated that Walmart's focus should be on "driving sales." Indeed, Walmart even refused to block the filling of prescriptions for certain doctors suspected of operating pill mills until it was too late. For example, it was reported that Walmart implemented a policy of blocking prescriptions from a certain prescriber, which pharmacists reported to Walmart as writing suspicious prescriptions, only after that prescriber had been indicted.

209.   It has been reported that, in 2018, top political appointees in the DOJ scrapped a criminal investigation into Walmart's opioid dispensing practices after significant pressure was brought to bear on the DOJ.

210.    It has also been reported that Walmart is currently undergoing negotiations for a civil settlement with the DEA to resolve allegations of FCSA violations. According to a thoroughly researched March 25, 2020 article in ProPublica, Walmart knew about its facilitation of drug diversion for years and did not do anything about it. The article summarized the facts surrounding a federal civil and criminal investigation of Walmart out of Texas:

> Opioids dispensed by Walmart pharmacies in Texas had killed customers who had overdosed. The pharmacists who dispensed those opioids had told the company they didn't want to fill the prescriptions because they were coming from doctors who were running pill mills. They pleaded for help and guidance from Walmart's corporate office. Investigators had obtained records of similar cries for help from Walmart pharmacists all over the country: from Maine, North Carolina, Kansas and Washington, and other states. They reported hundreds of thousands of suspicious or inappropriate opioid prescriptions. One Walmart employee warned about a Florida doctor who had a "list of patients from Kentucky

---

https://www.propublica.org/article/walmart-was-almost-charged-criminally-over-opioids-trump-appointees-killed-the-indictment.

that have been visiting pharmacies in all of central Wisconsin recently." That doctor had sent patients to Walmarts in more than 30 other states. In response to these alarms, Walmart compliance officials did not take corporate-wide action to halt the flow of opioids. Instead, they repeatedly admonished pharmacists that they could not cut off any doctor entirely. They could only evaluate each prescription on an individual basis. And they went further. An opioid compliance manager told an executive in an email, gathered during the inquiry and viewed by ProPublica, that Walmart's focus should be on "driving sales."[58]

211.    According to the article, Walmart pharmacists in multiple locations pleaded with the company to allow the pharmacists to stop filling illegitimate prescriptions. The pharmacists told Walmart, for example, "*[w]e are all concerned about our jobs and about filling for a pill mill doctor.*" Another Walmart pharmacist wrote that filling opioid prescriptions for suspicious doctors "is a problem and a liability on us . . . . Filling for him is a risk that keeps me up at night. This is a serious situation." The pharmacist wrote to headquarters: "*Please help us.*" But according to the Propublica article, "even after more than a decade of soaring addiction and deaths had transformed opioids into a national crisis, Walmart had a policy that pharmacists could conduct no 'blanket refusals' that shut off prescriptions written by a particular doctor." *Id.*

### 3.    Defendants continued to violate their duties regardless of prior regulatory actions.

212.    Despite being penalized by law enforcement, Defendants did not change their conduct. Rather, they treated fines as a cost of doing business in an industry that generates billions of dollars in profits.

213.    Defendants breached their duties because they failed to maintain effective controls against the diversion of prescription opioids, and to report and take steps to halt suspicious orders of prescription opioids.

---

[58] *Id.*

214.    Defendants failed to design and operate a system to identify and adequately report suspicious orders of prescription opioids.

215.    Defendants failed to adequately and effectively train their employees on the following non-exhaustive topics: (a) what constitutes a suspicious order of prescription opioids; and (b) what measures and/or actions should be taken when an order of prescription opioids is identified as suspicious.

216.    Upon information and belief, Defendants failed to analyze: (a) the volume of prescription opioids ordered by pharmacies relative to the population of the pharmacies' communities; (b) the increase in prescription opioid sales relative to past years; (c) the number of prescription opioids that were ordered relative to other drugs; and (d) the increase in annual opioid sales relative to the increase in annual sales of other drugs.

217.    Upon information and belief, Defendants also failed to adequately use data available to them—including ARCOS data, data they purchased from private data collection firms, marketing and sales data, demographic data, etc.—to identify pharmacies that were ordering suspicious volumes of prescription opioids, or to perform statistical analysis to avoid distributing prescription opioids that were illegally diverted or otherwise contributed to the opioid crisis.

218.    Defendants were, or should have been, fully aware that the quantity of prescription opioids they were distributing was untenable, and in many respects, patently absurd, yet they did not take meaningful action to investigate or to ensure that they were complying with their duties and obligations under the law with regard to controlled substances, and instead they distributed these suspicious orders of prescription opioids.

219.    Each Defendant knew or should have known that the amount of opioids that it supplied to, or dispensed from, points of sale in Cherokee Nation far exceeded what could be consumed for medically necessary purposes.

220.    Defendants negligently or recklessly failed to control their supply lines to prevent diversion. A reasonably prudent distributor of controlled substances would have anticipated the danger of opioid diversion and protected against it by, for example: (1) taking greater care and due diligence in hiring, training, and supervising employees; (2) providing greater oversight, security, and control of supply channels; (3) looking more closely at pharmacies and facilities that were purchasing large quantities of commonly-abused opioids in amounts much greater than appropriate, given the size of the local populations; (4) eliminating corporate policies that facilitated and/or encouraged unlawful distribution and sales of prescription opioids; (5) investigating demographic or epidemiological facts concerning the increasing demand for narcotic painkillers on and around Cherokee Nation; (6) informing pharmacies and retailers about prescription opioid diversion; (7) using their specialized knowledge and capabilities about local and national supply and demand for prescription drugs, as the largest and most sophisticated companies in the United States handling these drugs, including highly addictive and dangerous opioids[59]; (8) using specialized data, statistics and analytical resources readily available to them (but not to the public) to identify suspicious transactions, orders, or dispensing activity; (9) not making statements to regulators and to the public that provided false assurances Defendants were adhering to their duties and responsibilities; and (10) following statutes, regulations, professional standards, and guidance from government agencies. Defendants were under a duty to speak with

---

[59] Cherokee Nation does not claim that prescription opioids are defective products, and is not asserting any products liability claim in this action.

respect to their distribution of suspicious orders, and yet they concealed their wrongdoing from the DEA, the public, and Cherokee Nation.

221.    Defendants violated 21 U.S.C. § 843(a)(4) by knowingly and intentionally furnishing false material information in, and omitting material information from, reports, records, and other documents required to be made, kept, and filed under applicable laws, as the information relates to Defendants' unlawful distribution practices, including Defendants' failure to maintain effective controls against diversion, failure to report suspicious prescription opioids orders, and failure to halt suspicious orders of prescription opioids. Defendants concealed the reality of the suspicious orders that they filled on a daily basis—leading to the diversion of hundreds of millions of doses of prescription opioids into the illicit market.

222.    Defendants also violated Oklahoma statutes that make it unlawful "[t]o furnish false or fraudulent material information in, or omit any material information from, any application, report, or other document required to be kept or filed under this act, or any record required to be kept by this act . . . ." 63 OKLA. STAT. § 2-406(A)(4).

223.    In addition, Defendants violated Section 2-401(A)(1), which makes it unlawful to distribute or dispense a controlled substance except as authorized by state law, which would include the Oklahoma Uniform Controlled Dangerous Substances Act and implementing regulations. 63 OKLA. STAT. § 2-401(A)(1). By turning a blind eye to diversion, Defendants aided and abetted the unlawful distribution and dispensing of prescription opioids, in violation of 63 OKLA. STAT. § 2-401(A)(1).

224.    The compensation Defendants provided to certain of their employees was affected, in part, by the volume of their sales of opioids to pharmacies and other facilities servicing Cherokee

Nation, thus improperly creating incentives that exacerbated opioid diversion and the resulting epidemic of opioid abuse.

225.    The Pharmacy Defendants failed to conduct adequate internal or external audits of their opioid sales to identify these kinds of patterns regarding suspicious activity, and failed to create policies accordingly, despite the companies' promotional and advertising statements that their pharmacists use technology, expertise, one-on-one interactions, and communications with doctors (among other things) as a means to ensure appropriate prescription drug dispensing practices in the national pharmacy chains.

226.    The Pharmacy Defendants also failed to effectively respond to concerns raised by its own employees regarding inadequate policies and procedures regarding opioid dispensing. Plaintiffs have alleged that the corporate policies—and lack thereof—of the Pharmacy Defendants have contributed to the public nuisance that exists by virtue of the opioid crisis.

227.    Recent news sheds further light on how their corporate policies thoroughly control what happens in the individual retail pharmacies. The *New York Times* published articles on January 31, 2020 and February 21, 2020 reporting on how corporate policies at large chain pharmacies such as Walgreens and CVS have led to complaints by pharmacists, who say that corporate policies have made it impossible for the pharmacists to carry out their duties in a safe manner. [60] In the February 21 article, the *New York Times* reports that senior Walgreens executives asked a consulting firm "to remove some damaging findings after seeing a draft of their presentation" and to "delete a bullet point last month that mentioned how employees 'sometimes

---

[60] Ellen Gabler, *How Chaos at Chain Pharmacies Is Putting Patients at Risk*, THE NEW YORK TIMES (Jan. 31, 2020), https://www.nytimes.com/2020/01/31/health/pharmacists-medication-errors.html and https://www.nytimes.com/2020/02/21/health/pharmacies-prescription-errors.html.

skirted or completely ignored' proper procedures to meet corporate metrics." These articles show the reality of what happens in the chain pharmacies: the parent companies control virtually every aspects of what their pharmacy employees do.

228.    Even though the Pharmacy Defendants have an extensive understanding of the risks and harms of prescription opioid diversion, they continue to ignore their obligations to prevent prescription opioid diversion.

229.    The Pharmacy Defendants breached their duties because they failed to maintain effective controls and company policies against diversion, and to prevent widespread filling of quantities of prescriptions Pharmacy Defendants knew or should have known could not have been valid, based on the information available to them.

230.    The Pharmacy Defendants failed to adequately train their pharmacists and pharmacy technicians on the following non-exhaustive topics: (1) what constitutes a proper inquiry into whether an opioid prescription is legitimate; (2) whether an opioid prescription is likely for an FDA-approved condition; (3) what measures and/or actions should be taken when a prescription is identified as phony, false, forged, or otherwise illegal; and (4) how to respond to suspicious circumstances, including indications that pills are being illegally diverted. The Pharmacy Defendants have not adequately trained or supervised their employees at the point of sale to investigate or report suspicious or invalid prescriptions, or protect against corruption or theft by employees or others.

231.    The Pharmacy Defendants regularly filled prescriptions in circumstances where red flags were present, without resolving the concerns, and without reporting prescribers even when there should have been suspicion.

232.     The Pharmacy Defendants regularly filled opioid prescriptions that were facially unreasonable, without due diligence. They filled these prescriptions based corporate policies or practices that allowed them to do so without adequate monitoring or oversight.

233.     The Pharmacy Defendants have engaged in a consistent, nationwide pattern and practice of illegally distributing opioids that has also affected Cherokee Nation and its citizens.

234.     Upon information and belief, The Pharmacy Defendants also failed to adequately use data available to them to identify doctors who were writing suspicious volumes of prescriptions and/or prescriptions for suspicious amounts of opioids, or to adequately use data available to them to do statistical analysis to avoid filling prescriptions that were illegally diverted or otherwise contributed to the opioid crisis in Cherokee Nation.

235.     The Pharmacy Defendants were, or should have been, fully aware that the quantity of prescription opioids they were dispensing was untenable, and in many respects, patently absurd, yet Pharmacy Defendants did not take meaningful action to investigate or to ensure that they were complying with their duties and obligations under the law with regard to controlled substances, and they dispensed these prescription opioids.

236.     The Pharmacy Defendants violated 21 U.S.C. § 843(a)(4) by knowingly and intentionally furnishing false material information in, and omitting material information from, reports, records, and other documents required to be made, kept, and filed under applicable laws, as the information relates to The Pharmacy Defendants' unlawful dispensing practices, including the Pharmacy Defendants' failure to maintain effective controls against diversion, and failure to stop dispensing invalid, illegitimate prescriptions for opioids. The Pharmacy Defendants concealed the reality of the suspicious orders that they filled on a daily basis—leading to the diversion of hundreds of millions of doses of prescription opioids into the illicit market.

237.    The Pharmacy Defendants also violated Oklahoma statutes that make it unlawful "[t]o furnish false or fraudulent material information in, or omit any material information from, any application, report, or other document required to be kept or filed under this act, or any record required to be kept by this act . . . ." 63 OKLA. STAT. § 2-406(A)(4).

238.    In addition, the Pharmacy Defendants violated Section 2-401(A)(1), which makes it unlawful to distribute or dispense a controlled substance except as authorized by state law, which would include the Oklahoma Uniform Controlled Dangerous Substances Act and implementing regulations. 63 OKLA. STAT. § 2-401(A)(1). By turning a blind eye to diversion, Defendants aided and abetted the unlawful distribution and dispensing of prescription opioids, in violation of 63 OKLA. STAT. § 2-401(A)(1).

239.    The Pharmacy Defendants utilize monetary compensation programs for certain employees that are based, in part, on the number of prescriptions filled and dispensed. This type of compensation creates economic disincentives within the companies to change their practices to stem diversion. For example, there have been reports of chain store supervisory personnel directing pharmacists to fill prescriptions regardless of the red flags presented

**D.    Defendants have injured and continue to injure Cherokee Nation.**

240.    Defendants had the ability and the duty to prevent prescription opioid diversion described in this Complaint, which presented known or foreseeable dangers of serious injury. But they failed to do so, resulting in substantial injury to Cherokee Nation and its citizens.

241.    It was reasonably foreseeable to Defendants that their violations of their duties under federal and Oklahoma laws and regulations would allow prescription opioids to be diverted.

242.    It was reasonably foreseeable to Defendants that their failure to prevent diversion would cause injuries, including addiction, overdoses, and death. It was also reasonably foreseeable

that many of these injuries would be suffered by Cherokee Nation and its citizens, and that the costs of these injuries would be shouldered by Cherokee Nation.

243.    Defendants knew or should have known that the opioids being diverted from their supply chains would contribute to Cherokee Nation's opioid epidemic, and would create access to opioids by unauthorized users, which, in turn, would perpetuate the cycle of addiction, demand, and illegal transactions.

244.    For the Pharmacy Defendants it was reasonably foreseeable that filling invalid or suspicious prescriptions for opioids would cause direct harm to Cherokee Nation, and it was reasonably foreseeable that maintaining corporate policies that facilitated that conduct would cause direct harm to Cherokee Nation. They were aware of widespread prescription opioid abuse on and around Cherokee Nation, but nevertheless persisted in filling invalid or suspicious prescriptions for opioids and failed to address this misconduct. Pharmacy Defendants also lacked corporate policies designed to prevent the improper dispensation of prescription opioids.

245.    At all relevant times, the Pharmacy Defendants have engaged in improper dispensing practices, and continue to do so, despite knowing they could take measures to eliminate them in substantial part.

246.    Defendants knew or should have known, based on sheer aggregate numbers, a substantial amount of the opioids dispensed on and around Cherokee Nation were being dispensed invalidly or under suspicious circumstances that should have been investigated, but were not being investigated. It was foreseeable that filling suspicious wholesale or retail orders for opioids would harm Cherokee Nation and its citizens.

247.    Defendants knew of widespread prescription opioid abuse both nationally, and in the area of Cherokee Nation, but nevertheless persisted in a pattern of distributing and selling

commonly-abused opioids in places—and in such quantities, and with such frequency—that they knew or should have known these opioids were not being prescribed and consumed for legitimate medical purposes. They could not maintain policies that facilitated this while complying with their duties under state and federal law.

248.   The use of opioids by Cherokee Nation's citizens who were addicted or who did not have a medically necessary purpose for using opioids could not have occurred without the actions of Defendants. If Defendants had guarded against diversion, Cherokee Nation and its citizens would have avoided significant injury.

249.   Defendants profited substantially from their unlawful oversupply of prescription opioids in Cherokee Nation. Their participation and cooperation has foreseeably caused direct injuries and damages to Cherokee Nation. Defendants knew or should have known that Cherokee Nation would be unjustly forced to bear the costs of the resulting injuries.

250.   Defendants' conduct showed a reckless disregard for the safety of Cherokee Nation and its citizens.

251.   Defendants' conduct poses a continuing threat to the health, safety, and welfare of Cherokee Nation and its citizens.

252.   At all relevant times, Defendants engaged in these activities, and continue to do so, knowing that Cherokee Nation in its role of providing protection and care for its citizens, would have to provide or pay for additional costs to the healthcare, criminal justice, social services, welfare, and education systems, and would also have to bear the loss of substantial economic productivity and tax revenue.

E.    **Defendants' concealment and conspiracy.**

253.    Defendants should be prevented or estopped from asserting the statute of limitations as any defense or limitation to liability for their misconduct. Defendants undertook efforts to conceal their unlawful conduct and falsely assure the public, including Cherokee Nation, that they were undertaking efforts to comply with their obligations to prevent opioid diversion, all with the goal of continuing to generate profits.

254.    Defendants have also concealed and prevented discovery of information, including ARCOS data, which will confirm the extent of their unlawful activities and its direct impact on Cherokee Nation.

255.    Because of this concealment of material information, Cherokee Nation did not know of the existence or scope of Defendants' misconduct at issue in this lawsuit, and could not have acquired such knowledge sooner through the exercise of reasonable diligence. Only Defendants knew of their repeated, intentional failures to prevent opioid diversion in Cherokee Nation. Defendants cannot claim prejudice due to a late filing, because this suit was filed upon discovering the facts essential to the claim. Defendants knew their conduct was deceptive, and they intended it to be deceptive. Thus, Cherokee Nation was unable to obtain vital information regarding these claims absent any fault or lack of diligence on its part.

256.    Defendants agreed with each other to accomplish the unlawful purposes of selling, distributing, and retailing prescription opioids through violations of law and misrepresentations. They performed numerous overt acts in furtherance of this conspiracy, including selling, distributing, and retailing prescription opioids by means of misrepresentations and omissions, violating federal and state laws, and turning a blind eye to the diversion of prescription opioids.

257.     Defendants jointly agreed to disregard their duties under state and federal law to identify, investigate, halt, and report suspicious orders of opioids and diversion of their drugs into the illicit market. Disregarding their duties allowed them to unlawfully increase sales, revenues, and profits by fraudulently increasing the quotas set by the DEA that would allow them to benefit collectively from a greater pool of prescription opioids.

258.     Defendants jointly agreed to form an opioid supply chain business for the purpose of increasing the quota for and profiting from the increased volume of opioid sales in the United States, including but not limited to creating a market for the non-medical use of opioids of epidemic proportions. They concealed their wrongdoing from the public and Cherokee Nation by collective silence in the face of their duties to act and speak.

259.     Defendants distribute or dispense far greater quantities of prescription opioids than they know could be reasonably necessary for legitimate medical uses, while failing to report and take steps to halt suspicious orders, creating an oversupply of prescription opioids that fueled an illicit secondary market. As a result of Defendants' wrongful acts, Defendants created the opioid epidemic, and Cherokee Nation and its citizens have suffered injuries and damages.

260.     When a distributor does not report or stop excessive and suspicious orders, prescriptions for controlled substances may be written and dispensed to individuals who abuse them or who sell them to others to abuse. This, in turn, fuels and expands the illegal market and results in opioid-related addiction and overdoses. Without reporting by those involved in the supply chain, law enforcement may be delayed in taking action—or may not know to take action at all.

261.     Defendants purchased or obtained nationwide and regional prescriber- and patient-level data that allowed them to track prescribing trends, identify suspicious orders, identify patients

who were doctor shopping, identify pill mills, etc. In many cases, this data allowed them to analyze and track competitors' sales, and compare and analyze market share information.

262.    Defendants worked together to shore up markets for their drugs by intentionally increasing DEA quotas for opioids by withholding information they were required to report. Defendants had a duty under the controlled substances laws and regulations to identify and report suspicious orders of prescription opioids, yet failed to do so, in order to increase and maintain high quotas for the distribution and sale of their drugs, thereby unlawfully expanding the market. The concerted action of Defendants resulted in inflating and/or artificially maintaining high quotas, by refusing to identify, report, and reject suspicious orders despite their knowledge that they had a duty to do so and despite representations that they were complying with these obligations.

263.    After being caught for failing to comply with particular obligations at particular facilities, Defendants made broad promises to change their ways and insisted that they sought to be good corporate citizens. More generally, Defendants publicly portrayed themselves as committed to working with law enforcement, opioid manufacturers, and others to prevent diversion of these dangerous drugs. For example, Defendant Cardinal claims that: "We challenge ourselves to best utilize our assets, expertise and influence to make our communities stronger and our world more sustainable, while governing our activities as a good corporate citizen in compliance with all regulatory requirements and with a belief that doing 'the right thing' serves everyone."

264.    Defendant Cardinal likewise claims to "lead [its] industry in anti-diversion strategies to help prevent opioids from being diverted for misuse or abuse." Along the same lines, it claims to "maintain a sophisticated, state-of-the-art program" to help prevent and report drug diversion. Quite the contrary, Cardinal, along with the other Defendants, has instead fallen short of its duties to prevent diversion.

## V.   CLAIMS FOR RELIEF

### COUNT I: NUISANCE

### (Against All Defendants)

320.   Cherokee Nation realleges and incorporates by reference the foregoing allegations as if set forth at length herein.

321.   Defendants have caused, are causing, and will continue to cause a public nuisance, in that they have committed offenses against the public order and economy of Cherokee Nation by unlawfully:

   a.   facilitating the diversion of prescription opioids by selling, distributing, or dispensing, or facilitating the sale, distribution, or dispensing of, prescription opioids from premises on and around Cherokee Nation to unauthorized users—including children, people at risk of overdose or suicide, and criminals;

   b.   failing to implement effective controls to guard against theft, diversion, and misuse of prescription opioids from legal supply chains;

   c.   failing to design and operate an adequate system to detect, halt, and report suspicious orders of prescription opioids; and

   d.   using property for repeated unlawful sales of prescription opioids.

The nuisance arises out of Defendants' commission of these offenses.

322.   Defendants' activities have unreasonably interfered, are interfering, and will interfere with the common rights of the public:

   a.   to be free from reasonable apprehension of danger to person and property;

   b.   to be free from the spread of disease within the community, including the disease of addiction and other diseases associated with widespread illegal opioid use;

   c.   to be free from the negative health and safety effects of widespread illegal drug sales on premises on and around Cherokee Nation;

   d.   to be free from blights on the community created by areas of illegal drug use and opioid sales;

      e.      to live or work in a community in which local businesses do not profit from using their premises to sell products that serve the criminal element and foster a secondary market of illegal transactions; and

      f.      to live or work in a community in which community members are not under the influence of narcotics unless they have a legitimate medical need to use them.

323.    Defendants' interference with these public rights has been, is, and will continue to be unreasonable and objectionable because it:

      a.      has harmed and will continue to harm the public health and public peace of Cherokee Nation;

      b.      has harmed and will continue to harm Cherokee Nation neighborhoods and communities by increasing levels of crime and thereby interfering with the rights of the community at large;

      c.      is proscribed by state and federal laws and regulations;

      d.      is of a continuing nature, and has produced long-lasting effects; and

      e.      is known to Defendants that their conduct has a significant effect upon the public rights of Cherokee Nation and its citizens.

324.    In addition, and independently, the Defendants' conduct invades a legally protected interest. Defendants' conduct constitutes an unreasonable, intentional, and substantial interference because, *inter alia*, each Defendant has permitted dangerous drugs that they distribute or dispense to be diverted for illicit purposes such as to injure Cherokee Nation and its citizens.

325.    Because Defendants have sold prescription opioids in a manner contrary to law and because Defendants' conduct has unreasonably, intentionally, and substantially interfered with a right common to the general public, Defendants are liable for public nuisance.

326.    The nuisance has affected Cherokee Nation in that it has undermined, is undermining, and will continue to undermine Cherokee Nation citizens' public health, quality of life, and safety. It has resulted in increased crime and property damage within Cherokee Nation. It has resulted in high rates of addiction, overdoses, and dysfunction within Cherokee Nation.

327.   Public resources have been, are, and will continue to be consumed in efforts to address the opioid epidemic, thereby eliminating available resources which could be used to benefit Cherokee Nation public at large.

328.   Defendants had the obligation and ability to control the nuisance. At all times, Defendants had the power to shut off the supply of illicit opioids into Cherokee Nation, and Defendants possessed the right and ability to control the nuisance-causing outflow of opioids from pharmacy locations or other points of sale into the surrounding Cherokee Nation. The instrumentality which created and fueled the nuisance is Defendants' conduct in carrying out their business activities.

329.   Defendants' actions and omissions annoy, injure, and endanger the comfort, repose, health, and safety of Cherokee Nation, offend decency, and render the citizens of Cherokee Nation insecure in their lives and the use of property.

330.   Defendants' nuisance-causing activities are not outweighed by the utility of their behavior. In fact, their behavior is illegal and has no social utility whatsoever. There is no legitimately-recognized societal interest in failing to identify, halt, and report suspicious opioid transactions.

331.   As a direct and proximate result of the nuisance, Cherokee Nation citizens have been injured in their ability to enjoy rights common to the general public.

332.   As a direct and proximate result of the nuisance, Cherokee Nation has sustained economic harm by spending substantial sums trying to fix the societal harms caused by Defendants' nuisance-causing activity, including costs to the healthcare, criminal justice, social services, welfare, and education systems.

## COUNT II: NEGLIGENCE/GROSS NEGLIGENCE

### (Against All Defendants)

333.    Cherokee Nation realleges and incorporates by reference the foregoing allegations as if set forth at length herein.

334.    Defendants owe a duty to act reasonably under the circumstances.

335.    Defendants owe a duty to prevent the diversion of opioid prescriptions.

336.    Defendants also have duties under federal and Oklahoma law, including the FCSA and the Oklahoma CSA, to exercise reasonable care in selling and distributing opioids. For all Defendants, these duties include maintaining effective controls against the diversion of prescription opioids, and reporting and taking steps to halt suspicious orders of prescription opioids. For Defendants who own or operate retail pharmacies, these duties also include maintaining effective controls against diversion, reporting suspicious orders of prescription opioids, and not filling invalid, illegitimate prescriptions, specifically to persons that Defendants knew or should have known were diverting prescription opioids.

337.    The conduct of Defendants fell below the reasonable standard of care. Their negligent acts include the following:

      a.    oversupplying the market on and around Cherokee Nation with highly-addictive prescription opioids;

      b.    using unsafe distribution and dispensing practices;

      c.    enhancing the risk of harm from prescription opioids by failing to act as a last line of defense against diversion;

      d.    inviting criminal activity into Cherokee Nation by disregarding precautionary measures built into applicable laws and regulations;

      e.    failing to adhere to all applicable laws and regulations pertaining to the distribution and sale of prescription opioids;

      f.       failing to train or investigate their employees properly, and failing to provide adequate oversight of their operations;

      g.       failing to review prescription orders for red flags;

      h.       failing to report suspicious orders or refuse to fill them;

      i.       failing to provide effective controls and procedures to guard against theft and diversion of controlled substances;

      j.       failing to police the integrity of the supply chain for prescription opioids; and

      k.       maintaining policies and procedures at the national corporate level that allowed local employees to disregard their legal duties.

338.    Each Defendant had a responsibility to control the sale, distribution, or dispensing of prescription opioids.

339.    Each Defendant sold prescription opioids when it knew or should have known that: (a) there was a substantial likelihood that many of the sales were for non-medical purposes; and (b) opioids are inherently dangerous when used for non-medical purposes.

340.    Defendants were negligent or reckless in not acquiring or not utilizing special knowledge and special skills that relate to the dangerous activity of selling opioids in order to prevent or ameliorate such distinctive and significant dangers.

341.    Defendants were also negligent or reckless in failing to guard against foreseeable third-party negligence or misconduct, including that of negligent or corrupt prescribers, pharmacists, and staff, and criminals who buy and sell opioids for non-medical purposes.

342.    Each Defendant breached its duty to exercise the degree of care commensurate with the dangers involved in selling dangerous controlled substances.

343.    Defendants were also negligent or reckless in voluntarily undertaking duties to Cherokee Nation that they breached. Defendants, through their statements to the media, regulators,

insurance companies, customers, and the public at large, undertook duties to take all reasonable precautions to prevent drug diversion.

344.    Defendants' conduct was the cause-in-fact and proximate cause of injuries and damages to Cherokee Nation, including but not limited to the following: increased costs for the healthcare, criminal justice, social services, welfare, and education systems, as well as the cost of lost productivity and lower tax revenues.

345.    Cherokee Nation is without fault, and the injuries to it would not have happened in the ordinary course of events if Defendants had used due care commensurate to the dangers involved in the distribution and dispensing of prescription opioids.

346.    The reckless, wanton, and reprehensible nature of Defendants' conduct entitles Cherokee Nation to an award of punitive damages and attorneys' fees and costs. Defendants intentionally failed to perform their manifest duty to protect against prescription opioid diversion in reckless disregard of the consequences to Cherokee Nation and in callous indifference to the life, liberty, and property of Cherokee Nation or Cherokee Nation's people.

## COUNT III: UNJUST ENRICHMENT

### (Against All Defendants)

347.    Cherokee Nation realleges and incorporates by reference the foregoing allegations as if set forth at length herein.

348.    Should Cherokee Nation lack a remedy at law, the Court should exercise its equitable jurisdiction to grant relief for unjust enrichment.

349.    Cherokee Nation has expended substantial amounts of money in an effort to remedy or mitigate the societal harms caused by Defendants' conduct.

350.     Cherokee Nation's expenditures in providing healthcare services to people who use opioids have added to Defendants' wealth. The expenditures by Cherokee Nation have helped sustain Defendants' businesses.

351.     In this way, Cherokee Nation has conferred a benefit upon Defendants, by paying for what may be called Defendants' externalities—the costs of the harm caused by Defendants' improper sales, distribution, and dispensing practices.

352.     Defendants made substantial profits from their sale of prescription opioids while fueling the prescription opioid epidemic in Cherokee Nation.

353.     Defendants continue to receive considerable profits from the sale, distribution, and dispensing of controlled substances in Cherokee Nation. Defendants are aware of these obvious benefits, and that retention of these benefits is not justified under these circumstances. Defendants have been unjustly enriched by these benefits. It would be inequitable to allow Defendants to retain these benefits.

## COUNT IV: CIVIL CONSPIRACY

### (Against All Defendants)

354.     Cherokee Nation realleges and incorporates by reference the foregoing allegations as if set forth at length herein.

355.     Defendants' conspiracy consisted of a combination of two or more legal persons or entities to do an unlawful act, or do a lawful act by unlawful means.

356.     Each Defendant contributed to the creation of a public nuisance in Cherokee Nation, in combination with other Defendants, which constitutes an unlawful act forming the basis of a conspiracy claim.

357.     In addition to nuisance, each Defendant intentionally failed to perform its manifest duties under common law, the FCSA, and the Oklahoma CSA, in combination with other Defendants, which damaged Cherokee Nation and constitutes an unlawful act forming the basis of a gross negligence claim.

358.     Moreover, Defendants' unlawful acts amounted to violations of the FCSA, the Oklahoma CSA, and their implementing regulations, which caused injuries to Cherokee Nation.

359.     Defendants continuously distributed and supplied prescription opioids to the Defendants that operated retail pharmacies, which then dispensed these prescription opioids to consumers, including Cherokee Nation's citizens. These transactions occurred despite Defendants having knowledge that they were habitually violating the FCSA and Oklahoma CSA.

360.     Defendants' acts included the unlawful distribution and dispensing of prescription opioids to create the opioid epidemic. They violated 21 U.S.C. § 843(a)(4) by knowingly and intentionally furnishing false material information in, and omitting material information from, reports, records, and other documents required to be made, kept, and filed under applicable laws, as the information relates to Defendants' unlawful distribution and dispensing practices, including Defendants' failure to maintain effective controls against diversion and/or report and halt suspicious prescription opioids orders or transactions, and Pharmacy Defendants' failure to stop dispensing invalid, illegitimate prescriptions for opioids. Through these acts, Defendants diverted of hundreds of millions of doses of prescription opioids into the illicit market.

361.     Such activities also violated Oklahoma statutes that make it unlawful "[t]o furnish false or fraudulent material information in, or omit any material information from, any application, report, or other document required to be kept or filed under this act, or any record required to be kept by this act . . . ." 63 OKLA. STAT. § 2-406(A)(4).

362.    In addition, Defendants violated Section 2-401(A)(1), which makes it unlawful to distribute or dispense a controlled substance except as authorized by state law, which would include the Oklahoma Uniform Controlled Dangerous Substances Act and implementing regulations. 63 OKLA. STAT. § 2-401(A)(1). Defendants combined to unlawfully distribute or dispense prescription opioids to fuel the opioid crisis, in violation of 63 OKLA. STAT. § 2-401(A)(1).

363.    Without a steady wholesale supply and distribution of prescription opioids, the Pharmacy Defendants would not have been able to fill the increasing number of orders of prescription opioids for non-medical purposes throughout Cherokee Nation.

364.    No Defendants would have succeeded in profiting so much from the opioid epidemic without the concerted unlawful conduct of the other parties.

365.    The Defendants agreed with each other to accomplish the unlawful purposes of selling, distributing, and retailing prescription opioids through violations of law and misrepresentations, including unlawful misrepresentations to regulatory agencies. The Defendants performed numerous overt acts in furtherance of this conspiracy, including selling, distributing, and retailing prescription opioids by means of misrepresentations and omissions, violating federal and state laws, and turning a blind eye to the diversion of prescription opioids.

366.    Defendants jointly agreed to disregard their duties under state and federal law to identify, investigate, halt, and report suspicious orders of opioids and diversion of their drugs into the illicit market.

367.    Defendants jointly agreed to form an opioid supply chain business for the purpose of increasing the quota for and profiting from the increased volume of opioid sales in the United

States, including but not limited to creating a market for the non-medical use of opioids of epidemic proportions.

368.   Defendants also concealed their wrongdoing from the public and Cherokee Nation by collective silence in the face of their duties to act and speak.

369.   As a result of the concerted action between Defendants, Cherokee Nation and its citizens have suffered damages.

370.   Defendants are jointly and severally liable for the results of their concerted efforts.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, Cherokee Nation, prays that this Court enter judgment in its favor against Defendants and:

a.   On Count I (Nuisance Against All Defendants):

i.   Order Defendants to pay the expenses Cherokee Nation has incurred or will incur in the future to abate fully the nuisance they have caused;

ii.   Award Cherokee Nation punitive damages; and

iii.   Order such further relief as justice and equity may require.

b.   On Count II (Negligence/Gross Negligence Against All Defendants):

i.   Award Cherokee Nation compensatory damages for the increased costs to Cherokee Nation's healthcare, criminal justice, social services, welfare, and education systems, as well as the cost of lost productivity due to Defendants' negligence;

ii.   Award Cherokee Nation punitive damages;

iii.   Award Cherokee Nation attorneys' fees and costs; and

iv.   Order such further relief as justice and equity may require.

c.   On Count III (Unjust Enrichment Against All Defendants):

        i.     Award Cherokee Nation restitution of its costs caused by Defendants' actions, including the costs of addressing Defendants' externalities and the costs of prescription opioids paid for by Cherokee Nation;

        ii.    Disgorge Defendants of all amounts they have unjustly obtained; and

        iii.   Order such further relief as justice and equity may require.

    d.     On Count IV (Civil Conspiracy Against All Defendants):

        i.     Award Cherokee Nation compensatory and punitive damages for the conspiracy in which Defendants engaged; and

        ii.    Order such further relief as justice and equity may require.

## **REQUEST FOR JURY TRIAL**

Cherokee Nation respectfully requests that all issues presented by its above Complaint be tried by a jury, with the exception of those issues that, by law, must be tried before the Court.

Date: April 10, 2020
Respectfully Submitted,

                              */s/ Tyler Ulrich*
                              Tyler Ulrich (*pro hac vice*)
                              BOIES SCHILLER FLEXNER LLP
                              100 SE 2nd Street, Suite 2800
                              Miami, Florida  33131
                              tulrich@bsfllp.com
                              Tel: (305) 539-8400
                              Fax: (305) 539-1307

                              William S. Ohlemeyer
                              BOIES SCHILLER FLEXNER LLP
                              333 Main Street
                              Armonk, NY 10504
                              wohlemeyer@bsfllp.com
                              Tel: (914) 749-8200
                              Fax: (914) 749-8300

                              Attorney General Sara Hill

Assistant Attorney General Chrissi Nimmo
Assistant Attorney General John Young
THE CHEROKEE NATION
P.O. Box 948
Tahlequah, OK 74464

Richard W. Fields
FIELDS PLLC
1700 K Street, NW, Suite 810
Washington, DC 20006
fields@fieldslawpllc.com
Tel: (917) 297-3610

**ATTORNEYS FOR PLAINTIFF**
**CHEROKEE NATION**

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of April, 2020, I electronically filed and transmitted the foregoing document to the Clerk of the Court using the CM/ECF System for electronic service on all counsel of record in this action.

/s/ Tyler Ulrich
Tyler Ulrich