UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| THE CHEREOKEE NATION, )<br>)<br>   Plaintiff, )<br>)<br>v. )<br>)<br>MCKESSON CORPORATION; )<br>CARDINAL HEALTH, INC.; )<br>CARDINAL HEALTH 110, LLC; )<br>AMERISOURCEBERGEN DRUG CORP.; )<br>CVS PHARMACY, INC.; )<br>OKLAHOMA CVS PHARMACY, L.L.C.; )<br>WALGREEN CO.; )<br>WAL-MART STORES, INC. )<br>)<br>   Defendants. )<br>) | Case No. 18-cv-56-RAW-SPS |

**PLAINTIFF'S MOTION TO COMPEL REGARDING THE SCOPE OF DISCOVERY**

The parties have agreed to present motions regarding discovery issues on a shortened briefing schedule before the December 21, 2020 Status Conference in hopes of assisting the Court understand the pending discovery. This has been necessitated from Plaintiff's perspective because certain Defendants have recently taken the position that they will not collect documents for this case until the "scope" issues are resolved. Walgreens, Walmart, CVS have not produced any case-specific documents.[1]

---

[1] Walgreens and Walmart responded, in part, to several of Cherokee Nation's document requests by citing Bates numbers of responsive documents they previously produced in the MDL. Likewise, all Defendants have made general reference to "millions of documents" they have produced into the MDL repository from cases around the country, albeit without referencing any particular documents or Bates ranges responsive to pending discovery requests in this case. If any such documents are responsive to Cherokee Nation's RFPs or interrogatories, Defendants should simply identify them; the documents do not need to be produced again.

1

The briefing agreement is: Any Party may file motions no later than December 11, 2020; Responses to any such motions are due 7 days later; and replies no later than December 23, 2020.

Plaintiff raises three "scope" issues below which the parties have discussed during about 6 hours of meet and confer telephone conference and related correspondence: (1) Geographic scope; (2) Drug products; and (3) Temporal scope. The parties have reached an impasse and ask for the Court's rulings.

### 1. Cherokee Nation's "scope" positions are consistent with discovery rulings from the MDL on similar issues.

This case was remanded from the MDL as the "tribal track" bellwether case. The JPML remanded the case as part of what the MDL court described as a coordinated "hub and spoke" model of the national opioid litigation. This model contemplated that certain national discovery would occur in the MDL, and that case-specific discovery and trials would occur in the transferor jurisdictions of the remanded cases. The MDL court has spent nearly three years dealing with disputes about the appropriate "scope" of discovery in cases brought by government entities against opioid distributors and retail pharmacies. For example, the MDL court has issued rulings on topics such as the relevant Geographic area in an opioid case, and the relevant time period.

There are many discovery requests filed by all parties that are impact by the "scope" issues below. In conferring with Defendants, Cherokee Nation's position has been that if the MDL court has entered a ruling on a dispute about the "scope" of relevant discovery after receiving arguments and briefing from Defendants, then there is no reason to re-litigate the same issue here. Instead, the MDL ruling should be applied to corresponding discovery issues in this case, unless the parties agree otherwise or there is a good reason to revisit the issue. Defendants have embraced this position in this case by proposing that various orders from the MDL be incorporated into the

Court's Case Management Order. Cherokee Nation's positions below are consistent with the discovery rulings on corresponding issues in the MDL.

## 2. Relevant Opioid Products

Cherokee Nation's discovery requests seek certain categories of Defendants' documents and communications concerning opioids. Defendants do not dispute that the term "opioids" includes commonly abused opioid products such as codeine, but they nevertheless resist discovery into their practices and data concerning codeine (as well as any other opioid other than eight "Schedule II" opioids) by claiming it would be overly burdensome to look for such documents. Plaintiff had proposed a reasonable compromise that limited the discovery from "all opioids" to only seven Schedule II opioids plus codeine products in any Schedule. Defendants did not agree. Their objection to producing discovery regarding non-Schedule II opioids should be overruled for several reasons.

*First*, on the question of relevance, all commonly-abused opioids are clearly relevant. Although certain notorious Schedule II opioid products like fentanyl or high-dose OxyContin are among the strongest and the most deadly products, they are not necessarily the most widely abused in every geographic area. Less potent opioids in Schedule III through Schedule V—such as certain codeine-related products—are also highly important to this case. There is no basis to exclude them based on relevance.

*Second*, Plaintiff's Amended Complaint is not limited to only Schedule II opioids. Rather, the complaint puts at issue all opioids as defined by federal law, including codeine. *See, e.g.*, Am. Compl. at ¶¶ 30–31, D.E. 136 (April 10, 2020) (defining "opioids" broadly to "include *all drugs* derived in whole or in part from the opium poppy—natural, synthetic, and semi-synthetic opioids"). Plaintiff's discovery requests also define "opioids" by reference to definition in the Controlled Substances Act, 21 U.S.C. § 802, which includes codeine and other opioid products.

*Third*, the Pharmacy Defendants' relevant legal duties under federal regulations are not limited to only Schedule II opioids. Indeed, numerous federal cases have found that legal duties concerning controlled substances are relevant and applicable in opioid lawsuits. *See, e.g.*, 21 C.F.R. § 1306.04(a) (imposing responsibilities on pharmacists for the proper dispensing of all controlled substances without regarding for the schedule).[2]

*Fourth,* Pharmacy Defendants themselves have sought third-party discovery of non-Schedule II opioids—and even discovery of non-opioid drugs. *See, e.g.*, Walmart subpoena to Indian Health Service, D.E. 234-1 (seeking discovery of "Illicit Drugs," which Walmart defined broadly to include all Schedules for all drugs: "***any scheduled drug*** as defined in 21 U.S.C. § 812 that was illegally manufactured, obtained, diverted, or used."); Walgreens subpoenas to 21 Oklahoma Drug Courts, D.E. 214-1–228-1, D.E. 233-1, D.E. 235-1–239-1 (seeking discovery of "Illicit Drugs," which under Walgreens' definition would include all Schedules for all drugs: "any Schedule I drug, *as well as any drug monitored by the DEA*" (emphasis added)).

*Fifth*, half of the Defendants in this case—McKesson, Cardinal, and ABDC—agree that opioids such as codeine are within the scope of discovery regardless of whether they are classified Schedule II opioids, and have agreed to produce discovery.

---

[2] *See, e.g.*, *In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2019 WL 3917575, at *7–9 (N.D. Ohio Aug. 19, 2019) (finding that distributors of controlled substances have legal duties under the Controlled Substances Act, 21 U.S.C. §§ to identify, investigate, decline to ship, and report suspicious orders of controlled substances); *In re Na''l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2020 WL 5642173, at *2 (N.D. Ohio Sept. 22, 2020) ("The Court overruled the Pharmacy Defendants' principal contention, and the Court reaffirms its conclusion here: 'all registrants [including pharmacies] have an affirmative obligation to protect not only against diversion via theft but also other forms of diversion more broadly.'").

*Sixth*, the Pharmacy Defendants were ordered to produce data and documents about numerous non-Schedule II drugs in the MDL including benzodiazepines and muscle relaxers (which are Schedule IV and some are not even scheduled).

Pharmacy Defendants nevertheless maintain that discovery should be strictly limited to only eight specific Schedule II opioid products. Cherokee Nation is not aware of any MDL order holding that non-Schedule II opioids are irrelevant in a case in which Pharmacies' dispensing practices are at issue. Nor is there any reason for such a limitation. Codeine-related products, are highly abused particularly in Oklahoma and particularly among Native Americans, regardless of Schedule. The National Institute on Drug Abuse of the United States Department of Health and Human Services has written that "[d]rinking promethazine-codeine cough syrup mixed with soda (a combination called syrup, sizzurp, purple drank, barre, or lean) was referenced frequently in some popular music beginning in the late 1990s and has become increasingly popular among youth in several areas of the country." *See DrugFacts*, *Cough and Cold Medicine Abuse*, NATION INSTITUTE OF DRUG ABUSE (May 2014), www.drugabuse.gov/sites/default/files/drugfacts_cough_cold_meds.pdf. (warning that "when abused, promethazine-codeine cough syrup presents a high risk of fatal overdose due to its effect of depressing the central nervous system, which can slow or stop the heart and lungs. Mixing with alcohol greatly increases this risk."). DEA publications from recent years show that Oklahoma has been a national hotspot for these products (second highest in the country at times), and also that codeine products account for a huge amount of the opioid problem, 16% in recent years:

https://www.deadiversion.usdoj.gov/mtgs/pract_awareness/conf_2019/june_2019/guzman.pdf

(Graphics from pages 31 and 62 on the DEA publication are clipped below)

5





Moreover, Defendants themselves have put codeine squarely at issue in this case by arguing that ***all opioid products*** are relevant to Cherokee Nation's lawsuit—regardless of Schedule. In connection with the motion practice over whether there was federal jurisdiction, McKesson relied on non-Schedule II opioids as part of the argument in favor removal. *See National Prescription Opiate Litigation*, MDL No. 2804, D.E. 1052 (Oct. 28, 2018). McKesson's brief informed the MDL court about volumes of non-Schedule II opioid distributions and argued that:

6

> [the] ARCOS data [cited by Cherokee Nation] does not include ***numerous prescription opioid products that are within the scope of the [Cherokee] Nation's claims, such as Tramadol, propoxyphene, and others.*** *See* Compl., ¶ 29 (defining the 'opioid[s]' put at issue by the Nation's claims as 'all drugs derived in whole or in part from the opium poppy'). McKesson distributed a large number of dosage units for these prescription opioid products to federal government facilities in the Cherokee Nation's counties, and the Nation's calculation ignores those opioid distributions.

*Id*. Thus, in opposing remand to state court McKesson argued that the MDL court needed to consider non-Schedule II opioids (like Tramadol, codeine, and others). Therefore, having relied on data regarding ***all*** opioids—including all Schedules—to argue for federal jurisdiction, Defendants cannot credibly argue that non-Schedule II opioids are beyond the scope of discovery.

      **3.**    **Relevant Geographic Scope**

The relevant geographic area for discovery should be the Cherokee Nation and surrounding counties. This includes the 14 counties in Northeastern Oklahoma of Cherokee Nation's reservation, plus the 7 surrounding Oklahoma counties of Pawnee, Payne, Creek, Okmulgee, Pittsburg, Haskell, and Le Flore; and 9 counties next to Cherokee Nation in surrounding states: McDonald, Newton, Jasper, Benton, Washington, Crawford, Sebastian, Labette, and Montgomery. This is a huge compromise from what Plaintiff originally requested in discovery and what has been ordered in other opioid cases.

The rationale for the geographic scope is that controlled substances travel. Prohibiting Plaintiff from discovering information about the activities of pharmacies located outside Cherokee Nation (and distributing activities to these pharmacies) would exclude, for example, the nearby pharmacies that dispense opioids that flood the Cherokee Nation. Many of them are only a matter of miles away from Cherokee Nation. Notably, in opposing motions to dismiss in this case, Defendants argued it was arbitrary to assume that pharmacy locations serve only customers within a close geographic proximity; meaning Defendants have effectively conceded Cherokee Nation's

7

position regarding the relevance of data from pharmacies located in bordering counties. Additionally, this geographic scope is necessary to derive valid statistics showing how patterns of opioid transactions may differ across locations, which is relevant to establishing what the defendants knew about the potential diversion of controlled substances.

Moreover, the issue of the relevant geographic scope of distribution and dispensing data was litigated extensively in the MDL through briefs, hearings, and multiple orders. The MDL has "repeatedly" recognized that "certain ***evidence from beyond the plaintiff jurisdictions is relevant to their claims***." Order at 2, Case: 1:17-md-02804-DAP, D.E. 3389 (July 21, 2020) (citing rulings). There is no reason to depart from the principles established in the MDL concerning the appropriate scope of geographic discovery in opioid cases similar to this one.

The MDL, for example, ordered Pharmacy Defendants to produce transactional dispensing data for the ***entire state of Ohio*** (88 counties) in a case brought by two counties in northern Ohio. *See* Order at 3, *In Re: National Prescription Opiate Litigation*, MDL 2804, D.E. 3341 (June 17, 2020) (holding that "transactional dispensing data for Ohio is likewise relevant and proportional to the needs of Track Three."). This involved producing data for over 500 of Defendants' pharmacy locations (and possibly many more than that; Pharmacy Defendants have declined to say). The MDL court also ordered Walmart, CVS, and Walgreens to produce ***distribution*** data in their role as opioid distributors for the entire state of Ohio. Order Regarding Geographic Scope of Discovery at 7, 11, D.E. 3371 (July 8, 2020) (requiring the production of distribution data for the state of Ohio in response to plaintiffs' request for production no. 4 and restating that the Court found that "dispensing data for Ohio is likewise relevant and proportional to the needs of Track Three").

Similarly, in a different MDL case brought by a West Virginia county and city, the MDL court ordered some of the same Defendants here to produce transactional distribution data from an

*entire three-state area*—all of West Virginia, Kentucky, and Ohio. *See* Order Regarding Track Two Cases at 5, D.E. 2950 (Nov. 22, 2019) ("The Court concludes the appropriate geographic scope of discovery of transactional data should be for the states of Ohio, West Virginia, and Kentucky.").[3]

To try to distinguish Judge Polster's discovery orders, Pharmacy Defendants have previously directed Cherokee Nation to a New York trial court order (applying New York state civil procedure) in a case brought by two county governments, Nassau and Suffolk Counties. *See* Decision and Order, *In re: Opioid Litigation*, Index No. 400000/2017, D.E. 3388 (Jan. 28, 2020). The order in the New York county case is not comparable.

First of all, expanding discovery beyond the two counties in the New York case (on Long Island) would mean including New York City with its 8.3 million people. Cherokee Nation's discovery request is proportional to this case. In terms of burden, there were approximately 185 of Defendants' pharmacy locations in those two New York counties, according to DEA data. In this case there are about 194 of Defendants' Pharmacy locations in the relevant counties in Oklahoma, Arkansas, Missouri, and Kansas *combined*. The burden is not materially different.

There is also a much stronger argument for a broader geographic scope in this case. The population density in Nassau County, New York, is about 4,700 people living per square mile, which is extremely dense. By comparison, in Eastern Oklahoma along the Arkansas border, the

---

[3] *See also* Cardinal Letter to Plaintiffs dated Dec. 13, 2019, Exhibit to Plaintiffs' Motion to Compel Discovery, *Huntington v. AmerisourceBergen Drug Corp.*, Case 3:17-cv-01362, D.E. 140-2 (Jan. 24, 2020) ("Cardinal Health will also be producing transactional data for West Virginia, Kentucky, and Ohio consistent with Judge Polster's order, and expects to do so by years' end."); ABDC's Response to Plaintiffs' Motion to Compel, *Huntington v. AmerisourceBergen Drug Corp.*, Case 3:17-cv-01362, D.E. 193 (Mar. 4, 2020) (stating that "ABDC produced transactional data for West Virginia from 2002 through 2018 and Ohio from 2007 through 2017 [and] Kentucky from 2010 through November 30, 2018.").

9

population density is about 50 people living per square mile (8000% less). This means fewer pharmacies per square mile, and people may drive farther. Most of the relevant pharmacy locations in Arkansas, for example, are within about 25 miles from Cherokee Nation. And some are only a few miles away (including some located in what the United States Census Bureau has designated as the "Fort Smith Metropolitan Statistical Area," which is a five-county area including three Western Arkansas counties and part of Cherokee Nation).

In sum, as the MDL court recognized, there is no reason to arbitrarily cut-off discovery of Defendants' activities at the border of a plaintiff's jurisdiction. Rather, "evidence from beyond the plaintiff jurisdictions is relevant to their claims." This is even confirmed by Defendants' own geographically expansive third party discovery requests, whose scope is broader than what Defendants are asking this Court to impose on Plaintiff, including overbroad subpoenas to the United States Attorney's Office in the Westerns, Eastern, and Northern Districts.[4]

### 4. Temporal Scope for Discovery

The relevant discovery period in this case should be basically consistent with what was ordered in the MDL, as there is no reason to re-litigate these rulings. For the start-date, Cherokee Nation believes Defendants should be ordered to produce certain discovery back to January 1, 1996, consistent with the MDL ruling that "distributor defendants shall produce transactional data and Suspicious Order Reports with a cut-off date of January 1, 1996." *See* MDL Discovery Ruling No. 2 at 11, *In Re: National Prescription Opiate Litigation*, MDL 2804, D.E. 693 (June 30, 2018).

---

[4] *See also* Cardinal subpoena to Oklahoma Board of Medical Licensure and Supervision (no docket number) (seeking discovery for the entire state of Oklahoma relating to opioid diversion); Walgreens subpoena to Oklahoma Bureau of Narcotics, D.E. 205-1 (seeking discovery without geographic limitation of "[a]ll Documents reflecting or relating to Your registering and discipline of registrants on a summary basis by year."); Walmart subpoena to Indian Health Services, D.E. 234-1 (seeking discovery without geographic limitation of documents relating to opioid abuse).

The same 1996 start date also applied to distribution activities of the Pharmacy Defendants, as stated in a subsequent MDL ruling:

> [T]he pharmacies argue their discovery obligations should be more limited because, unlike the distributor defendants, they distributed opioids only to their own retail stores. The Special Master rejects this argument. The distribution function of a national retail pharmacy implicates exactly the same anti-diversion obligations as any other distributor defendant. . . . Accordingly, the Special Master declines to impose different discovery obligations on the pharmacy defendants than on the other distributor defendants.

MDL Discovery Ruling No. 3 at 7-8, D.E. 762 (July 17, 2018).

Additionally, Cherokee Nation has requested the Pharmacy Defendants produce pharmacy dispensing data back to 2006, which is also consistent with MDL rulings. *See* Order on Reconsideration Regarding Scope of Discovery at 4, *In Re: National Prescription Opiate Litigation*, D.E. 3055 (holding that the temporal scope for pharmacy dispensing data should be from 2006 forward).

Although Plaintiff is not aware of any specific ruling by the MDL court regarding the appropriate start date for relevant documents from the "custodial productions" from Defendants' witnesses, Plaintiff believes Defendants should produce responsive company documents, emails, memos, etc., from their witnesses' custodial files going back to 1996 if they exist (provided such files can be located after a reasonable search). Naturally, many companies do have electronically stored information ("ESI") that far back. If no such documents can be located, then Defendants should simply look for responsive documents from their relevant employees for as far back as they exist. Plaintiff understands that in the MDL some or all Pharmacy Defendants produced files from their custodians earlier than 2006.

Additionally, if any of Defendants' relevant custodians (i.e., the people who held the jobs over the relevant timeframe who would be most expected to have relevant documents) have saved

11

minimal or no ESI for certain years, Defendants should simply be required to search within reason for the custodian's documents/emails from other employees in related job functions, who communicated with the relevant custodians. In other words, if a custodian's inbox does not exist from 2006, Defendants should determine if emails sent by the custodians are recoverable from other sources. That way, Defendants will likely be able to obtain some of the documents that certain individual custodians may no longer possess.

Also, the Defendants themselves have sought discovery of documents going back to 1996 through numerous third-party subpoenas served upon Oklahoma government entities. As just a few examples, Walgreen's subpoena to the Oklahoma Bureau of Narcotics (D.E. 205-1) requires the agency to produce "annual reports *from 1996 to the present*." Cardinal's subpoena to Oklahoma Board of Medical Licensure and Supervision (no docket number) seeks discovery of "Documents *from 1996 to present* regarding the Oklahoma Board of Medical Licensure and Supervision's policy entitled 'Use of Controlled Substances for the Treatment of Pain.'" McKesson's subpoena to Adair County Sheriff (D.E. 232-1) requests "annual reports *from 1996 to the present*." Defendants cannot credibly argue that pre-2006 documents are "irrelevant" when they themselves are subpoenaing discovery back to 1996.

In sum, there is no basis for a blanket cut-off date of 2006 for witnesses' documents. This is especially true given the MDL rulings that find certain company documents from 1996 to be potentially highly relevant.

For the end-date of discovery collection, Cherokee Nation has proposed an end-date of April 4, 2020, the date Cherokee Nation filed its Amended Complaint. This will maintain consistency with what was done in the MDL *See, e.g.*, Order Regarding Temporal Scope of Discovery at 1–3, *In Re: National Prescription Opiate Litigation*, Case: 1:17-md-02804-DAP,

D.E. 3399 (July 29, 2020) (ordering an end date of May 27, 2020—which is the date MDL Track 3 plaintiffs filed their *amended complaint*—for certain discovery relating to dispensing claims). Some or all of the Pharmacy Defendants have produced both custodial files and other documents in the MDL from 2020, too. The 2020 end date is also consistent with the temporal scope of discovery that Defendants are seeking in this case. *See, e.g.*, Walmart subpoena to Indian Health Services, D.E. 234-1 (served Nov. 10, 2020) (seeking discovery through 2020).[5]

## CERTIFICATE OF GOOD FAITH CONFERENCE

Counsel for movant has met and conferred in good faith with opposing counsel approximately 5 times over the course of 6 weeks on the scope issues discussed above. The conferences were by telephone and in writing by letters and email, while counsel were located in different states. After all these conferences, the parties have been unable to reach an accord.

Dated: December 9, 2020.

Respectfully Submitted,

*/s/ Tyler Ulrich*
Tyler Ulrich (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
100 SE 2nd Street, Suite 2800
Miami, FL 33131
tulrich@bsfllp.com
Tel: (305) 539-8400
Fax: (305) 539-1307

William S. Ohlemeyer (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
wohlemeyer@bsfllp.com
Tel: (914) 749-8200

---

[5] Some Defendants have said MDL Discovery Ruling No. 2 imposed an end date of 2018 for discovery. On its face, however, that ruling provides no such end date. Rather, it discusses only the begin date for discovery. *See* Discovery Ruling No. 2 at 11, *In Re: National Prescription Opiate Litigation*, Case: 1:17-md-02804-DAP, D.E. 693 (June 30, 2018)

13

Fax: (914) 749-8300

Michael Burrage; OK #1350
WHITTEN BURRAGE
512 N. Broadway Ave., Suite 300
Oklahoma City, OK 73102
Tel: (405) 516-7800
Fax: (405) 516-7859

Richard W. Fields (*pro hac vice*)
FIELDS PLLC
1700 K Street, NW, Suite 810
Washington, DC 20006
fields@fieldslawpllc.com
Tel: (917) 297-3610

Attorney General Sara Hill
Assistant Attorney General Chrissi Nimmo
Assistant Attorneys General John Young
THE CHEROKEE NATION
P.O. Box 948
Tahlequah, OK 74464
chrissi-nimmo@cherokee.org
john-young@cherokee.org
Tel: (918) 453-5000
Fax: (918) 458-5099

*Attorneys for Plaintiff*
*Cherokee Nation*

## CERTIFICATE OF SERVICE

I hereby certify that on December 9, 2020, a true and correct copy of the foregoing document was served on counsel of record for defendants in this action via e-mail.

*/s/ Tyler Ulrich*
Tyler Ulrich
