## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF OKLAHOMA

THE CHEROKEE NATION,

*Plaintiff*

—v—

CVS PHARMACY, INC.; OKLAHOMA
CVS PHARMACY, L.L.C.; WALGREEN
CO.; WAL-MART STORES, INC.,

*Defendants.*

Case No. CIV–18–56–RAW–SPS

Hon. Ronald A. White

## DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS
## AND MEMORANDUM IN SUPPORT

8026865.8

# Table of Contents

Table of Authorities ...........................................................................................iii

Introduction ..................................................................................................... 1

Background ...................................................................................................... 3

   I.  Plaintiff's Theory of Liability.......................................................................... 3

   II. The Supreme Court of Oklahoma's Decision in *Johnson &
      Johnson.* ................................................................................................. 5

Standard.......................................................................................................... 6

Argument ........................................................................................................ 6

   I.  *Johnson & Johnson* Squarely Forecloses Plaintiff's Public
      Nuisance Claim. ....................................................................................... 6

   II. Plaintiff Cannot Recast Its Flawed Nuisance Theory In
      Negligence. ............................................................................................ 10

      A. Plaintiff's Negligence Theory Fails Because It Lacks A
         Causative Link Between Product And Harm. ............................................ 11

      B. Plaintiff's Negligence Claim Also Fails Under The Economic
         Loss Principles of the Third Restatement. ................................................ 15

      C. *Johnson & Johnson* Defeats Plaintiff's Theory of Duty............................ 16

      D. *Johnson & Johnson* Makes Clear This Is a Product Liability
         Action, Which Is Barred By the Innocent Seller Rule. .............................. 17

   III. *Johnson & Johnson* Defeats Plaintiff's Analogous Unjust
      Enrichment Claim.................................................................................... 18

      A. *Johnson & Johnson* Undercuts Plaintiff's "Negative
         Externalities" Theory. ............................................................................ 19

      B. *Johnson & Johnson* Undercuts Plaintiff's Theory of Injustice.................. 22

   IV. *Johnson & Johnson* Deprives Plaintiff's Civil Conspiracy Claim
      of An Underlying Tort............................................................................. 23

Conclusion ................................................................................................................ 25

8026865.8

## Table of Authorities

**Cases**

*Allen* v. *IM Sols., LLC*, 94 F. Supp. 3d 1216 (E.D. Okla. 2015) ...................................... 23

*Amparan* v. *Lake Powell Car Rental Cos.*, 882 F.3d 943(10th Cir. 2018) ..................... 22

*Anderson* v. *Merrill Lynch Pierce Fenner & Smith, Inc.*, 521 F.3d 1278
    (10th Cir. 2008) ............................................................................................................ 6

*Ashcroft* v. *Iqbal*, 556 U.S. 662 (2009) ............................................................................... 6

*Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544 (2007) ........................................................ 6

*Bennett* v. *Skyline Corp.*, 52 F. Supp. 3d 796 (N.D. W. Va. 2014) .................................. 24

*Carista* v. *Valuck*, 394 P.3d 253, 2016 OK CIV APP 66 (Okla. Civ. App.
    2016) ........................................................................................................................... 18

*Case* v. *Fibreboard Corp.,* 743 P.2d 1062 (Okla. 1987)...............................................12, 20

*City of Chicago* v. *Beretta U.S.A. Corp.*, 821 N.E.2d 1099 (Ill. 2004) ........................8, 11

*City of St. Louis* v. *Benjamin Moore & Co.*, 226 S.W.3d 110 (Mo. 2007) (en
    banc)............................................................................................................................ 11

*City of Tulsa* v. *Bank of Okla., N.A.*, 280 P.3d 314, 2011 OK 83 (Okla.
    2011) ........................................................................................................................... 18

*Cresser* v. *Am. Tobacco Co.*, 662 N.Y.S.2d 374 (N.Y. Sup. Ct. 1997) ............................ 24

*CVS Pharmacy, Inc.* v. *Bostwick*, 251 Ariz. 511, 494 P.3d 572 (2021) ...............10, 15, 16

*Edwards* v. *Basel Pharms.*, 933 P.2d 298, 1997 OK 22 (Okla. 1997) ............................. 18

*Fox* v. *Oklahoma Memorial Hosp.*, 774 P.2d 459 (Okla. 1989) ....................................... 24

*Graves* v. *Mazda Motor Corp.*, 598 F. Supp. 2d 1216 (W.D. Okla. 2009) ...................... 14

*In re: National Prescription Opiate Litig. (Muscogee (Creek) Nation* v.
    *Purdue Pharma L.P.)*, 2019 WL 2468267 (N.D. Ohio Apr. 1, 2019),
    *report & recommendation adopted in part*, 2019 WL 3737023 (N.D. Ohio
    June 13, 2019) ............................................................................................................ 19

*McKee* v. *Moore,* 648 P.2d 21, 1982 OK 71 (Okla. 1982) ................................................ 18

*Myers* v. *Lashley*, 44 P.3d 553 (Okla. 2002).................................................................... 24

8026865.8

*Oklahoma ex rel. Hunter* v. *Johnson & Johnson*, 2021 WL 5191372, 2021 OK 54 (Okla. Nov. 9, 2021) ...................................................................passim

*Oklahoma* v. *McKesson Corp.*, Case No. CJ-2020-84 (Okla. Dist. Ct.) (filed Nov. 30, 2021) .................................................................................... 7

*Proctor & Gamble Co.* v. *Haugen*, 222 F.3d 1262 (10th Cir. 2000) ................................... 3

*Schovanec* v. *Archdiocese of Okla. City*, 188 P.3d 158, 2008 OK 70 (Okla. 2008) ....................................................................................................23, 24

*Sonnenreich* v. *Philip Morris Inc.*, 929 F. Supp. 416 (S.D. Fla. 1996) ........................... 24

*Steed* v. *Bain-Holloway*, 356 P.3d 62 (Okla. Civ. App. 2015) ....................................12, 13

*Tri* v. *J.T.T.*, 162 S.W.3d 552 (Tex. 2005) ......................................................... 24

*United States* v. *Sdoulam*, 398 F.3d 981 (8th Cir. 2005) ................................. 24

## Statutes

Drug Dealer Liability Act. Laws 1994, c. 179, §§ 1–15 (eff. Sept. 1, 1994) ................... 12

Okla. Stat. tit. 25, § 5 ....................................................................... 23

Okla. Stat. tit. 76, § 57.2(G)(2) ............................................................. 18

## Other Authorities

Restatement (Third) of Torts: Liab. for Econ. Harm § 1 (2020)................................... 15

Restatement (Third) of Torts: Liab. for Econ. Harm § 8 (2020)................................... 15

## Rules

Fed. R. Civ. Pro. 12(b)(6) ..................................................................... 6

Fed. R. Civ. Pro. 12(c) ....................................................................... 1

8026865.8

Pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, Defendants CVS Pharmacy, Inc., Oklahoma CVS Pharmacy, L.L.C., Walgreen Co., and Walmart Stores, Inc. move for judgment on the pleadings on all counts of the complaint filed by Plaintiff Cherokee Nation.

## Introduction

Like plaintiffs in other opioid litigation, the Cherokee Nation has litigated this case primarily under a theory of public nuisance that this Court has observed  is "novel" and "has the potential to morph into the 'tort that ate the world.'" ECF No. 288 at 14. Their theory is that Defendants contributed to an "opioid epidemic" by dispensing prescription opioids that "oversupplied" the market for prescription opioids, and consequently that Defendants should be held liable for all expenses incurred by the Nation arising from the alleged epidemic, without proof that a specific defendant's unlawful conduct caused the Nation to make a specific expenditure.

Plaintiff treats public nuisance as if it created an extreme form of market share or enterprise liability, under which participants in a type of commerce are held liable for any harms attributable to that commerce without regard to each participant's fault or role in causing the harm. But the Supreme Court of Oklahoma, in a recent landmark decision, held unequivocally that this theory fails because Oklahoma public nuisance law does not extend to "the manufacturing, marketing, and selling of prescription opioids." *Oklahoma ex rel. Hunter* v. *Johnson & Johnson* ("*Johnson & Johnson*"), 2021 WL 5191372, at *1, 2021 OK 54, ¶ 2 (Okla. Nov. 9, 2021). As the Court explained: "However grave the problem of opioid addiction is in Oklahoma, public nuisance law does not

provide a remedy for this harm." *Id.* at *3, ¶ 9. Under this decision, there is no doubt that Defendants are entitled to judgment on Plaintiff's claim for public nuisance, as the State of Oklahoma itself recently concluded when dropping its public nuisance claims against opioid distributors. *See* Notice of Voluntary Dismissal Without Prejudice, *Oklahoma* v. *McKesson Corp.*, Case No. CJ-2020-84 (Okla. Dist. Ct.) (filed Nov. 30, 2021).

The *Johnson & Johnson* decision also eliminates Plaintiff's claims of negligence, unjust enrichment, and civil conspiracy. Plaintiff has anchored its negligence and unjust enrichment claims on the same theories of indirect causation and duty that the *Johnson & Johnson* Court rejected: that a manufacturer or seller of a lawful product can be liable to non-purchasers for economic damage arising from a public health crisis in some way related to the product, rather than for the direct harm the product itself may have caused to purchasers. Allowing that theory to proceed under negligence or unjust enrichment— after it was thoroughly rejected in the context of a claim for public nuisance—would contravene the core rationale of *Johnson & Johnson*. It would also contravene settled principles of Oklahoma law rejecting any form of market share liability. Because *Johnson & Johnson* eliminates each of the Cherokee Nation's intentional tort claims, its cause of action for civil conspiracy must likewise fail. Even if the Nation's negligence claim or unjust enrichment claim somehow survives *Johnson & Johnson*, neither claim can satisfy the underlying tort requirement, which this Court previously concluded was met by only "the Nation's claim for public nuisance." ECF No. 288 at 9.

It is well established that federal courts should not expand state tort law in novel and unprecedented ways. Rather, if state law is to be expanded, it should be done by state

2

courts and legislatures. *See, e.g.*, *Proctor & Gamble Co.* v. *Haugen*, 222 F.3d 1262, 1280 (10th Cir. 2000). The Oklahoma Supreme Court has squarely rejected such expansion of public nuisance law based on reasoning equally applicable to the Nation's other claims. Against this, federalism requires that this Court reject all of the Nation's state law claims—none of which are grounded in established Oklahoma tort law. The Court should therefore enter judgment in favor of Defendants on all counts and dismiss this case.

## Background

### I.      Plaintiff's Theory of Liability.

The Cherokee Nation's case centers on Defendants' supposed contributions to the alleged opioid epidemic and the economic harms incurred by the tribe. The Nation alleges that, by "distribut[ing] or dispens[ing] far greater quantities of prescription opioids than they know could be reasonably be necessary for legitimate medical uses," Am. Compl. ¶ 259, Defendants "created the opioid epidemic," *id.*, and that "American Indians, including Cherokee Nation, have been significantly impacted by this epidemic," *id.* ¶ 10. Plaintiff's core theory is *not* that Defendants directly caused harm such as "public blight" and "social despair." *Id.* ¶ 13. Rather, Plaintiff asserts that an epidemic caused those negative effects. *See, e.g.*, *id.* ¶ 12 ("The opioid epidemic has also injured even the youngest members of Indian society."). And Defendants are liable for those effects, the theory goes, because they contributed in some measure to this amorphous epidemic.

In asserting this theory, the Cherokee Nation does not distinguish between Defendants' alleged contributions to the epidemic and those of other pharmacies, or even of other participants in the "U.S. drug distribution industry." *Id.* ¶ 7. Critically, Plaintiff

3

does not distinguish between the harm caused by legitimately prescribed opioids and illegitimately prescribed opioids. Nor does it link Defendants' dispensing of any specific medication to any specific economic expenditure or other financial harm. Indeed, establishing that necessary link would be impossible. Rather, the Cherokee Nation alleges Defendants "oversuppl[ied] the market," *id.* ¶ 337.a., and that as a result of this oversupplied market, individuals became addicted, that addiction became widespread, and in response, the Nation spent money on such things as preventative measures and treatment programs.

Plaintiff asserts that these allegations give rise to claims against Defendants for public nuisance, negligence, unjust enrichment, and civil conspiracy. Although the labels and buzzwords differ, each count is based on the same basic oversupplied market/epidemic theory:

- In Count I (public nuisance), Plaintiff alleges that oversupplying the market for lawful opioid medications has created a public nuisance in the form of an opioid epidemic. Am. Compl. ¶ 321. If a Defendant contributed at all to this epidemic, it is allegedly liable for all economic harm arising from it. *Id.* at 82, pt. a.

- In Count II (negligence), Plaintiff alleges that Defendants contributed to an "oversupplied market." *Id.* ¶ 337.a. If a Defendant has a share of this market, it is allegedly liable for all economic harm that can be traced— again not to that Defendant's conduct—but to the market itself. *Id.* at 82, pt. b.

- In Count III (unjust enrichment), Plaintiff alleges that Defendants contributed to "the prescription opioid epidemic." *Id.* ¶ 352. It refers to the various economic harms and expenditures it allegedly incurred related to this epidemic as "Defendants' externalities." *Id.* ¶ 351. If a Defendant is in the business of dispensing prescription opioids, then each Defendant is allegedly liable for all those expenditures (because the expenditures somehow "sustain Defendants' businesses"). *Id.* ¶ 350; *see also id.* at 82–83, pt. c.

4

- In Count IV (civil conspiracy), Plaintiff alleges that Defendants conspired to create a public nuisance in the form of an oversupplied market by agreeing to act negligently. *Id.* at 83, pt. d.

## II.   The Supreme Court of Oklahoma's Decision in *Johnson & Johnson*.

In June 2017, the State of Oklahoma sued three opioid manufacturers, Purdue, Teva, and Johnson & Johnson. The State alleged that "the companies deceptively marketed opioids in Oklahoma," thereby creating a public nuisance in the form of an opioid epidemic. 2021 OK 54, ¶ 6. After a bench trial, the court ordered Johnson & Johnson— the lone non-settling defendant—to pay $465 million to fund one year of the State's abatement plan. The district court entered this judgment without considering Johnson & Johnson's share of the opioid prescriptions sold. *See id.* The court appropriated money to 21 government programs for services to combat opioid abuse. *See id.*

On November 9, 2021, the Supreme Court of Oklahoma reversed the district court's judgment. *See id.* ¶ 39. It ruled that "the district court's expansion of public nuisance law went too far. Oklahoma public nuisance law does not extend to the manufacturing, marketing, and selling of prescription opioids." *Id.* ¶ 2. "This case challenges us to rethink traditional notions of liability and causation," the Court observed, before concluding that it was "unconvinced" by the State's "novel" theory of "liability for the marketing and selling of a legal product, based upon the acts not of one manufacturer, but an industry." *Id.* ¶ 38.

5

## Standard

In considering a motion for judgment on the pleadings under Rule 12(c), the court uses the same standard it uses in considering a motion to dismiss under Rule 12(b)(6). That is, the court accepts as true all factual allegations in the complaint and construes those facts in the light most favorable to Plaintiff. *Anderson* v. *Merrill Lynch Pierce Fenner & Smith, Inc.*, 521 F.3d 1278, 1284 (10th Cir. 2008). The court does not accept as true "legal conclusions," however, and "[t]hreadbare recitals of the elements of a cause of action" do not suffice. *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007)). Instead, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*, 556 U.S. 662, 678 (2009) (citation omitted). In other words, the plaintiff must nudge its "claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

## Argument

### I.    *Johnson & Johnson* Forecloses Plaintiff's Public Nuisance Claim.

This Court previously expressed "a bit of skepticism" regarding the viability of the Cherokee Nation's public nuisance claim. Order on Pharmacy Defs.' Mot. to Dismiss at 10, ECF No. 289. That skepticism was well founded. The Oklahoma Supreme Court has now confirmed that "Oklahoma public nuisance law does not extend to the manufacturing, marketing, and selling of prescription opioids." *Johnson & Johnson*, 2021 OK ¶ 2. That holding squarely forecloses the Nation's attempt to hold Defendants liable under Oklahoma public nuisance law for selling prescription opioids. Accordingly, Plaintiff's nuisance claim must be dismissed.

6

The Oklahoma Supreme Court's ruling in *Johnson & Johnson* is straightforward and dispositive.[1] It limited public nuisance liability to "defendants (1) committing crimes constituting a nuisance, or (2) causing physical injury to property or participating in an offensive activity that rendered the property uninhabitable." *Id.* ¶ 18. Thus, absent "criminal or property-based" conduct, there can be no public-nuisance liability for "the manufacturing, marketing, and selling of lawful products." *Id.* ¶ 19. The Cherokee Nation alleges neither that Defendants committed crimes constituting a nuisance, nor that they injured property. Defendants therefore cannot be held liable under public nuisance for selling lawful opioid products.

That simple test from *Johnson & Johnson* is enough to end the Cherokee Nation's nuisance claim—just as it ended the State of Oklahoma's analogous claim against opioid distributors. *See* Notice of Voluntary Dismissal Without Prejudice, *Oklahoma* v. *McKesson Corp.*, Case No. CJ-2020-84 (Okla. Dist. Ct.) (filed Nov. 30, 2021). Each reason the Oklahoma Supreme Court gave for refusing "to extend public nuisance law to envelop J&J's conduct as an opioid manufacturer" applies equally to the Nation's allegations against Defendants. *Johnson & Johnson*, 2021 OK 54, ¶ 23.

*First*, the Court reasoned that "[t]he manufacture and distribution of products rarely causes a violation of a public right." *Id.* ¶ 23. That is equally true of *dispensing* a product—indeed, the same product. The Nation's nuisance claim here, like the State of

---

[1] This Court previously recognized that the nuisances alleged here and in *Johnson & Johnson* are potentially overlapping; in denying the Pharmacy Defendants' Motion to Dismiss, the Court "acknowledge[d]" that, if the Pharmacy Defendants were to be found liable for the claimed nuisance in this case, "double recovery is a hypothetical possibility" in light of the then-existing recovery from the manufacturers. ECF No. 289 at 5.

Oklahoma's nuisance claim against manufacturers, is "more in line with a private tort action for individual injuries sustained from use of a lawful product and in providing medical treatment or preventative treatment to certain, though numerous, individuals." *Id.* ¶ 24. An accumulation of individual alleged injuries, and the costs associated with providing treatment to those individuals, does not amount to "an interference with the public right of health." *Id.* ¶ 25. Notably, the Illinois Supreme Court said just that in rejecting "public nuisance claims against manufacturers, distributors, *and dealers* of handguns" in a decision the Oklahoma Supreme Court called "instructive." *Id.* at ¶ 26 (emphasis added) (citing *City of Chicago* v. *Beretta U.S.A. Corp.*, 821 N.E.2d 1099 (Ill. 2004)).

*Second*, a pharmacy, like a manufacturer, "does not have control of its product once it is sold." 2021 WL 5191372, at *7. Like manufacturers, pharmacies cannot control how patients use prescription opioids after they receive those medications at the pharmacy counter. Nor do Defendants have any control over the many hospitals, medical professionals, and non-party pharmacies that dispense prescription opioids in and around the Cherokee Nation. *See* Am. Compl. ¶ 165 & n.32 (incorporating publicly available ARCOS data).

Similarly, Defendants here lack sufficient control over opioids to abate the alleged opioid epidemic nuisance. Opioid use and addiction will not stop if Defendants pay for Cherokee Nation programs for medical treatment and preventive programs. Plaintiff's own medical professionals continue to treat patients with prescription opioids, which are FDA- and DEA-approved medications. And Plaintiff does not and cannot seek to prevent

Defendants from dispensing medications prescribed by Oklahoma doctors. For these reasons, neither manufacturers nor pharmacies have a "common law tort duty to monitor how a consumer uses or misuses a product after it is sold." *Johnson & Johnson*, 2021 WL 5191372 at *8 ¶ 27.

*Third*, the Nation here, like the State in *Johnson & Johnson*, seeks to hold Defendants "responsible for products that entered the stream of commerce more than 20 years ago, shifting the wrong from the manufacturing, marketing, or selling of a product to its continuing presence in the marketplace." 2021 OK 54, ¶ 33. But in *Johnson & Johnson*, the Court aligned itself with a "clear national trend to limit public nuisance to land or property use," which entails "refus[ing] to allow products-based public nuisance claims." *Id.* ¶ 35. Those limits play an essential role in preventing lawful businesses' exposure to expansive and "impermissibly vague" liability:

> Without these limitations, businesses have no way to know whether they might face nuisance liability for manufacturing, marketing, or selling products, i.e., will a sugar manufacturer or the fast food industry be liable for obesity, will an alcohol manufacturer be liable for psychological harms, or will a car manufacturer be liable for health hazards from lung disease to dementia or for air pollution.

*Id.* ¶¶ 37, 39. Those limitations and their rationale apply here and foreclose the Nation's public nuisance claim; because if sugar producers, alcohol makers, and opioid manufacturers cannot be held liable in public nuisance, then neither can bakeries, liquor stores, or pharmacies. Defendants are therefore entitled to judgment on the pleadings on Count I.

## II.     Plaintiff Cannot Recast Its Flawed Nuisance Theory In Negligence.

*Johnson & Johnson* also defeats the Cherokee Nation's negligence claim for at least four reasons.

*First*, Plaintiff's theory of negligence is simply another form of the public nuisance theory rejected in *Johnson & Johnson*: that the sale of a lawful product exposes a defendant to expansive liability for governmental costs in responding to an "epidemic." The *Johnson & Johnson* Court rejected that form of liability because doing so "allows courts to manage public policy matters that should be dealt with by the legislative and executive branches." 2021 OK 54, ¶ 39. It would make no sense to permit the same expansive liability under negligence, especially given Oklahoma's longtime rejection of negligence claims based on market share liability.

*Second*, Plaintiff's claims for purely economic loss caused by alleged physical harm to tribe members are barred under the economic loss principles set forth in the Third Restatement. In *Johnson & Johnson*, the Supreme Court signaled its alignment with those principles. 2021 OK 54, ¶ 21. *Accord CVS Pharmacy, Inc.* v. *Bostwick*, 251 Ariz. 511, 494 P.3d 572, 580 (2021).

*Third*, *Johnson & Johnson* undercuts Plaintiff's theory of duty. The decision makes clear that Defendants owe no duty to the Cherokee Nation to monitor how a consumer uses or misuses a product after it is sold.

*Finally*, the Supreme Court's instruction that prescription opioid cases like this one are product liability actions, means that this case is barred by the innocent seller rule.

10

A.     **Plaintiff's Negligence Theory Fails Because It Lacks A Causative Link Between Product And Harm.**

As the *Johnson & Johnson* Court's reasoning highlights, Plaintiff's public nuisance theory is an unprecedented and extreme form of market share liability, a theory employed by plaintiffs who cannot demonstrate a causative link between the specific products supplied by the defendants and the harms they contend they sustained from the use of or exposure to those products. If Plaintiff cannot recover in public nuisance because its theory replicates the ills of market share liability, it surely cannot recover for the same theory in negligence, where market share liability has been soundly rejected by Oklahoma courts.

In *Johnson & Johnson*, the Court relied on decisions from other courts that reject theories of market share liability. 2021 OK 54, ¶ 25. These include *City of St. Louis* v. *Benjamin Moore & Co.*, 226 S.W.3d 110, 116 (Mo. 2007) (en banc) and *City of Chicago* v. *Beretta U.S.A. Corp.*, 821 N.E.2d 1099 (Ill. 2004). *Benjamin Moore* is particularly instructive. In that case, the City of St. Louis created a program to abate lead paint from homes. To fund that program, the City sued lead paint manufacturers. Because the City could not link specific manufacturers' products to the lead paint found in specific homes, the City proceeded on a market share theory of liability. "Under a market-share approach to liability, the plaintiff must join enough defendants to constitute a substantial share of the market and then the burden shifts to each defendant to exonerate itself or join the responsible parties not named by plaintiffs." 226 S.W.3d at 115. The Supreme Court of Missouri declined to adopt this method to the harms caused by exposure to lead paint. The Court determined that the theory "risks exposing these

11

defendants to liability greater than their responsibility and may allow the actual wrongdoer to escape liability entirely." *Id.* at 116.

Oklahoma, like Missouri, has rejected market share liability. *Case* v. *Fibreboard Corp.*, 743 P.2d 1062, 1067 (Okla. 1987). In *Case*, the plaintiffs alleged they were injured by asbestos-containing products. But they could not tie any of the named defendants to any specific product. Among other problems, the Court rejected market share liability because balancing the contributions of each manufacturer to the asbestos market would be incalculably difficult. *Id.* at 1066–67.

The Court of Civil Appeals of Oklahoma later applied *Case* to a liability theory that is precisely the same as Plaintiff's theory here. In 1994, the Oklahoma Legislature adopted the Drug Dealer Liability Act. Laws 1994, c. 179, §§ 1–15 (eff. Sept. 1, 1994). The Act allowed for civil claims against participants in the illegal drug market by those persons who suffered personal or economic harm from that market. The Court struck down the Act as unconstitutional. *Steed* v. *Bain-Holloway*, 356 P.3d 62, 66, 2015 OK CIV APP 68, ¶ 13 (Okla. Civ. App. 2015).

In *Steed*, children harmed by their mother's use of marijuana sued for damages from participants in the illegal market for marijuana, including loss of "economic and educational potential." *Id.* ¶ 3. Under the Act, the plaintiffs were not required to connect the defendants' sale of particular drugs to their alleged harm. Rather, the Act "eliminate[d] the traditional element of causation and replace[d] it with a requirement that a plaintiff show that a defendant marketed the same drug, within the same time period, and within the same geographic target community as that used by the individual

12

user." *Id.* ¶ 13. Plaintiffs argued that causation was satisfied because liability under the Act was "based upon a rational relationship between an illegal drug participant and the individual user of an illegal drug." *Id.* ¶ 14.

The *Steed* Court disagreed. The Court concluded that the Drug Dealer Liability Act violated due process because the Act failed to require a "causative link" between the defendant's conduct and the plaintiff's harm. Simply showing a correlation of time, place, and drug-type between the illegal drug market participant and the illegal drug user was not enough.

In the wake of the Supreme Court's decision in *Johnson & Johnson*, the Cherokee Nation's allegations of generalized harm from a *legal* market for prescription opioids are even further at odds with Oklahoma law. Using ARCOS data, Plaintiff alleges that Defendants oversupplied the lawful market for prescription opioids between 2006 and 2014. Am. Compl. ¶ 14. But Plaintiff does not allege that Defendants constitute all or even half of the relevant lawful market. That alone should be fatal—it means that even if the alleged "epidemic" were *solely* attributable to the sale of prescription opioids by pharmacies, it would not be more likely than not that any harm was caused by Defendants rather than sales by other non-party actors.

Plaintiff acknowledges the presence of other market participants. *Id.* ¶ 165 & n.32. Among them are former defendants McKesson, Cardinal, and ABDC. *Id.* ¶ 158. The data in the amended complaint make clear that Defendants do not account for even a substantial portion of the market. *Id.* ¶ 33. Indeed, CVS is alleged to have distributed just 8.5 million dosage units during this time frame, while Cardinal distributed nearly

8026865.8

eight times that amount (62 million); ABDC, nearly 16 times that amount (94 million); and McKesson 19 times that amount (152 million). *Id.* Yet without alleging or having the ability to prove that any particular dosage unit distributed by a given Defendant can be traced to any particular harm, Plaintiff seeks to hold CVS and the other two Defendants liable for amorphous harms such as "household dysfunction," *id.* ¶ 49, "a diminished pool of available resources [for] . . . cultural preservation," *id.* ¶ 50, and lost productivity and tax revenue, *id.* ¶ 252. Worse yet, the Cherokee Nation's liability theory is even further attenuated than theories previously rejected by Oklahoma courts. That is because Cherokee Nation citizens make up only some of the population in the relevant market. *Id.* ¶ 35.

Because *Johnson & Johnson* rejected Plaintiff's theory of aggregate harm under a claim for nuisance, that theory cannot proceed under the exacting causation standards for negligence—which require tying a defendant's specific conduct to the plaintiff's specific harm. *Case*, 743 P.2d at 1067. Defendants are entitled to judgment on the pleadings on Plaintiff's negligence count.[2]

---

[2] If Plaintiff were to attempt to prove a causative link between its harm and prescriptions filled in Kansas, Arkansas, and Missouri, the Court would need to undertake individual choice-of-law analyses to determine whether the laws of those States should apply. *See, e.g.*, *Graves* v. *Mazda Motor Corp.*, 598 F. Supp. 2d 1216, 1217 (W.D. Okla. 2009) (applying the law of Mississippi to a derivative, loss-of-consortium claim by an Oklahoma resident for injuries his wife sustained from an accident in Mississippi).

8026865.8

**B.      Plaintiff's Negligence Claim Also Fails Under The Economic Loss Principles of the Third Restatement.**

In *Johnson & Johnson*, the Supreme Court relied in part on Restatement (Third) of Torts: Liab. for Econ. Harm § 8 cmt. g (2020); *see* 2021 OK 54, ¶ 21. As that section explains, most courts have rejected public nuisance liability against product manufacturers as an "inapt vehicle for addressing the conduct at issue." Section 8 is part of Chapter One of the Third Restatement, which pertains to the unintentional infliction of economic loss. Sections One and Seven of the Restatement are part of the same chapter and apply the same principle to claims of negligence. The rules set forth in these sections make clear that Plaintiff cannot recover for economic losses under a negligence theory when it is precluded from recovering for those same losses under a nuisance theory.

Section One provides that "[a]n actor has no general duty to avoid the unintentional infliction of economic loss on another." Restatement (Third) of Torts: Liab. for Econ. Harm § 1 (2020). "Economic loss" is defined as "pecuniary damage not arising from injury to the plaintiff's person or from physical harm to the plaintiff's property." *Id.* § 2. Section Seven provides that "a claimant cannot recover for economic loss caused by . . . unintentional injury to another person." *Id.* § 7.

In similar opioid litigation, the Supreme Court of Arizona recently recognized that, outside of certain professional and business relationships, parties have no duty to avoid economic harm to third parties. *CVS Pharmacy, Inc.* v. *Bostwick*, 494 P.3d at 580. In *CVS Pharmacy*, a hospital brought a negligence action against CVS to recover the costs of uncompensated care it provided to opioid-addicted patients. In an interlocutory appeal, the Supreme Court of Arizona held that "a pharmacy that self-distributes

15

prescription opioids to its affiliated pharmacies owes [no] duty to a hospital that incurs costs to treat opioid-addicted patients." *Id.* at 574. Among other reasons, the Court explained that with the limited exceptions mentioned, it was not aware of any cases "allowing a negligence claim against a third party for purely economic loss." *Id.* at 580.

Because Oklahoma has signaled its alignment with the rules concerning economic loss laid out in the Third Restatement, Count II fails to state a claim and Defendants are entitled to judgment on the pleadings.

### C.  *Johnson & Johnson* Defeats Plaintiff's Theory of Duty.

*Johnson & Johnson* also undercuts the very premise of the Plaintiff's negligence theory: that Defendants owed a duty to Plaintiff because oversupplying the market could foreseeably harm the Nation. Before *Johnson & Johnson*, this Court accepted that theory of duty, concluding that "the Nation has adequately alleged facts demonstrating [Pharmacies] owed it a duty because it was foreseeable that negligently failing to prevent the diversion of addictive opioids, including allegedly 'oversupplying the market' with such opioids, would lead to abuse, addiction, and overdoses, and that Nation would pay the price." ECF No. 288 at 16. But the Oklahoma Supreme Court has now made clear that no such duty exists under Oklahoma law. Rather, *Johnson & Johnson* held that "[t]here is no common law tort duty to monitor how a consumer uses or misuses a product after it is sold" when a seller lacks control over the product after that point. 2021 OK 54, ¶ 27. Under *Johnson & Johnson*, therefore, Defendants did not owe a duty to protect Plaintiff from economic harm it might suffer from Defendants' sales of medications.

As noted, the Supreme Court of Arizona recently recognized that pharmacies have no duty to avoid economic harm to third parties. *CVS Pharmacy, Inc.*, 494 P.3d at 580. In

16

8026865.8

*CVS Pharmacy, Inc.*, the Supreme Court of Arizona held that "a pharmacy that self-distributes prescription opioids to its affiliated pharmacies owes [no] duty to a hospital that incurs costs to treat opioid-addicted patients." *Id.* at 574.

Under *Johnson & Johnson*, the same conclusion follows here: Defendants owed no duty to a tribe that incurred costs to address the consequences of the opioid epidemic. For this additional reason, Defendants are thus entitled to judgment on the pleadings on Plaintiff's negligence count.

### D.   *Johnson & Johnson* Makes Clear This Is a Product Liability Action, Which Is Barred By the Innocent Seller Rule.

*Johnson & Johnson* defeats Plaintiff's negligence claim for still another reason. The Oklahoma Supreme Court made clear that recovery for damage caused by the manufacture or sale of lawful products is the province of products liability law as described in the Third Restatement of Torts. *See* 2021 OK 54, ¶ 21. Yet product liability rules under Oklahoma law bar this action.

This Court previously denied Defendants' innocent-seller defense under Oklahoma law on the Court's view that Oklahoma's innocent-seller provision "applies only to products liability actions premised on defective products," while "[t]his is not a products liability claim premised on a defective product." ECF No. 288 at 15. But, in *Johnson & Johnson*, the Oklahoma Supreme Court has now made clear that a claim that a defendant negligently marketed and sold opioid medications "sounds in product-related liability." 2021 OK 54, ¶ 20. And there is no basis in the innocent-seller statute for treating harm caused by a failure to prevent the *misuse* of a product any differently from harm caused by a *defective* product. After all, the statute imposes liability on a seller

17

who was careless "in assembling, inspecting, or maintaining" a product *and* a seller who was careless "in passing on warnings or instructions from such product's manufacturer about the dangers and proper use of such product." Okla. Stat. tit. 76, § 57.2(G)(2)(b). As a result, Oklahoma's innocent-seller provision is in fact applicable and bars Plaintiff's negligence claim.

For each of these reasons, the Cherokee Nation's negligence claim must be dismissed.[3]

## III.   *Johnson & Johnson* Defeats Plaintiff's Analogous Unjust Enrichment Claim.

The *Johnson & Johnson* decision also defeats Plaintiff's claim of unjust enrichment. That claim requires proof of "enrichment to another, coupled with a resulting injustice." *City of Tulsa* v. *Bank of Okla., N.A.*, 280 P.3d 314, 319, 2011 OK 83, ¶ 19 (Okla. 2011). The Cherokee Nation alleges that it indirectly conferred a benefit on the Pharmacy

---

[3] If this case is to proceed on an alternative theory of negligence liability, Plaintiff must satisfy the strict standard for pharmacy-liability under Oklahoma's "'learned intermediary doctrine,' which Oklahoma has recognized as applicable in prescription drug cases." *Edwards* v. *Basel Pharms.*, 933 P.2d 298, 300, 1997 OK 22 (Okla. 1997) (citing *McKee* v. *Moore*, 648 P.2d 21, 24, 1982 OK 71 (Okla. 1982)). Under the learned intermediary doctrine, "the determination of whether a particular medication is medically necessary for a patient lies with the treating physician or other appropriate individual." *Carista* v. *Valuck*, 394 P.3d 253, 257, 2016 OK CIV APP 66, ¶ 7 (Okla. Civ. App. 2016) (citation omitted). A pharmacy can be held liable for personal injuries suffered by a patient only if an exception to the doctrine applies. These include:

1. If the prescription is "unreasonable on its face," e.g., it prescribes facially bizarre quantities or dosages clearly outside of any acceptable range, or clearly inappropriate drugs; and

2. If the prescribed drug is clearly contraindicated, and the pharmacist has sufficient knowledge of the patient's condition and history to know this.

*Carista*, 2016 OK CIV APP 66, ¶ 6. Accordingly, if this case proceeds, the Court should make clear that the immunity provided by the learned intermediary doctrine applies.

8026865.8

Defendants by spending money to address "negative externalities" from the Defendants' sale of lawful prescription opioids. *See* Am. Compl. ¶¶ 348–53. These externalities are the negative effects prescription opioids have on persons other than purchasers or users—e.g., increased costs of health care or law enforcement incurred by Plaintiff in addressing the opioid epidemic.

### A. *Johnson & Johnson* Undercuts Plaintiff's "Negative Externalities" Theory.

Plaintiff's negative externalities theory is materially indistinguishable from the public nuisance theory rejected by *Johnson & Johnson*, and that decision makes clear that this Court can no longer predict that Oklahoma would recognize a negative externalities form of unjust enrichment in this context. Defendants previously moved to dismiss the Nation's unjust enrichment claim on the ground that Oklahoma had never recognized a negative externalities theory. This Court denied the motion based largely on the MDL Court's decision in *In re: National Prescription Opiate Litig. (Muscogee (Creek) Nation* v. *Purdue Pharma L.P.)*, 2019 WL 2468267 (N.D. Ohio Apr. 1, 2019), *report & recommendation adopted in part*, 2019 WL 3737023 (N.D. Ohio June 13, 2019). *See* ECF No. 289 at 16–18. In that case, the magistrate and district judges in the Northern District of Ohio acknowledged that Oklahoma had not recognized the negative externalities theory. But they concluded that the "applicable principles of Oklahoma . . . law permit a broad view of unjust enrichment liability to vindicate a wide variety of equitable principles." 2019 WL 3737023, at *8. These are the same two MDL decisions that wrongly predicted Oklahoma also would recognize a claim for public

nuisance against prescription opioid manufacturers, distributors, and pharmacies—a decision emphatically rejected in *Johnson & Johnson*.

After *Johnson & Johnson*, Plaintiff's negative externalities theory cannot support a claim for unjust enrichment. As explained above, a key feature of public nuisance—and the reason why plaintiffs in many prescription-opioid cases have focused on that theory— is the ostensible opportunity to establish liability without showing direct causation between the harm alleged and the individual defendants' wrongful conduct. Some courts have concluded (wrongly in Defendants' view) that plaintiffs need only prove that each defendant's conduct was a substantial factor contributing to an "opioid epidemic," and each contributing defendant can then be held responsible for the costs to abate the epidemic or the damages caused by it. By contrast, in a products-liability case, the plaintiff must prove that a particular defendant's defective product or failure to warn caused damage to that plaintiff. *See Case*, 743 P.2d at 1067.

In *Johnson & Johnson*, the Court made clear that recovery for damage caused by the manufacture or sale of lawful products is the province of products liability law, not public nuisance. *See* 2021 OK 54, ¶ 21. The Court was concerned that a claim for public nuisance against prescription-opioid defendants would allow expansive liability against manufacturers and distributors of lawful products by untethering the alleged harm from the wrongful conduct of particular defendants. As the Court explained:

> This case challenges us to rethink traditional notions of liability and causation . . . . The State presented us with a novel theory-public nuisance liability for the marketing and selling of a legal product, based upon the acts not of one manufacturer, but an industry. However, we are unconvinced

8026865.8

that such actions amount to a public nuisance under Oklahoma law.

¶39 The Court has allowed public nuisance claims to address discrete, localized problems, not policy problems. Erasing the traditional limits on nuisance liability leaves Oklahoma's nuisance statute impermissibly vague. The district court's expansion of public nuisance law allows courts to manage public policy matters that should be dealt with by the legislative and executive branches; the branches that are more capable than courts to balance the competing interests at play in societal problems. Further, the district court stepping into the shoes of the Legislature by creating and funding government programs designed to address social and health issues goes too far. This Court defers the policy-making to the legislative and executive branches and rejects the unprecedented expansion of public nuisance law.

*Id.* ¶¶ 38–39; *see also id.* ¶ 31 ("To expand public nuisance to cover a manufacturer's production and sale of a product would cause the manufacturer to be responsible for products it did not produce. We refuse to expand Oklahoma's nuisance law so greatly.").

This rationale applies equally to Plaintiff's theory that justice requires individual pharmacies to pay for the costs the Nation expended in mitigating the "societal harms" of the epidemic. This theory, like public nuisance, improperly exposes the makers and sellers of a *lawful* product to expansive liability even though they lack sufficient control of the product to be considered responsible for its misuse. And like the public nuisance theory in *Johnson & Johnson*, it would allow recovery from all defendants whose conduct contributed to an opioid epidemic, without proof that a specific defendant wrongfully distributed or dispensed a particular prescription opioid that actually caused a particular "externality" that Plaintiff spent money to address. In other words, if Plaintiff's theory is correct, then a sugar manufacturer *will* "be liable for obesity," an

21

alcohol manufacturer "for psychological harms," and a car manufacturer "for air pollution"—with all of the fatal flaws that the Oklahoma Supreme Court found in such liability—just under the name of "unjust enrichment" rather than "public nuisance. Plaintiff should not be permitted to circumvent the Oklahoma Supreme Court's clear rejection of liability in such circumstances through artful pleading.

### B.    *Johnson & Johnson* Undercuts Plaintiff's Theory of Injustice.

The *Johnson & Johnson* decision also establishes that Defendants' alleged "enrichment" was not an "injustice." The Court held that a private defendant could not be held liable for costs the State incurred in addressing the opioid epidemic based on the defendant's conduct in manufacturing, distributing, and selling opioid medications. That theory of liability was too attenuated, too vague, and too expansive to support liability through the judiciary. *See* 2021 OK 54, ¶¶ 31, 38–39. It is unthinkable that the Oklahoma Supreme Court would emphatically reject such expansive tort liability under a theory of public nuisance only to allow it under a vague theory of unjust enrichment. Permitting this case to proceed on this theory is also at odds with the principle that a federal court applying state law should, when making an *Erie* assessment about the scope of state law, err toward constraining, rather than expanding, liability. Because it is not a federal court's place to expand state law, *see Amparan* v. *Lake Powell Car Rental Cos.*, 882 F.3d 943, 948 (10th Cir. 2018), the Court should enter judgment on the pleadings for Defendants with respect to Count III of the Complaint.

8026865.8

## IV. *Johnson & Johnson* Deprives Plaintiff's Civil Conspiracy Claim of An Underlying Tort.

Finally, the Nation's civil conspiracy claim cannot survive *Johnson & Johnson*. Civil conspiracy requires "the existence of an underlying tort or wrongful act." ECF No. 289 at 18 (quoting *Allen* v. *IM Sols., LLC*, 94 F. Supp. 3d 1216, 1233 (E.D. Okla. 2015)). The Court previously allowed Plaintiff's civil conspiracy theory to proceed because "the Nation's claim for public nuisance satisfie[d] the underlying tort requirement." *Id.* at 19. But as explained above, *Johnson & Johnson* has now fatally undercut that claim. *See supra* Part I. And as explained above, *Johnson & Johnson* has also eliminated Plaintiff's negligence and unjust enrichment claims, so Plaintiff cannot swap them into public nuisance's place. Because Plaintiff cannot proceed on any underlying tort, it cannot proceed on civil conspiracy to commit a tort either.

Even if Plaintiff's negligence or unjust enrichment claims somehow survive *Johnson & Johnson*, its civil conspiracy theory must still fail. The tort underlying civil conspiracy must be *intentional*, because "[c]ivil conspiracy is an intentional tort." *Schovanec* v. *Archdiocese of Okla. City*, 188 P.3d 158, 175, 2008 OK 70, ¶ 46 (Okla. 2008). Plaintiff has never argued that unjust enrichment can satisfy this aspect of civil conspiracy. And though it has argued that gross negligence may do so, *see* Pl. Opp'n to Mot. to Dismiss at 54–55, ECF No. 159, Plaintiff is wrong. Under Oklahoma law, gross negligence "differs from standard negligence *only* in degree." ECF No. 288 at 17 (emphasis in original); *accord* Okla. Stat. tit. 25, § 5 (2020) ("There are three degrees of negligence, namely, slight, ordinary and gross."). And courts have repeatedly explained that parties cannot "conspire to commit a negligent or unintentional act." *United States* v. *Sdoulam*, 398

23

F.3d 981, 987 (8th Cir. 2005); *see also, e.g.*, *Bennett* v. *Skyline Corp.*, 52 F. Supp. 3d 796, 815 (N.D.W. Va. 2014) (noting the "distinction between negligence and an intentional tort for purposes of a civil conspiracy action"); *Cresser* v. *Am. Tobacco Co.*, 662 N.Y.S.2d 374, 378 (N.Y. Sup. Ct. 1997) (holding that for civil conspiracy, "the underlying tort must be an intentional one since there can hardly be an agreement to commit a negligent act"); *Sonnenreich* v. *Philip Morris Inc.*, 929 F. Supp. 416, 419 (S.D. Fla. 1996) ("Logic and case law dictate that a conspiracy to commit negligence is a non sequitur.").

To be sure, gross negligence in a particular case can include an "intentional failure to perform a manifest duty in reckless disregard of the consequences." *Fox* v. *Okla. Mem'l Hosp.*, 774 P.2d 459, 461, 1989 OK 38 (Okla. 1989). But that is not enough. As this Court has explained, Oklahoma law "does not limit claims of gross negligence to those that allege an intentional failure to perform a manifest duty." ECF No. 288 at 17. Because gross negligence is thus "characterized as reckless indifference to the consequences" that "falls short of an intentional wrong's equivalent," *Myers* v. *Lashley*, 44 P.3d 553, 563, 2002 OK 14, ¶ 22 (Okla. 2002), it cannot support a claim of civil conspiracy. In fact, the Texas Supreme Court—whose explanations of civil conspiracy the Oklahoma Supreme Court has endorsed, *see Schovanec*, 2008 OK 70, ¶ 46—has held exactly that. "[T]here cannot be a civil conspiracy to be negligent," even where "conduct amounted to . . . perhaps gross negligence." *Tri* v. *J.T.T.*, 162 S.W.3d 552, 557 (Tex. 2005). Because there is no underlying tort—let alone an intentional one—supporting the Cherokee Nation's allegations of conspiracy, Defendants are entitled to judgment on the pleadings with respect to Count IV.

8026865.8

## Conclusion

For these reasons, Defendants are entitled to judgment as a matter of law on all of Plaintiff's causes of action.

Date: December 13, 2021

Respectfully submitted,

*/s/ G. Calvin Sharpe*
G. Calvin Sharpe
OBA No. 11702
Amy D. White
OBA No. 19255
PHILLIPS MURRAH P.C.
Corporate Tower, 13th Floor
101 North Robinson Avenue
Oklahoma City, Oklahoma 73102
(405) 235-4100
(405) 235-4133 (fax)
gcsharpe@phillipsmurrah.com
adwhite@phillipsmurrah.com

Eric R. Delinsky
(admitted *pro hac vice*)
Alexandra W. Miller
(admitted *pro hac vice*)
Paul B. Hynes, Jr.
(admitted *pro hac vice*)
Margarita K. O'Donnell
(admitted *pro hac vice*)
ZUCKERMAN SPAEDER LLP
1800 M Street, NW, Suite 1000
Washington, D.C. 20036
(202) 778-1800
(202) 822-8106 (fax)
edelinsky@zuckerman.com
smiller@zuckerman.com
phynes@zuckerman.com
modonnell@zuckerman.com

Conor B. O'Croinin
(admitted *pro hac vice*)
William J. Murphy

*/s/ Larry D. Ottaway*
Larry D. Ottaway
OBA No. 6816
Amy Sherry Fischer
OBA No. 16651
FOLIART HUFF OTTAWAY &
   BOTTOM
201 Robert S Kerr Avenue, 12th Floor
Oklahoma City, Oklahoma 73102
(405) 232-4633
(405) 232-3462 (fax)
larryottaway@oklahomacounsel.com
amyfischer@oklahomacounsel.com

Laura Jane Durfee
Andrew Junker
JONES DAY
2727 North Harwood Street
Dallas, Texas 75201
(214) 969-5150
ldurfee@jonesday.com
ajunker@jonesday.com

Jason Varnado
JONES DAY
717 Texas, Suite 3300
Houston, Texas 77002
(832) 239-3939
(832) 239-3600 (fax)
jvarnado@jonesday.com

**Counsel for Defendant Walmart Inc.**

*/s/ Steven E. Holden*
Steven E. Holden
OBA No. 4289
HOLDEN LITIGATION, HOLDEN P.C.

25

8026865.8

(admitted *pro hac vice*)
J. Michael Pardoe
(admitted *pro hac vice*)
ZUCKERMAN SPAEDER LLP
100 East Pratt Street, Suite 2440
Baltimore, Maryland 21202-1031
(410) 332-0444
(410) 659-0436 (fax)
cocroinin@zuckerman.com
wmurphy@zuckerman.com
mpardoe@zuckerman.com

**Counsel for Defendants
CVS Pharmacy, Inc., and
Oklahoma CVS Pharmacy,
L.L.C.**

15 East 5th Street, Suite 3900
Tulsa, Oklahoma 74103
Telephone:  (918) 295-8888
Facsimile:  (918) 295-8889
steveholden@holdenlitigation.com

*/s/ Robert B. Tannenbaum*
Steven E. Derringer
(admitted *pro hac vice*)
Robert B. Tannenbaum
(admitted *pro hac vice*)
BARLIT BECK LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois 60654
Telephone:  (312) 494-4400
Facsimile:  (312) 494-4440
steven.derringer@bartlitbeck.com
robert.tannenbaum@bartlitbeck.com

**Counsel for Defendant Walgreen Co.**

8026865.8